# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL C. SKAKEL | : | CASE NO. 3:07 CV 1625 (PCD) |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| PETER J. MURPHY, | : | |
| Respondent. | : | OCTOBER 27, 2008 |

## PETITIONER'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure, the Petitioner, Michael C. Skakel, files this statement of undisputed material facts in support of his motion for summary judgment.

**Statute of Limitations Issue**

1. On June 20, 2000, Michael Skakel filed a Motion to Dismiss in the trial court claiming that the prosecution was time-barred under Conn. Gen. Stat. § 54-193.

2. The trial court denied this motion by Memorandum of Decision dated December 11, 2001.

3. The trial court concluded that Mr. Skakel's prosecution was not subject to the statute of limitations set forth in Conn. Gen. Stat. § 54-193 (Rev. to 1975) because murder was historically considered a grave offense to which the statute of limitations was never intended to apply.

4. The trial court did not hold that the amendment to the statute of limitations enacted in 1976 should be applied retroactively to Mr. Skakel's prosecution.

5. In deciding Mr. Skakel's case, the Connecticut Supreme Court overruled two of its prior decisions, State v. Paradise, 189 Conn. 346 (1983) and State v. Crowell, 228 Conn. 393 (1994).

6. The Connecticut Supreme Court applied that 1976 amendment to the statute of limitations retroactively to Mr. Skakel.

7. After the Connecticut Supreme Court issued its decision, Mr. Skakel filed a Motion for Reconsideration, To Reargue And For Reconsideration And Reargument En Banc dated February 14, 2006.

8. In that Motion for Reconsideration, Mr. Skakel claimed that the Connecticut Supreme Court's decision violated the Ex Post Facto Clause and the Due Process Clause of the United States Constitution.

**Brady Issue**

9. During pre-trial discovery, Mr. Skakel filed two motions for discovery an inspection seeking, inter alia, exculpatory evidence, evidence that someone other than Mr. Skakel was involved in the murder or near the scene, and sketches or composite drawings.

10. The State did not object to these requests.

11. The trial court ordered compliance with all requests not objected to.

12. The State thereafter filed a "Notice of Service: State's Disclosure" advising the trial court and Mr. Skakel that it had delivered its discovery responses to counsel for Mr. Skakel.

13. The State later told the trial court that it had provided an "open file" and permitted the inspection of 1,806 pages of police reports.

14. The State did not produce any sketch and no sketches were included in the open file that the State made available for inspection.

15. The State provided a copy of the sketch for the first time on August 21, 2002.

16. Mr. Skakel then filed an amended motion for a new trial on August 26, 2002.

17. The trial court denied Mr. Skakel's motion and refused to hold an evidentiary hearing.

18. The trial court ruled that (a) the State did not suppress the sketch under Brady because Mr. Skakel was on notice that the sketch existed based on the police reports that were provided to the defense; (b) that Mr. Skakel's discovery motion only sought the right to "inspect" items; (c) that the sketch was not material under Brady because it was inadmissible unless and until the security guard testified; and (d) the amended motion for new trial was not timely, despite having been filed five days after disclosure of the sketch.

19. The Connecticut Supreme Court held that the sketch was not suppressed under Brady because two investigative reports made available by the State among the 1,806 pages of discovery documents referenced the sketch, and Mr. Skakel and his counsel had actual notice of the existence of the sketch.

20. Eight years prior to Mr. Skakel's arrest, the lead investigator prepared two "profile reports" – one for Kenneth Littleton and one for Thomas Skakel – that contained evidence pointing to each as the possible killer of Martha Moxley.

21. The State never disclosed either of the profile reports.

22. Mr. Skakel filed a motion for a new trial pursuant to Connecticut Practice Book § 42-53 within five days of the jury's verdict.

23. The motion sought a new trial on the ground, inter alia, that the State made belated disclosures of Thomas Skakel's arrest warrant affidavit and videotaped police interviews of Kenneth Littleton in violation of Brady.

24. New counsel appeared on behalf of Mr. Skakel prior to sentencing.

25. New counsel filed an amended motion for new trial, which included the additional claims relating to the suppression of the sketch as well as the State's failure to disclose the profile reports.

26. At oral argument on the amended motion for new trial, the trial court reviewed the profiles in camera, marked them under seal as a State's exhibit, and denied the amended motion for new trial and request for evidentiary hearing.

27. The trial court ruled that the profiles were protected from disclosure under the work-product doctrine because they contained the mental impressions of the author, former Inspector Solomon.

28. The trial court also ruled that as to the new issues raised in the amended motion for new trial that had not been raised in the original motion for new trial, no cause was shown as to why these arguments could not have been raised in the original motion.

29. The trial court stated that these facts, coupled with the trial court's estimation that the claims lacked merit in general, persuaded the court that the interests of justice would not be served by permitting the late filing of the new arguments.

30. The Connecticut Supreme Court, rather than address the merits of the claim, simply ruled that the trial court acted within its discretion in rejecting the <u>Brady</u> claim as time-barred.

**Juvenile Court Issue**

31. At the time of his arrest, Mr. Skakel was 39 years old.

32. He was 15 years old at the time of the offense.

33. Because he was a juvenile at the time of the murder, Mr. Skakel was charged as a delinquent in the juvenile matters division of the trial court.

34. Pursuant to Conn. Gen. Stat. § 17-60a (Rev. to 1975), the State requested that Mr. Skakel's case be transferred to the regular criminal docket.

35. On June 20, 21 and 28, 2000, the juvenile court held a probable cause hearing limited to the issues of establishing Mr. Skakel's age and whether there was probable cause to believe he committed the crime.

36. The juvenile court issued its decision on August 17, 2000 and concluded that probable cause existed.

37. The court also ordered an investigation by the probation office pursuant to Conn. Gen. Stat. § 17-66 (Rev. to 1975).

38. Joseph Paquin, supervisor of Juvenile Probation Services in the Judicial District of Stamford/Norwalk, prepared a three-page report, which the juvenile court in turn provided to counsel.

39. On October 20, 2000, the juvenile court held another hearing pursuant to Conn. Gen. Stat. § 17-60a at which evidence was presented regarding the second, third and fourth factors set forth in that statute – the availability of institutions for the care and treatment of the "child," the safety of the community, and whether the facilities of the adult criminal division of the superior court provided a more effective setting for disposition of the case.

40. Evidence was also presented regarding the probation department's investigation and report pursuant to Conn. Gen. Stat. § 17-66.

41. The State offered no evidence at the hearing.

42. The defense called Mr. Paquin to testify regarding his report.

43. Mr. Paquin admitted that he had never done a report of this nature before, and stated that he focused principally on the question of what state facilities might be available for Mr. Skakel, if he were found to have committed the act charged.

44. Mr. Paquin acknowledged that Mr. Skakel had no prior or subsequent criminal record.

45. Mr. Paquin had checked only with the Long Lane School, and had not investigated whether a suitable facility was available out of state for Mr. Skakel.

46. Mr. Paquin stated that he had, in the past, placed others, including children, in facilities outside the state, depending on their needs.

47. When asked whether there was any facility where Mr. Skakel could get adequate treatment, Mr. Paquin admitted that he did not know what Mr. Skakel's psychological or psychiatric needs were because there had been no such examination of him.

48. The defense also presented testimony from Clinton Roberts, a private sentencing consultant and a ten-year veteran state probation officer who had prepared numerous alternative sentencing proposals.

49. Mr. Roberts testified that there was at least one facility within the state that, on the same site, accommodated both youths and adults.

50. This facility was principally involved in the treatment of substance abuse problems.

51. Mr. Roberts also testified that in general, in the juvenile system, if there were a unique situation that programs or institutions within Connecticut could not meet, facilities outside the state would be an alternative.

52. Finally, the defense called Bernadette Coomaraswamy, a state magistrate and lawyer, to testify.

53. Ms. Coomaraswamy explained that during that period of time, the focus of the juvenile system was on treatment and rehabilitation, rather than punishment.

54. Ms. Coomaraswamy also testified that she participated in the placement of individuals with special needs in out of state facilities.

55. Ms. Coomaraswamy was a neighbor of both the Moxleys and the Skakels in 1975 and had known Mr. Skakel since age 12.

56. Ms. Coomaraswamy opined that even if Mr. Skakel were responsible for the acts charged – which she did not personally believe – she would not view him as a danger to the community.

57. The juvenile court issued its ruling on January 31, 2001, finding that there was "no available or suitable state institution designed for the case and treatment of children to which the Juvenile Court could commit, the now forty year old, respondent that would be suitable for his care and treatment, should he be adjudicated delinquent for the murder of the victim."

58. The court further found that "the facilities of the adult criminal division of the Superior Court afford and provide a more effective setting for the disposition" of the case, and "the institutions to which the adult criminal division of the Superior Court may sentence a defendant are more suitable for the care and treatment" of Mr. Skakel, should he be found guilty.

59. Accordingly, the juvenile court ordered that the case be transferred to the regular criminal docket.

60. The Connecticut Supreme Court's determination of the juvenile transfer issue was based on an administrative regulation promulgated by the Connecticut Department of Children and Families (DCF) in 1994, Regs. Conn. State Agencies § 17a-145-48.

61. The Connecticut Supreme Court interpreted the regulation to mean that anyone over the age of eighteen is not considered a "child," and thus is not within the jurisdiction of the DCF.

62. The Connecticut Supreme Court concluded that (a) even though the mandatory investigation under Conn. Gen. Stat. § 17-66 (Rev. to 1975) was not completely performed in this case, it was of no consequence because the DCF regulation required Mr. Skakel to be transferred to the adult docket simply because of his age; (b) the juvenile court properly relied on this 1994 regulation at the time of the transfer hearing even though it was not in place in 1975 because the transfer statute

required the juvenile court to look at current options for placement rather than options that may have existed in 1975; thus, because Mr. Skakel was over eighteen, there were no current options available to him for placement at the time of transfer; and (c) the juvenile court was not required to consider out of state placement for Mr. Skakel because the court could only consider placement for those persons committed, admitted or transferred to the DCF; because Mr. Skakel was over eighteen, DCF had no jurisdiction over him and could not place him anywhere, including out of state facilities.

**Prosecutorial Misconduct Issue**

63. The Connecticut Supreme Court disagreed with Mr. Skakel's argument that the prosecutor misrepresented the chronology of events.

64. The Connecticut Supreme Court ruled that the state's attorney did not misrepresent the chronology of events to make it appear that Mr. Skakel was telling the masturbation story only after Henry Lee became involved in the investigation.

65. The Connecticut Supreme Court did find, however, that the prosecutor's comments about DNA evidence being the "real deal" in criminal investigations were improper.

66. Notwithstanding this finding, the Connecticut Supreme Court determined that Mr. Skakel's due process rights were not violated as a result of this statement.

67. The court decided that Mr. Skakel's counsel's failure to object to the comments at trial indicates that he did not believe that it was unfair in view of the record of the case at the time.

68. The court also found that even if the state's attorney's characterization of the state of DNA evidence in the 1990's was overblown, that characterization did not represent the kind of "gross or flagrant impropriety for which a new trial is required."

69. The Connecticut Supreme Court rejected Mr. Skakel's claim that the State's argument was based on facts not in evidence.

70. The court found that the State's argument that Littleton was told to take the four boys to Windham was founded on "reasonable inferences drawn from the testimony" of Littleton and Mr. Skakel's father.

71. The court further determined that the state's attorney did not go beyond the bounds of proper argument when he urged the jury to infer that Mr. Skakel's father had been instrumental in orchestrating Mr. Skakel's alibi.

72. The court stated: "Although the state's attorney did not, and could not, point to any direct evidence of a concerted effort by the [Petitioner's] father or other members of the Skakel family to orchestrate an alibi for the [Petitioner], it was reasonable for the state's attorney to implore the jury to infer, on the basis of circumstantial evidence, that such an effort had been undertaken on the [Petitioner's] behalf." State v. Skakel, 276 Conn 633, 755 (2006).

73. The Connecticut Supreme Court also disagreed with Mr. Skakel's claim that the State improperly argued that Mr. Skakel's family believed that he had killed the victim, which is why Mr. Skakel was sent to Elan, and that the State improperly told the jury that it could infer that Mr. Skakel's family told Elan administrators that he had been involved in the murder.

74. The Connecticut Supreme Court found that the state's attorney's argument that Mr. Skakel had been sent to Elan because of his involvement in the murder was based upon the testimony of Rogers and Coleman, which was not hearsay.

75. The court noted that Rogers and Coleman both testified that Mr. Skakel had told them that his family had sent him to Elan to shield him from police.

76. The Connecticut Supreme Court also determined that the State's second argument was focused on the likelihood that Mr. Skakel had disclosed his involvement in the murder to members of his family.

77. The court found that the inference urged by the state's attorney was appropriately based on the evidence.

78. Thus, the court found that the state's argument as to what Elan administrators likely had learned from Mr. Skakel's family about his involvement in the murder was not improper.

79. The Connecticut Supreme Court found that the State's referring to Mr. Skakel as "the killer" was not improper under the circumstances.

80. The court noted that when the word "killer" was considered in the "fuller context of the argument in which it was used, it is clear that the state's attorney's use of the word was neither gratuitous nor inflammatory; rather, the state's attorney employed the term merely as a shorthand for 'the person who had killed the victim.'" Id. at 759-60.

81. The court found the use of the term was benign.

82. The Connecticut Supreme Court decided that the State's use of the phrase "spoiled brat," although grounded in the evidence, was injudicious.

83. However, the court determined, "When the objectionable references are viewed in the broader context of the entire trial, however, it is apparent that they were isolated, relatively innocuous and not unduly prejudicial to the [Petitioner]." Id. at 761.

84. The court found that the comments did not affect the fairness of the trial and that no due process violation had occurred.

85. The Connecticut Supreme Court disagreed with Mr. Skakel's claim that the state's attorney improperly stated that Mr. Skakel had masturbated on the victim's dead body.

86. Mr. Skakel had claimed to the supreme court that the State's argument was improper because it was based on incredible testimony from Gregory Coleman.

87. The court found that the fact that the jury could have concluded that some or all of Coleman's testimony was unbelievable did not mean that the state's attorney could not properly argue inferences from that testimony.

88. Mr. Skakel also argued to the supreme court that the state's attorney improperly argued that two red marks found on the victim's right and left thighs substantiated his contention that Mr. Skakel had masturbated on the victim.

89. The court determined that Henry Lee's testimony, that the marks were consistent with bloody hands trying to force the victim's legs apart, coupled with Mr. Skakel's alleged statement to Coleman that he had masturbated on the body, provided a sufficient factual basis for the State's argument.

90. The court noted that the argument also found support in Mr. Skakel's statements to other witnesses that he had masturbated in a tree next to the victim's house.

91. Mr. Skakel also argued that the State's argument was inconsistent with the fact that the autopsy failed to disclose the presence of semen.

92. The court acknowledged that although the autopsy failed to detect the presence of semen in the victim's pubic area, nothing in the report indicated an attempt to determine whether semen was present on other areas of the victim's body.

93. The court found that because the autopsy did not rule out the possibility of the existence of semen on other body parts, the state's attorney's argument suggesting that possibility was not improper.

94. The Connecticut Supreme Court found that the State's use of an audiovisual display during its rebuttal argument was not improper.

95. Mr. Skakel had argued that the State deceptively spliced together an edited version of the tape recorded interview with ghostwriter Richard Hoffman to make it appear as if Mr. Skakel's comments about masturbating in a tree were a confession to murder.

96. Mr. Skakel had claimed that this was compounded by the fact that the voice-over was played while gory photographs of the murder scene were shown on the large screen.

97. The supreme court concluded that it was proper for the state's attorney to play for the jury portions of the tape-recorded interview with Hoffman.

98. The court stated that it was not likely that the State's presentation confused the jury or prejudiced Mr. Skakel.

99. The court indicated that the presentation was not deceptive.

100. The court concluded that the playing of the presentation did not violated Mr. Skakel's right to a fair trial.

**Coerced Confessions Issue**

101. The Connecticut Supreme Court held that Mr. Skakel's federal due process claim failed as a matter of law because the inculpatory statements were not procured by and State official or person acting on behalf of the State.

102. The state supreme court relied exclusively on <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986) in making its decision.

**THE PETITIONER,**
**MICHAEL C. SKAKEL**

BY   /s/_____
     HUBERT J. SANTOS
     Federal Bar No. ct00069
     Email: hsantos@santos-seeley.net
     HOPE C. SEELEY
     Federal Bar No. ct 4863
     Email: hseeley@santos-seeley.net
     SANDRA SNADEN KUWAYE
     Federal Bar No. ct18586
     Email: ssnaden@santos-seeley.net
     SANTOS & SEELEY, P.C.
     51 Russ Street
     Hartford, CT 06106
     Tel: (860) 249-6548
     Fax:(860) 724-5533

**CERTIFICATION**

      I hereby certify that on October 27, 2008, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Michael O'Hare, Esq.
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT 06067
Tel. No. (860) 258-5887
Fax No. (860) 258-5968
E-mail: michael.ohare@po.state.ct.us
Federal Bar No. ct 05318

                                                  /s/_____
                                                HOPE C. SEELEY