# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL C. SKAKEL | : | CIVIL NO. 3:07 CV 1625 (PCD) |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| PETER J. MURPHY | : | |
| Respondent | : | OCTOBER 27, 2008 |

### PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

HUBERT J. SANTOS
Federal Bar No. ct 00069
HOPE C. SEELEY
Federal Bar No. ct 04863
SANDRA L. SNADEN
Federal Bar No. ct 18586
SANTOS & SEELEY, P.C.
51 Russ Street
Hartford, CT 06106
Tel. (860) 249-6548
Fax (860) 724-5533

## TABLE OF CONTENTS

Table of Contents.................................................................................................................. i

I.    PROCEDURAL HISTORY ..................................................................................... 1

      A.    State Trial Court Proceedings ......................................................... 1

      B.    Appellate Proceedings.................................................................... 2

      C.    Federal District Court Proceedings – The Instant
            Petition For A Writ Of Habeas Corpus............................................ 4

II.   STATEMENT OF FACTS........................................................................................ 5

      A.    October 30, 1975: Mr. Skakel's Alibi and No Physical Evidence ................... 5

      B.    Another Suspect: Kenneth Littleton ................................................ 7

      C.    The Elan Statements: Emotional and Physical Torture ................................. 9

      D.    Post-Elan Statements, Hearsay and Prejudicial Tabloids............................. 18

III.  ARGUMENT........................................................................................................ 23

      A.    The Connecticut Supreme Court Violated The Ex
            Post Facto Clause And The Due Process Clause
            Of The United States Constitution When It Overruled
            Its Own Binding Precedent In Order To Authorize
            The Prosecution Of The Petitioner That Had Previously
            Been Time-Barred ......................................................................... 24

            1.    Facts And Procedural History Relevant To This Claim ...................... 24

            2.    The Applicable Constitutional Provisions .......................................... 27

            3.    The Connecticut Supreme Court's Prior Expressed Law .................. 32

            4.    The Connecticut Supreme Court's Decision Was
                  Contrary To Clearly Established Federal Law As
                  Determined By The Supreme Court Of The United States ............... 37

                  a.    Bouie v. City of Columbia, 378 U.S. 347 (1964) ...................... 37

b.    <u>Marks v. United States</u>, 430 U.S. 188 (1977) ......................... 39

c.    <u>Rogers v. Tennessee</u>, 532 U.S. 451 (2001) ........................... 41

d.    Conclusion .............................................................................. 44

5.    The Connecticut Supreme Court's Application Of Its New Statutory Interpretation To The Petitioner Conflicts With The Decisions Of Federal Courts Of Appeals And Another State Supreme Court ............................................................. 44

B.    The Connecticut Supreme Court's Decision Regarding The State's Withholding Of Certain Exculpatory Evidence Violates The Petitioner's Constitutional Right To A Fair Trial As Set Forth In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) ........................ 48

1.    The Sketch ....................................................................................... 48

a.    Additional Facts And Procedural History Relevant To This Claim ........................................... 48

b.    The Connecticut Supreme Court's Finding That The Sketch Was Not "Suppressed" Under <u>Brady v. Maryland</u> Is Contrary To Established Federal Law .............. 53

2.    The Profile Reports ......................................................................... 64

a.    Additional Facts And Procedural History Relevant To This Claim ........................................... 64

b.    The Connecticut Supreme Court's Decision Ignored The Requirements Established By The United States Supreme Court In <u>Brady v. Maryland</u> And Its Progeny ...................................................... 66

c.    Considering The Issue On The Merits, The State Was Required To Provide The Summary Profile Reports Relating To Littleton And Thomas Skakel To The Defendant Pursuant To <u>Brady v. Maryland</u> .................. 67

d.    Conclusion .............................................................................. 69

C.    The Connecticut Supreme Court's Decision That Mr.
      Skakel Was Properly Transferred To Adult Court
      Violates The Due Process Clause Of The United
      States Constitution ........................................................................ 69

      1.    Facts And Procedural History Relevant To This Claim ...................... 69

      2.    The Connecticut Supreme Court's Decision That
            The Petitioner Was Appropriately Transferred To
            Adult Court, Based On An Administrative
            Regulation, Was Improper .................................................... 74

      3.    The Connecticut Supreme Court's Improper
            Reliance On The 1994 DCF Regulation Violated
            The Petitioner's Right To Due Process of Law .................................... 79

      4.    The Connecticut Supreme Court's Retrospective
            Application Of The 1994 DCF Regulation Violates
            The Due Process And Ex Post Facto Clauses Of
            The United States Constitution ............................................ 82

D.    The Connecticut Supreme Court's Decision Regarding
      Prosecutorial Misconduct That Took Place At The
      Petitioner's Trial Violates The Due Process Clause Of
      The United States Constitution .................................................... 84

      1.    Facts Relevant To This Claim ............................................ 86

            a.    The State's False And Misleading Story
                  About A Forensic Cover-Up By Michael
                  Skakel And His Family .......................................... 86

            b.    The State's False Story About A Skakel
                  Family Conspiracy To Orchestrate A
                  Fabricated Alibi ................................................ 90

            c.    The State's Argument That The "Skakel
                  Family" Believed That They "Had A Killer
                  Living Under Their Roof" ...................................... 93

            d.    The State's Scripted Argument Calling
                  Petitioner "The Killer" And "Spoiled Brat" ................... 95

e.     The State's False Allegation That The
Petitioner Masturbated On The Victim's Body..........................96

f.     The State's Misuse Of The Evidence In Its
Audio-Visual Presentation Of A Fictional
Confession During Closing Argument ......................................98

2.     The Connecticut Supreme Court's Decision Was An
Unreasonable Application Of Established Law And/Or
Was Based On An Unreasonable Determination Of
The Facts In Light Of The Evidence Presented ...............................100

a.     The Forensic Cover-Up...........................................................100

1.     Misrepresentation Of The Chronology ...........................101

2.     The State's Comment That DNA Evidence
Was The "Real Deal"........................................................103

b.     The Conspiracy To Fabricate An Alibi ..................................105

c.     The Family's Belief That They "Had A
Killer Living Under Their Roof" ...............................................108

d.     The State's Name-Calling Of The Petitioner .........................112

1.     The State's Use Of The Term "Killer" .............................112

2.     The State's Use Of The Phrase "Spoiled Brat" ..............113

e.     Masturbation On The Victim's Body .......................................115

f.     The State's Audio-Visual Presentation....................................... x

3.     The Cumulative Effect Of The State's Misconduct............................122

E.     The Petitioner's Federal Due Process Rights Were
Violated Due To The Admission Of Coerced Confessions ..........................124

1.     Additional Facts Relevant To This Claim ...........................................124

2.     The Connecticut Supreme Court's Decision .....................................124

3.      The Connecticut Supreme Court's Decision That
        The Admission Of Coerced Confessions Did Not
        Offend The Federal Due Process Clause Was An
        Unreasonable Application Of Federal Law ........................................ 125

IV.     CONCLUSION ........................................................................................ 127

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL C. SKAKEL | : | CASE NO. 3:07 CV 1625 (PCD) |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| PETER J. MURPHY, | : | |
| Respondent. | : | OCTOBER 27, 2008 |

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7 and 56 of the Local Rules of Civil Procedure, the Petitioner, Michael C. Skakel (hereinafter "Mr. Skakel" or "Petitioner"), hereby submits this Memorandum of Law in support of his Motion for Summary Judgment.

**I.      PROCEDURAL HISTORY**

      **A.      State Trial Court Proceedings**

Mr. Skakel was arrested and charged on January 19, 2000 for the October 30, 1975 murder of Martha Moxley in Greenwich, Connecticut.  Mr. Skakel, who was 39 years old on the date of his arrest, was initially presented in juvenile court because he was 15 years old at the time of the homicide. Appendix at A391 (hereinafter "App. ___"). The juvenile court (Dennis, J.) granted the State's motion to transfer the matter to the

regular criminal docket because of the Petitioner's age.[1]  Mr. Skakel moved to dismiss

the case under the applicable five-year statute of limitations, which the trial court

denied.  App. A225; A226. Following a month-long jury trial, Mr. Skakel was convicted

of murder on June 7, 2002.  He was sentenced to a term of incarceration of 20 years to

life in accordance with the 1975 adult sentencing laws.

### B.    Appellate Proceedings

After the verdict, the Mr. Skakel filed an appeal to the Connecticut Supreme

Court.  In his brief, Mr. Skakel raised the following claims of error:

1. Whether the trial court erred in concluding that the prosecution of the
   Defendant was not barred by the 1975 five-year statute of limitations and
   pursuant to State v. Paradise?

2. Whether the State's suppression of exculpatory material requires a new
   trial?

3. Whether the Juvenile Court erred in transferring this matter to the Adult
   Criminal Division of the Superior Court?

4. Whether the pervasive prosecutorial misconduct which occurred during
   the State's summation deprived the Defendant of a fair trial?

5. Whether the admission of prior testimony violated the Defendant's right to
   confrontation?

6. Whether the admission of the Defendant's involuntary Elan statements
   resulted in a due process violation?

---

[1] Mr. Skakel filed an interlocutory appeal from the transfer order. The Connecticut
Supreme Court held that the transfer order was not an appealable final judgment and
dismissed the appeal. In re Michael S., 258 Conn. 621, 631 (2001).

7.    Whether the numerous evidentiary errors, including the admission of supermarket tabloids, warrant a new trial?

See Petitioner's Brief to the Connecticut Supreme Court, App. A7.  The Connecticut Supreme Court rejected all of these claims and affirmed the trial court's judgment of guilty.  State v. Skakel, 276 Conn. 633, 770 (2006), App. A92 - A184.

After the Connecticut Supreme Court's decision was issued, Mr. Skakel filed a Motion For Reconsideration, To Reargue And For Reconsideration And Reargument En Banc on February 14, 2006.  In this Motion, Mr. Skakel argued that the Connecticut Supreme Court's decision regarding the statute of limitations issue, in overruling two of its own prior binding precedents and applying an amendment to the statute of limitations retroactively to revive the prosecution of Mr. Skakel that was previously time-barred, violated the Ex Post Facto Clause and the Due Process Clause of the United States Constitution and the Due Process Clause of the Connecticut Constitution.  Mot. for Reconsideration, App. A185.  This issue was not raised in Mr. Skakel's original briefing because trial court had based its statute of limitations decision on an entirely different ground; Id. at n.1, App. A186 (footnote 1). Thus, the retroactive application of the new statute of limitations did not occur in this case until the Connecticut Supreme Court did so in its decision.

In the Motion For Reconsideration, To Reargue And For Reconsideration And Reargument En Banc, Mr. Skakel also claimed that his transfer from the juvenile docket

3

to adult court was unconstitutional, in violation of his rights under the Due Process and Ex Post Facto Clauses of the United States Constitution. App. A195. Mr. Skakel argued that the Connecticut Supreme Court's reliance on a 1994 administrative regulation that was not in force at the time the crime was committed denied him his constitutional rights. Id.

Finally, Mr. Skakel also raised a claim in the Motion that the Connecticut Supreme Court's refusal to review *in camera* profile reports that were prepared regarding suspects other than Mr. Skakel deprived him of fundamental fairness. App. A202. The Connecticut Supreme Court denied the Motion For Reconsideration, To Reargue And For Reconsideration And Reargument En Banc on March 14, 2006.

### C. Federal District Court Proceedings – The Instant Petition For A Writ Of Habeas Corpus

On November 5, 2007, Mr. Skakel filed the instant Petition For A Writ Of Habeas Corpus in the United States District Court for the District of Connecticut, raising the first six claims of error that had been raised before the Connecticut Supreme Court. On December 21, 2007, the Respondent filed his answer to the petition. Pursuant to the scheduling order, the parties were ordered to file cross Motions for Summary Judgment.

## II.    STATEMENT OF FACTS

### A.    October 30, 1975: Mr. Skakel's Alibi and No Physical Evidence

On October 30, 1975, Mr. Skakel, then fifteen years old, was 20 minutes away from Greenwich's Belle Haven community at the time his fifteen-year-old neighbor and friend, Martha Moxley, was killed around 10:00 p.m.[2] Two of the Mr. Skakel's older brothers (Rushton, Jr. and John), his two cousins (James and Georgeann Dowdle) and a neighbor (Helen Ix) confirmed that Mr. Skakel had left Belle Haven around 9:30 p.m. and did not return until <u>after</u> the murder.[3]

On October 30, 1975, the older Skakel children (including the Petitioner), his

---

[2]The State charged that the murder occurred between the hours of 9:30 p.m. on October 30, 1975 and 5:30 a.m. on October 31, 1975 (App. A218), but the overwhelming evidence showed that the victim was killed around 10:00 p.m. In 1975, the police consulted with Dr. Joseph Jachimczyk, a medical examiner from Houston, Texas who concluded that the time of death was about 10:00 p.m. Trial Transcript 5/8/02 at 38 (hereinafter "Tr."); Tr.5/28/02 at 128-131. His opinion is supported by the observations of several people, including Mrs. Moxley, Helen Ix and David Skakel, who heard dogs barking around this time. <u>See</u> Testimony of Mrs. Moxley, Tr.5/7/02 at 76 (she heard incessant barking between 9:30 p.m. and 10:00 p.m.); Helen Ix, Tr.5/9/02 at 74; 84-5; 89 (her dog was really agitated and barking violently between 9:45 p.m. and 10:15 p.m.; it was "scared violent barking"; he was staying in one spot in the middle of the road facing the Moxley property and in the direction of where the victim's body was found); David Skakel, Tr.5/22/02 at 85 (heard the Ix dog barking between 9:30 p.m. and 10:00 p.m.). Also, between 9:30 p.m. and 10:00 p.m., Mrs. Moxley heard a commotion outside. Tr.5/7/02 at 42-3; 75. Several years later, she recalled that it was at this point that she heard her daughter screaming and other voices. <u>Id.</u> at 82.

[3] <u>See</u> Testimony of Helen Ix, Tr.5/9/02 at 110-112; J. Dowdle, Tr.5/22/02 at 10-15; Rushton Skakel, Jr., 5/22/02 at 63-65; Georgeann Dowdle, Tr.5/23/02 at 47-48; John Skakel, Tr.5/28/02 at 33-35; Petitioner's taped interview with Richard Hoffman,Trial Ex. 80, at 46-75.

cousin, James Dowdle, his sister's friend, Andrea Shakespeare, and the tutor, Kenneth Littleton,[4] went to the Belle Haven Club for dinner around 6:00 p.m. Tr.5/9/02 at 159-60; Tr.5/28/02 at 24; Tr.5/29/02 at 4-5; Tr.5/22/at 11; Tr.5/9/02 at 119. They returned to the Skakel house around 8:30 p.m. or 8:45 p.m.  Tr.5/9/02 at 119; 161. Martha Moxley, Helen Ix and Geoffrey Byrne stopped by the Skakel house (Id. at 65; State's Ex. 80 at 30) and they hung out in the driveway with Mr. Skakel and then listened to music in the car. Tr.5/9/02 at 67-8. Mr. Skakel, Martha, Geoff and Helen initially were in the Skakel car in the driveway. Id. at 110. Later, brothers Tom, John and Rush, and cousin Jimmy Dowdle were in the car. Rush indicated that he had to take his cousin home, and only Tom, Martha, Geoff and Helen got out of the car.[5] The car drove off. Tr.5/9/02 at 112. Helen Ix's recollection is that Mr. Skakel left with them. Id. at 111; see also. Trial Ex. 80, at 39; 46-50. Mr. Skakel, his two brothers and his cousin left Belle Haven around 9:30 p.m. to go to his cousin's house across town to watch a newly-released Monty Python movie that began at 10:00 p.m. See fn. 3. They watched the show and then the Skakel brothers returned home around 11:00 p.m. Tr.5/22/02 at 18; 65; Tr.5/28/02 at 34.

---

[4] Mr. Skakel is one of seven children. Tr.5/9/02 at 68-9. In 1975, Rushton, Jr. was 19 years old and a sophomore at Dartmouth, Tr.5/22/02 at 62; Julie was 17 years old, Tr.5/9/02 at 117; Tommy was the next oldest; John was 16 years old, Tr.5/28/02 at 24; David was 12 years old, Tr.5/22/02 at 83; and Stephen was the youngest. Mr. Skakel's father, Rushton Skakel, Sr., was out of town on a hunting trip that night, Tr.5/9/02 at 156; Mr. Skakel's mother died in 1973. Tr.5/29/02 at 93.
[5] Helen Ix walked home with Geoffrey Byrne. Martha Moxley and Tommy Skakel stayed in the driveway and were engaged in "playful flirtation." Tr.5/9/02 at 70.

The victim's body was found under a large pine tree on the Moxley property around 11:30 a.m. on October 31, 1975. The victim was laying face down, and her pants were around her ankles. Tr.5/7/02 at 116-1. The victim suffered multiple and severe injuries to her head and stab wounds to her neck that were consistent with being caused by a piece of golf club shaft. Tr.5/8/02 at 115-116. Three pieces of a golf club were found near the victim's body.[6] Tr.5/7/02 at 161. The investigation revealed that the victim had been assaulted near her driveway and then dragged to the pine tree. Id. at 162; Tr.5/8/02 at 138; 147. The State had no forensic or physical evidence linking Mr. Skakel to this murder. Tr.5/8/02 at 153-154; 178.

## B.    Another Suspect: Kenneth Littleton

At trial, the defense pointed to Kenneth Littleton as a possible third-party suspect for the murder. Littleton began his employment as the part-time Skakel family tutor on the day Martha Moxley was murdered.[7] Tr.5/9/02 at 155. Littleton testified under a grant

---

[6]The golf club was a Tony Penna golf club. Tr.5/7/02 at 169-70.  The same brand was found at the Skakel residence. Id. at 172; Tr.5/9/02 at 13. It was common for golf clubs to be left about the Skakel property. Tr.5/8/02 at 24; 66.

[7]Littleton was working at the Brunswick School in Greenwich as a teacher and coach, Tr. 5/9/02 at 154, when he accepted the part-time tutoring position. Littleton later was diagnosed with bi-polar disorder in 1985. On the date he testified he was taking six psychiatric medications. Tr.5/9/02 at 152-153. Littleton testified that his "life went down the tubes" the summer following the murder. He was arrested in Nantucket and dismissed from Brunswick School and St. Luke's School, and was continually pursued by the Connecticut authorities. Tr.5/13/02 at 34. In the 1980's he was involved in an incident and lied about his identity. He told the police his name was Kenny Kennedy. Id. at 43-45. He gave the Kennedy name because President Kennedy was his hero.  Id. at

of immunity since he had been a suspect in the murder for many years. Tr.5/9/02 at 155.

Littleton was interviewed on a number of occasions by the Greenwich police after the murder. It was not, however, until the third interview that he admitted going outside near the time of the murder to investigate a disturbance at the rear of the Skakel driveway. Tr.5/13/02 at 102; Tr.5/9/02 at 164-167. Littleton testified that he never left the Skakel property. Tr.5/9/02 at 167.

Littleton was one of the chief suspects in the murder. Tr.5/22/02 at 100. In 1991, Inspectors Jack Solomon, now the police chief of Easton (Id. at 97), and Frank Garr, approached Littleton's former wife, Mary Baker, for help in the investigation. Tr.5/22/02 at 100. She agreed to tape their conversations. Tr. 5/13/02 at 164. On tape, Ms. Baker reminded Littleton that he had told her he committed the murder during a car trip from Baltimore to Connecticut in 1984. Id. at 160-166. Ms. Baker testified that her statement was untrue and fabricated, and that Littleton was in a manic and psychotic state during the 1984 trip. Id. at 164-167. Inspector Solomon testified that Ms. Baker had told him that Littleton had admitted to her that he had buried a bloody piece of a golf club in the woods. Tr. 5/22/02 at 137-138.

In 1992, Littleton met with Dr. Kathy Morall, a forensic psychiatrist assisting the

---

47. Littleton had a paranoid suspicion that the "Skakels slash Kennedys" were trying to blow his heart out with an intravenous dosage of cocaine. Id. at 52. In the mid 1980's Littleton was drinking heavily and suffered blackouts. Id. at 125.

prosecution. Tr.5/13/02 at 108. At that meeting, Littleton testified that he had told his former wife that he had killed Martha Moxley. Littleton also testified that he told Mary that he killed the victim by stabbing her through the neck. Id. at 118.

### C. The Elan Statements: Emotional And Physical Torture

From 1978 to 1980, Mr. Skakel was physically and emotionally brutalized at Elan, a residential "treatment" facility for adolescents and young adults located in Poland Springs, Maine. For two years, Mr. Skakel was held captive in this secluded environment where the residents regularly were beaten unmercifully and emotionally tortured.[8]

The centerpiece of the State's case against Mr. Skakel was several statements he allegedly made to residents and a staff person during his tormented time at Elan. The Elan Program touted a controversial behavioral modification program that relied upon peer and staff confrontation predicated on intimidation, humiliation, physical beatings and emotional poundings. Joseph Ricci, the founder of Elan, was universally feared by the residents. Tr.5/23/02 at 114, 133; Tr.5/16/02 at 72; 218; Tr.5/17/02 at 57; 109. Elan even had its own cult-like lingo to describe positions and events, *i.e.* night

---

[8] See generally Testimony of Charles Seigan, 5/16/02 at 57; 68; 72-6; 89-93;117; John Higgins, 5/16/02 at 187-8; Sarah Petersen, 5/23/02 at 116-17; 134; 141; 153-55; Mike Wiggins, 5/23/02 at 196-99; Donna Kavanah, 5/23/02 at 209-15; Greg Coleman, 5/17/02 at 183; 186. In its closing argument, even the prosecution admitted that a "concentration camp type atmosphere" existed at Elan. Tr.6/3/02 at 17.

owls, expeditors, haircuts, being shot down and general meetings.[9] Tr.5/16/02 at 65.

The most glaring example of Elan's technique of persecution was the "general meeting," which "was probably the scariest word" at Elan. Id. at 70. When a staff member yelled "General meeting!" residents were required to drop whatever they were doing and attend. Id. 70. The typical general meeting was attended by over 100 people present. Id. at 72-3. A staff person stirred up the crowd – almost like a pep rally – against the person for whom the general meeting was called. The "victim" of the general meeting was hidden in a back room and only displayed before the crowd once the assembly had become sufficiently frenzied. A staff member always asked whether anyone had any feelings towards the target, inevitably resulting in a barrage of 20-30 out-of-control people rushing and screaming at the person. Id. at 90; see also 5/17/02 at 169; 5/23/02 at 116. The target inevitably received some type of punishment at the general meeting.[10] Tr.5/16/02 at 74. If Ricci did not like how the target of the general

---

[9]A "night owl" was a resident assigned to guard the entrances so that people would not run away. Tr.5/16/02 at 67; 179. An "expeditor" was a resident assigned to Elan's police force who was required to take head counts every 15-20 minutes. Id. at 66. A "haircut" was a verbal reprimand for minor infractions, while "being shot down" meant if a resident were disobedient, their position was taken away and they were required to wear shorts, go barefoot and made to scrub floors all day. Id. at 93-4.

[10] One of the Elan survivors, Mike Wiggins, provided the most graphic testimony about the horrors of a general meeting at Elan during this time period. For 14 days he was forced to sit facing in the corner during the day and made to sleep under the urinals at night. The staff then called for a general meeting and he was ordered into the boxing ring many times and then forced to lean over a chair while the staff and residents paddled him with a plywood paddle with holes. He was beaten so badly that his

meeting answered a question, he would "continue to confront them and pelt them emotionally, have them spanked or placed in the boxing ring."[11] Tr.5/23/02 at 117.

Approximately six months into his two-year Elan nightmare, Mr. Skakel tried to run away. His punishment was severe. For three days, Mr. Skakel was ordered in the corner of the dining room on a stage where he had to alternate sitting and standing each hour without any sleep. Tr.5/17/02 at 8; 80; Tr.5/24/02 at 6. Two "personal overseers" or "gorillas" guarded him at all times. Tr.5/17/02 at 8; 99; 134-5; Tr.5/24/02 at 6-10. These were "trusted residents" handpicked by the Elan staff. Tr.5/17/02 at 99; 135.

After standing and sitting in a corner for three days, the Elan staff and residents – about 150 people led by Ricci – victimized Mr. Skakel at a brutal general meeting. Tr.5/17/02 at 8; 17; 57; Tr.5/24/02 at 6. One witness testified that "[t]hey dragged him into the room, they put him against the wall and that's where the confrontations started." Tr.5/17/02 at 80-1; 86. During the meeting, Ricci accused Mr. Skakel of murdering Martha Moxley. Tr.5/16/02 at 75; Tr.5/17/02 at 57; Tr.5/23/02 at 171-2; Tr.5/24/02 at 10-

buttocks were black and became bloody. His scars from the torture session are still visible. The emotional and physical assault lasted around eight hours until he finally admitted that he was a chicken. Once he made that admission, he was forced to dress up in a chicken costume. Tr.5/23/02 at 181; 196-99; See also Testimony of Sarah Petersen, Id. at 141; 153; 155; Testimony of Donna Kavanah, Id. at 209-15.

[11] Alice Dunn, a former Elan staff person, testified the boxing ring was used to beat the words out of the person. The ring actually was a human circle of people, and the target of the meeting would be required to fight round after round, encountering a new boxer for each round. Tr.5/17/02 at 84; see also, Tr.5/23/02 at 120.

11. When Mr. Skakel denied his involvement in the murder, Ricci "got more agitated, verbally intolerant and abusive." Tr.5/17/02 at 58. Mr. Skakel was crying throughout Ricci's bullying. After repeated denials, Ricci ordered Mr. Skakel into the boxing ring where he was "brutalized." Id. at 9. At the end of each round, Ricci asked Mr. Skakel if he killed Martha Moxley. For hours, Mr. Skakel denied any involvement and was placed back in the ring for another round against a fresh fighter.[12] Tr.5/23/02 at 173; Tr.5/24/02 at 10-11. This physical and emotional torture lasted for hours. Tr.5/23/02 at 173; Tr.5/24/02 at 10-11. The assault finally ended when Mr. Skakel responded "I don't know" to Ricci's accusation that he murdered Martha Moxley. Tr.5/17/02 at 84-5; 5/23/02 at 175; 5/24/02 at 14. Whenever Mr. Skakel was confronted about the murder after this general meeting, he responded that he just didn't know. Tr.5/17/02 at 85.

After that general meeting, the question of whether Mr. Skakel had been involved in the murder haunted him as a topic of conversation throughout the Elan community.[13]

---

[12]Each fighter slugged Mr. Skakel as hard as possible. Tr.5/23/02 at 174. While he was being pummeled in the ring, the students cheered on the person beating him, chanting, "hit him hard, hit him harder, get him, get him." Id. at 174-75; Tr.5/24/02 at 14.

[13] Sarah Petersen, who arrived at Elan in January 1979 testified that "Almost anytime any kind of general meeting was called, Mike Skakel was asked to stand up and he was dealt with in some kind of manner." Tr.5/23/02 at 114. Ricci would "just confront him again and again and say have you copped to your guilt, we know you did this and just go on and on and on, just totally pretty much torturing him." Id. at 115. She witnessed Mr. Skakel being pummeled in the boxing ring on more than one occasion, as well as being paddled for denying his involvement in the murder. Id. at 125. During these beatings, Mr. Skakel was crying, "sometimes just uncontrollably." Petersen testified that

Tr.5/16/02 at 75. For weeks, he was required to wear a chest-to-floor cardboard sign 16 hours a day that said confront me on why I murdered Martha Moxley, yet he steadfastly denied it.[14] Tr.5/17/02 at 94; 96. He also was confronted in therapy. One witness recalled Mr. Skakel's reaction as being either annoyed that he was being asked again or crying and shaking his head. Tr.5/16/02 at 78. He would finally say that he didn't know and that would stop the questions.[15] Id. at 104. It got to the point, however, that Mr. Skakel was told repeatedly that he would never be permitted to leave Elan unless he confessed to the murder. Tr.5/23/02 at 146; 155.

Despite the pummeling, the beating and the threats, witness after witness from

---

after hours of this torment, Mr. Skakel would finally say "I don't know, maybe I did" which "immediately" stopped the beatings. Id. at 122-4.

[14]See also Testimony of Sarah Petersen, 5/23/02 at 114-5; Michael Wiggins, 5/23/02 at 177; Donna Kavanah, 5/23/02 at 207; Angela McFillan, 5/24/02 at 4. As part of Elan's protocol for sign-wearers, Mr. Skakel was required to stand up in the dining hall and read his sign before every meal. Tr.5/17/02 at 99.

[15]Elizabeth Arnold testified that she was present in a group session a day or two after the general meeting in which Mr. Skakel stated over and over that he didn't remember and he didn't know what happened. Tr.5/17/02 at 5; 12. While Ms. Arnold's grand jury testimony was limited to Mr. Skakel not remembering, at trial, she significantly embellished her prior testimony. She testified that he said he was very drunk, that he had some sort of blackout, and that he didn't know if he had done it or if his brother had done it. She also said that he remembered something about running around outside and that his brother had "f-d" his girlfriend. He said his brother had stolen his girlfriend and had fooled around with her. Id. at 3-4. Arnold admitted that she **never told the grand jury this information**, but reading Mark Fuhrman's book about the case had helped her recall it. Id. at 22-3.

Elan testified that Mr. Skakel never confessed to killing Martha Moxley.[16] There were only two exceptions, John Higgins and Greg Coleman, two Elan residents who stood out among many others for the brutality of their conduct and the unreliability of their stories.

Higgins, a member of Elan's elite police force, often served as Mr. Skakel's abusive personal overseer.[17] About 20 years post-Elan, Higgins – who had a reputation for being untruthful[18] – surfaced after learning about a reward being offered for the Moxley murder in *People* magazine. Tr.5/16/02 at 220, 222; 228. He now claimed that one time while serving "night owl" duty with Mr. Skakel, Mr. Skakel had a conversation with himself in which he first said he did not know whether he did it; then, that he may have done it; then, that he did not know what happened; then, that he must have done it; then, that he did it. Id. at 179; 182; 227. Higgins said he was "totally uninvolved verbally" and simply watched Mr. Skakel talk to himself for two hours. Id. at 213-14.

Higgins' ridiculous story reinforces other Elan survivors' opinions that he is untrustworthy. Higgins was a member of the Elan police force, Id. at 216-17, which

---

[16] See Testimony of Sarah Petersen, Tr.5/23/02 at 158; Donna Kavanah, Tr.5/23/02 at 209; Dorothy Rogers, Tr.5/16/02 at 143-4; Alice Dunn, Tr.5/17/02 at 78; Angela McFillan, Tr.5/24/02 at 35; Mike Wiggins, Tr.5/23/02 at 176; Elizabeth Arnold, Tr.5/17/02 at 16; Charles Seigan, Tr.5/16/02 at 99.

[17] In that role, Higgins screamed at Mr. Skakel every few minutes and ordered him around. He was mean-spirited towards Mr. Skakel and he "seemed to really like making Mike Skakel's life miserable." Tr.5/23/02 at 152-3; 160.

[18] Tr.5/23/02 at 129; 178.

made him an extremely unlikely candidate to hear Mr. Skakel's "bleed out" confession.

Moreover, Higgins never reported Mr. Skakel's "confession" to the Elan staff or

authorities.[19] Id. at 220. Finally, Higgins made the preposterous claim that the first and

only time at Elan he heard about the Moxley murder was from Mr. Skakel during the

"night owl" session despite the fact that Higgins was at Elan from May of 1978 through

early 1980, Tr.5/16/02 at 178, and thus, he necessarily would have been present for the

beating sessions in which Mr. Skakel was confronted over and over with this murder.[20]

Gregory Coleman, one of the most aggressive Elan tormenters and a "head

gorilla",[21] also came forward at least 20 years post-Elan with an equally fantastic story

after watching a television news magazine story. Tr.5/17/02 at 170. Coleman, a long-

time heroin addict and convicted felon, had been hospitalized several times for mental

---

[19]Other Elan witnesses opined that if John Higgins ever heard anyone confess to murder, he would have run to Joe Ricci with it because it would have furthered his own status within the program. See Testimony of Sarah Petersen, 5/23/02 at 161; Michael Wiggins, 5/23/02 at 180; Angela McFillan, 5/24/02 at 32; 69.
[20]Attendance at general meetings was mandatory. Tr.5/24/02 at 10; see also Tr.5/16/02 at 70. Further, it was a topic of conversation among the Elan residents (Tr.5/16/02 at 75) and Higgins would have had to have been blind not to have noticed the chin-to-floor sign that Mr. Skakel was forced to adorn. See Tr.5/17/02 at 94; 96.
[21]See Tr.5/17/02 at 170. During his reasonable cause testimony in the Juvenile Court, Coleman candidly admitted that he was involved in the violent beating of a female resident, Kim Freehill. She was paddled so violently with open hands and a wooden mallet that she had to be taken to the hospital. Coleman nonchalantly testified that the assault was so horrific that "she went into shock" and "lost the ability to retain her bowel movements. " Tr.6/21/00 at 57-8. The trial court refused to permit any testimony relating to Coleman's beating of Kim Freehill, ruling it was not relevant. Tr.5/29/02 at 3; Tr.5/16/02 at 110-7; Tr.5/23/02 at 124; Tr.5/29/02 at 132-5.

illness and had problems that plagued him for most of his life. Id. at 151-52. Coleman, undoubtedly the State's most important witness since he was the only witness to say without equivocation that Mr. Skakel admitted that he killed Martha Moxley, died of a drug overdose in 2001 about four months after he testified at the probable cause hearing. Id. at 89; 99. Over objection, Coleman's sterilized testimony from pretrial proceedings was "read" to the jury by a prosecutor; the jury never was able to observe the demeanor of this key witness.

Coleman – armed with a baseball bat – stood guard over Mr. Skakel with another person[22] in the dining room after Mr. Skakel's escape attempt failed but prior to his first general meeting. Coleman was singled out for guard duty because of his intimidating size. Tr.5/17/02 at 134-35. The rules mandated absolutely no talking. Tr.5/24/02 at 8. Nonetheless, Coleman claimed that Mr. Skakel told him, "I am going to get away with murder because I am a Kennedy," and then said he had made advances to this girl, she spurned his advances, and he drove her head in with a golf club. According to Coleman, Mr. Skakel said that he hit her so hard that the golf club broke in half and that two days later he returned to the body and masturbated on it.[23] Tr.5/17/02 at 137.

---

[22]Significantly, none of the people identified by Coleman as witnessing Mr. Skakel's statements were produced by the State to support Coleman's story. See Tr.5/17/02 at 157.
[23]Coleman was the only witness who said anything about masturbating on the body. This story, of course, could not be true since the victim was found less than 24 hours after the murder. Tr. 5/7/02 at 155-160.

Coleman's story changed dramatically each time he told it.[24] First, as with

Higgins, it is not believable that Mr. Skakel would choose Coleman, the head "gorilla", to

be his confidante when Coleman was standing over him with a baseball bat. This doubt

is magnified because talking between the personal overseer and the person being

guarded was prohibited under the Elan Code. Tr.5/24/02 at 8. It is particularly incredible

that Coleman would not have reported this important event to the staff. See generally

Testimony of Sarah Petersen, 5/23/02 at 161; Angela McFillan, 5/24/02 at 32. Coleman

obviously would have been rewarded at Elan with extra privileges and elevated status

and power. It makes no sense that Coleman and Higgins would have kept this

information to themselves at (and after) the general meeting devoted to the topic.[25]

Coleman's testimony was untrustworthy for other reasons.[26] Coleman, a 20-25

---

[24] It is not surprising that Coleman's story constantly changed since he had been exposed to three different TV tabloid shows about the murder – one prior to testifying before the grand jury and two additional ones. Tr.5/17/02 at 163.

[25] Coleman's claim that he never attended a general meeting for Mr. Skakel, Tr.5/17/02 at 141, is equally incredible. There were numerous general meetings for Mr. Skakel (Tr.5/23/02 at 114) and attendance at general meetings was mandatory. Tr.5/24/02 at 10.

[26] Coleman's testimony lacked corroboration. He provided the names of three possible witnesses to Mr. Skakel's confession, but none of them testified. He claimed Mr. Skakel received special treatment, but no one else saw it. He testified that during a primal scream session, Mr. Skakel was told by Alice Dunn to get in touch with his guilty feelings over the incident in Connecticut and he repeatedly screamed that he was sorry. Tr.5/17/02 at 139; 180-1; 189; 192; Tr.5/20/02 at 47-8. But, Coleman was unable to name one other Elan resident who was present for this session, Tr.5/17/02 at 191, and Alice Dunn did not corroborate Coleman. Instead, she recalled a primal scream session

bag a day heroin addict, testified before the grand jury one hour after shooting up. Tr.5/17/02 at 155; 168-9. He was unable to focus at the probable cause hearing because he was under severe heroin withdrawal that required him to go to the hospital after testifying. Id. at 173-6. He admitted at the probable cause hearing that his recall was questionable because of his ingestion of drugs and alcohol over a long period of time, the passage of time, and because he had been exposed to television tabloid shows and read about the case. Tr.5/17/02 at 150; 163; Tr.5/20/02 at 41; 53-4. Finally, Coleman, like Higgins, clearly had self-serving motivations for testifying.[27]

### D. Post-Elan statements, hearsay and prejudicial tabloids

The State bolstered the inherently unreliable Elan statements with hearsay, prejudicial statements and the unprecedented admission of prejudicial tabloid articles.

**The triple hearsay testimony of Mildred Ix**: The State presented a statement purportedly made by Mr. Skakel enmeshed in three levels of hearsay. Before the grand jury, Mildred Ix, a Skakel neighbor and friend of Mr. Skakel's father, testified that Rushton Skakel, Sr. told her that the Petitioner had allegedly told him that he, the Petitioner, could have murdered the victim. Tr.5/15/02 at 128; Trial Ex. 87. At trial, Mrs. Ix denied that Rushton Skakel, Sr. said this to her, Tr.5.15.02 at 128, and explained that

---

in which Coleman was present where the topic was getting Mr. Skakel to address his feelings of loss and sadness over his mother's death. Id. at 90-1.
[27]Prior to testifying in the juvenile court proceedings, Coleman wrote to Inspector Garr while incarcerated and demanded $1,200.00. Coleman reminded Garr that he did what he had to do to help out Garr when he testified before the grand jury. Tr.5/20/02 at 23-4.

when she testified before the grand jury she mistakenly attributed her thoughts to Mr. Skakel's father. Id. at 133; 137. The trial court ruled that the statement of the father to Mrs. Ix was admissible under the residual exception to the hearsay rule. Id. at 117-19.

**The irrelevant and prejudicial testimony of Larry Zicarelli and Edwin Jones:**

Larry Zicarelli,[28] the Skakel family chauffer from 1976 to 1977 testified that in the spring of 1977, he drove Mr. Skakel to New York City after Mr. Skakel had had a fight with his father. Tr. 5/16/02 at 2-15. During this day trip, Zicarelli represented that Mr. Skakel made the following statements: (1) that he had "done something very bad" and that "he either had to kill himself or get out of the country"; Id. at 15; and, (2) that if Zicarelli knew what Mr. Skakel had done, he would never talk to him again. Id. at 22-23. The State offered those statements as a confession to the Moxley murder, when, in fact, he was expressing guilt over having been discovered sleeping with his mother's dress.[29]

The defense called Edwin Jones, the person who had contacted the State about Zicarelli. Apparently, Zicarelli casually discussed this incident with Jones in 1990. Tr.5/28/02 at 5-7. In 1993, Jones contacted Inspector Garr. Id. at 6. During the State's

---

[28]Zicarelli had been approached by the police for assistance during his employment at the Skakels, yet he never told the police about Michael Skakel's alleged statements. Zicarelli was called by Inspector Garr in the early 1990s. Id. at 30-35; 45.

[29] Mr. Skakel's sister, Julie, testified that Mr. Skakel never adjusted to their mother's death in 1973. He was found sleeping with one of his mother's dresses, which led to the problem with his father. Zicarelli took Mr. Skakel to New York for an appointment after Mr. Skakel had this problem with his father over sleeping with one of his mother's dresses. Tr.5/29/02 at 92-3; see also defense closing argument, Tr.6/3/02 at 66.

cross-examination of this witness, Mr. Jones testified that Zicarelli told him that the Defendant **confessed** to the murder of Martha Moxley.  Id. at 16.

**The discredited testimony of Matthew Tucharoni**: Mr. Tucharoni, a hairdresser employed at a hair salon in Greenwich in 1975, waited 26 years to come forward with his story.[30] Tr.5/15/02 at 157-8; 169. He claimed that Mr. Skakel, his sister (Julie) and his brother (Rush) came in for haircuts in the spring of 1976 for the first and only time. Id. at 158; 167; 181-2.  As Tucharoni was trimming Mr. Skakel's hair, Tucharoni claimed that Mr. Skakel said, "I am going to get a gun and I am going to kill him." He reported that Julie said, "you can't do that" to which Mr. Skakel replied, "Why not, I did it before, I killed before." Id. at 166-7. Julie Skakel rebutted Mr. Tucharoni's story.  She indicated that she never went with Mr. Skakel and Rush for haircuts; that it was not something the three of them would have done since they did not get along; that Mr. Skakel went to Mike the barber for his haircuts; and that the Tucharoni incident never happened. Tr.5/29/02 at 80-1.

**The statements made by the Defendant to Meredith, Pugh & Hoffman**: Mr. Skakel related what he did on October 30, 1975 after returning from his cousin's house to three trial witnesses: Michael Meredith in 1987; Andrew Pugh in 1991, and Richard

---

[30]In fact, he contacted the State just before the start of evidence at the urging of a long-time customer, a Stamford sheriff. Id. at 169; 177-8. Even though Tucharoni had cut the Stamford sheriff's hair every four to five weeks for 15-20 years, he only brought up this incident in 2002. Id. at  202-3.

Hoffman in 1997. He told Mr. Meredith that he "unequivocally" was innocent of murdering Martha Moxley. Tr.5/20/02 at 111; 126; see also Testimony of Hoffman, Tr.5/21/02 at 151-2. Mr. Skakel said that after returning home from his cousin's house on October 30, 1975, he was unable to sleep so he snuck outside and he ran to a house on Walsh Lane where he hoped to see a lady naked. Trial Ex. 80 at 78, 83. On his way back to his house, he stopped at Martha Moxley's house and climbed a tree by their front door, hoping to see Ms. Moxley through a window. Id. at 85-93. While in the tree, he masturbated for 30 seconds, then realized that if got caught, everyone would think he was crazy. Id. at 94-96; See also Tr.5/20/02 at 112; 165. He climbed down the tree, thought he heard something, and then ran home. As he was running home, he remembered thinking, "Oh my God, I hope to God nobody saw me jerking off." Exhibit 80 at 103. When Mrs. Moxley came to the Skakel house the next morning and spoke with the Petitioner, he remembered feeling panicked and thinking, "Oh my God, did they see me last night?", referring to his masturbation-in-the tree episode. Id. at 105-107.

**The admission of prejudicial Tabloid articles:** Geranne Ridge testified that she met Mr. Skakel for no more than ten minutes at her condominium in Boston in the spring of 1997. Tr. 5/21/02 at 9-10. She claimed that Mr. Skakel was a guest of her house guest, Marissa Verrochi.[31] Id. at 10-1. She recalled that Mr. Skakel jokingly made

---

[31] Ms. Verrochi testified that she was never in the presence of Mr. Skakel and Gerrane Ridge. Tr.5/23/02 at 92.

the statement "Ask me why I killed my neighbor." Id. at 13-4. Ms. Ridge denied that Mr.

Skakel made any other incriminating admissions about the murder. Id. at 14; 63. When

confronted with a tape recorded phone call to a friend in February 2002, wherein she

related statements allegedly made by Mr. Skakel, Id. at 20-28; Trial Ex. 104, she

testified that she had made up the information to appear self-important and that she

acquired the information from tabloids and other sources, including gossip. Tr.5/21/02 at

69-71. The State showed Ms. Ridge three tabloids she had brought to court and asked

her to locate the information she had provided to her friend. Id. at 109-113 (Trial

Exhibits 105, 106 and 107).[32] The three inflammatory tabloids (*The Star*, *The National*

---

[32] State's Exhibit 105 is an article dated March 19, 2002 that appeared in *The National Enquirer,* and is captioned *Cousin Blows Lid Off 25 Years Of Cover-Ups – Kennedy Family Secrets Exposed – Murder – Addictions – Affairs.* The inside story bears the caption: *Kennedy Family's Darkest Secrets* and pictures the Petitioner as an adult, along with a picture of Martha Moxley. After recounting the tales of sex, alcohol and drugs, the article concluded that the Petitioner is charged with murdering Martha Moxley and that he "refused to cooperate with police."

State's Exhibit 106, is an article that is dated February 29, 2000 and appeared in *The Globe* with the headline, *Kennedy's Dirty Secrets*, and the inside caption: *Michael Skakel Linked To Shocking Book Proposal That Airs Kennedy Dirty Laundry.* The article recounts the Petitioner's book proposal and makes repeated reference to the Petitioner:

- Skakel is called a recovering addict;
- Skakel is branded a liar by members of the Kennedy family. ("The allegations contained in the [book] proposal are false, malicious and libelous.");
- Skakel lied to investigators probing the murder of Martha Moxley;
- Skakel is quoted as saying: "I am a member of a family sick unto death with generations of secrets…" and "You're only as sick as your secrets."

State's Exhibit 107 is an article dated May 13, 1997 from the *Star* tabloid bearing the lead headline: *Kennedy And Teen Lover.* The inside story is captioned "*Kennedy Heir,*

---

*Enquirer* and *The Globe*) were then admitted, over Mr. Skakel's objection of relevance and prejudice. The court gave a cautionary instruction that the tabloids were not being offered for the truth. Ms. Ridge then testified that the tabloids made no mention of the information she imparted to her friend. Tr.5/21/02 at 114-117. She also stated that the tabloids were not her only sources of the information she provided to her friend. Id. at 129-30.

## III. ARGUMENT

The federal courts have jurisdiction to grant a writ of habeas corpus ordering the release of a petitioner whose detention is unconstitutional. See 28 U.S.C. § 2254; Townsend v. Sain, 372 U.S. 293, 312 (1963). A federal court may grant habeas corpus relief to a petitioner convicted in a state court proceeding if the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may also grant habeas relief when the state court's adjudication "resulted in a decision that was based on an unreasonable determination of

---

*His Teen Love And Their Steamy 5-Year Affair.*" This tabloid article discusses an affair the Petitioner's cousin, Michael Kennedy, had with his underage babysitter. Although the Petitioner's name did not appear in the article, the details of a Kennedy being attracted to a 15-year old bears a striking similarity to the State's theory that the motive for the killing was Petitioner's attraction to the 15-year old victim.

the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

2254(d)(2).

A decision by a state court is "contrary to" clearly established law if it "applies a

rule that contradicts the governing law set forth in [Supreme Court] cases" or if it

"confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme Court] and nevertheless arrives at a result different from [Supreme Court]

precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A habeas petitioner can

demonstrate that the state court's decision involved an "unreasonable application " of

clearly established law if he can show that the state court applied precedent to the facts

of his case in an objectively unreasonable manner.  Woodford v. Visciotti, 537 U.S. 19,

24-25 (2002) (per curiam).

**A.  The Connecticut Supreme Court Violated The Ex Post Facto Clause And The Due Process Clause Of The United States Constitution When It Overruled Its Own Binding Precedent In Order To Authorize The Prosecution Of The Petitioner That Had Previously Been Time-Barred**

**1.  Facts And Procedural History Relevant To This Claim**

Mr. Skakel was arrested on January 19, 2000 for a crime that occurred nearly 25

years earlier, when he was 15 years old.  The offense of which Mr. Skakel was

convicted (non-capital murder pursuant to Connecticut General Statutes Section 53-

54a) occurred in 1975.  At that time, the limitations period for that offense was five

years.  Conn. Gen. Stat. § 54-193 (Rev. to 1975) ("No person shall be prosecuted … for

any crime or misdemeanor of which the punishment is or may be imprisonment in the Connecticut Correctional Institution, Somers, except within five years next after the offense has been committed.") (see App. A236).

One year later, in 1976, the Connecticut legislature enacted a statute eliminating the limitations period for certain offenses, including non-capital murder.  Conn. Gen. Stat. § 54-193 (1976), App. A238.  Between 1980 and the Mr. Skakel's arrest in 2000, the Connecticut Supreme Court held **twice**, each time **unanimously**, that the 1976 statute did not apply to pre-enactment conduct.  See State v. Paradise, 189 Conn. 346, 353 (1983); State v. Crowell, 228 Conn. 393, 397 (1994).

On June 20, 2000, Mr. Skakel filed a Motion To Dismiss in the trial court claiming that the prosecution was time-barred under Conn. Gen. Stat. § 54-193, the statute of limitations in effect on October 30, 1975.  App. A225. The trial court denied the motion by Memorandum of Decision dated December 11, 2001.  State v. Skakel, No. FST-CR-00-135792T, 2001 WL 1681793 (Conn. Super. Ct. Dec. 11, 2001) (Kavanewsky, J.). App. A226.

The trial court concluded that Mr. Skakel's prosecution was not subject to the statute of limitations set forth in Section 54-193 (Rev. to 1975) because murder historically was considered a grave offense to which the statute of limitations was never intended to apply.  App. A233. The trial court did **not** hold that the amendment to the statute of limitations enacted in 1976 should be applied retroactively to Mr. Skakel's

prosecution.  Indeed, the retroactive application of the 1976 amendment to the statute of limitations was ***never*** argued or presented to the trial court by the State.  In fact, in its Memorandum In Opposition To Motion To Dismiss filed on May 30, 2001, the State conceded that it could ***not*** rely on a claim for retroactive application of the 1976 amendment, and it ***never*** argued that <u>Paradise</u> should be overruled.  <u>See</u> State's Memorandum In Opposition To Motion To Dismiss, App. A209.

Because the trial court did not apply the new statute of limitations retroactively, or even entertain that issue, the parties did not brief that issue on appeal to the Connecticut Supreme Court.  Rather, the State focused its brief entirely on the argument that there was never a statute of limitations for murder, and it argued in only one page of its lengthy brief that <u>Paradise</u> and <u>Crowell</u> should be overruled.  <u>See</u> State's Brief to Connecticut Supreme Court at 11-27.  As such, Mr. Skakel briefly addressed the issue in three-quarters of a page in his 25-page Reply Brief.

Surprisingly, despite its own two binding authorities holding that Section 54-193 "provided for a five-year period of limitations on ***all*** felony offenses," <u>Paradise</u>, 189 Conn. at 348 (emphasis added), the Connecticut Supreme Court announced that it had changed its view on how to interpret the scope of the 1976 statute; it overruled <u>Paradise</u> and <u>Crowell</u>, the two prior decisions that had declared that the 1976 statute operates prospectively only; and it applied the new interpretation retroactively to the Petitioner. <u>See</u> <u>State v. Skakel</u>, 276 Conn. at 693.

After the Connecticut Supreme Court issued its decision on this ground, the Petitioner filed a Motion For Reconsideration, To Reargue And For Reconsideration And Reargument En Banc, claiming that the Connecticut Supreme Court's decision contravened the Ex Post Facto and Due Process Clauses of the United States Constitution and the Due Process Clause of the Connecticut Constitution.[33] App. A185. The Connecticut Supreme Court denied the Motion.

### 2.    The Applicable Constitutional Provisions

The Due Process Clause of the United States Constitution requires that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV.  Article I of the Constitution also prohibits the passing of any ex post facto law by the United States Congress or a state legislature.  U.S. Const., art. I, §§ 9, 10.  In particular, the Due Process Clause prevents courts from expanding criminal statutes retroactively, just as the Ex Post Facto Clause proscribes the legislative enactment of laws that seek to accomplish the same end.

The United States Supreme Court recognized more than 200 years ago the several categories of legislative actions that are prohibited by the Ex Post Facto Clause:

---

[33] The Ex Post Facto and Due Process issues did not arise in this case until the Connecticut Supreme Court's decision in 2006.  The Petitioner addressed these issues as soon as they arose in the state court system and, thus, has exhausted the issues properly below.

1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

Calder v. Bull, 3 U.S. (Dall.) 386, 390-91 (1798); see also Collins v. Youngblood, 497 U.S. 37, 46 (1990) (recognizing the authoritativeness of the Calder description of ex post facto laws).

The Due Process Clause's requirement that no State shall "deprive any person of life, liberty, or property, without due process of law" imposes on state courts many of the same restrictions that the Ex Post Facto Clause imposes on state legislatures. These two clauses ensure fundamental fairness, through notice and fair warning, and prevent arbitrary and vindictive use of the law. The United States Supreme Court has held, with respect to the elements of a criminal offense, that a judicial construction of a statute may not be given retroactive effect if that construction is "'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]'" Bouie v. City of Columbia, 378 U.S. 347, 354 (1964) (citation omitted).

The United States Supreme Court has routinely held that the retroactive application of statutes in a manner described above violates the Constitution's prohibition on ex post facto laws. See, e.g., Carmell v. Texas, 529 U.S. 513 (2000)

(holding that the retroactive application of an amendment to the criminal procedure code reducing the amount of corroborating evidence required for conviction of a sexual offense violated the Ex Post Facto Clause).  That prohibition against ex post facto laws also extends to statutes, enacted after a limitations period has expired, "authoriz[ing] criminal prosecutions that the passage of time has previously barred."  Stogner v. California, 539 U.S. 607, 610 (2003).  Thus, in Stogner, the Supreme Court held that a law permitting the prosecution of sex-related child abuse offenses within one year of the victim's report to police may not be applied to offenses whose prosecution was time-barred at the time of the law's enactment.  That use of such a law would "produce the kind of retroactivity that the Constitution forbids[.]"  Id.

The Supreme Court recognized in Bouie v. City of Columbia, 378 U.S. 347 (1964) that the Due Process Clause of the Fourteenth Amendment prohibits **courts** from achieving through judicial decision-making many of the same retroactive changes in criminal law that would be forbidden under the Ex Post Facto Clause if attempted by the legislative branch.  Id. at 353-54.  ("If a state legislature is barred by the *Ex Post Facto* Clause from passing … a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.").  As the Supreme Court has recognized in the context of judicial decisions that "attach[] criminal penalties to what previously had been innocent conduct[,]" the guiding principles for determining whether the Due Process Clause

forbids judicial expansion of a criminal statute are "notice, foreseeability, and, in particular, the right to fair warning[.]"  Rogers v. Tennessee, 532 U.S. 451, 459 (2001); see also Marks v. United States, 430 U.S. 188, 191-92 (1977).

A new limitations period, when applied retroactively to permit a prosecution that the passage of time had previously barred, violates the requirements of notice, foreseeability and fair warning protected by the Due Process Clause.  In particular, a State that applies its laws in such a manner "has deprived the defendant of the 'fair warning,' Weaver v. Graham, 450 U.S. 24, 28 (1981), that might have led him to preserve exculpatory evidence."  Stogner, 539 U.S. at 611.  It "'unfair[ly] and dishonest[ly]'" permits prosecution "after the State has assured 'a man that he has become safe from its pursuit[.]'"  Id. (quoting Judge Learned Hand in Falter v. United States, 23 F.2d 420, 426 (2d Cir.), cert. denied, 277 U.S. 590 (1928)).  In fact, such a statute "falls literally within the categorical descriptions of *ex post facto* laws set forth" in Calder because it "enable[s] punishment where it was not otherwise available 'in the ordinary course of law,'" Stogner, 539 U.S. at 611, 614, and it "permit[s] conviction on a quantum of evidence where that quantum, at the time the new law is enacted, would have been legally insufficient."  Id. at 616.[34]

_____

[34] The outcome in Stogner did not depend on the petitioner's ability to prove he had actually relied on the pre-existing limitations period or that he otherwise had been prejudiced by the prosecution's delay.  The Court instead noted generally that "[m]emories fade, and witnesses can die or disappear" when there is a lengthy delay.

Of course, not every judicial ruling that reevaluates and refines the scope of criminal law is unconstitutional. Rather, the test for determining if the retroactive application of such a judicial decision violates the Due Process Clause is whether it construes the law in a manner that is "'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]'" Bouie, 378 U.S. at 354. This formulation provides courts with the needed flexibility to ensure that the law may evolve, see Rogers, 532 U.S. at 462, while at the same time ensuring fundamental fairness, including the requirement that the prosecution and punishment of particular conduct be foreseeable. See Rogers, 532 U.S. at 461-62; Marks, 430 U.S. at 191-92; Bouie, 378 U.S. at 354. A judicial ruling that is unexpected and indefensible by reference to the status quo ante deprives a defendant of those protections. Bouie, 378 U.S. at 354.

As applied to statutes of limitations, the Due Process Clause prohibits the same sort of "unexpected and indefensible" judicial rulings described in Bouie if such rulings would authorize prosecution that the passage of time had previously barred. As noted above, the United States Supreme Court made clear in Stogner that such a result threatens the same "'manifestly unjust and oppressive'" effects that result from the

Stogner, 539 U.S. at 631. Although proof of prejudice to the Petitioner in this case is therefore unnecessary, the retroactive extension of the limitations period in fact worked manifest prejudice against him. The prejudice included faded witness memories, the death and other unavailability of key witnesses, and the Petitioner's loss of the ability to be adjudicated as a juvenile rather than an adult.

retroactive application of other new criminal laws, and it "'unfair[ly] and "'dishonest[ly]'"

allows prosecution after the State has "assured 'a man that he has become safe from its

pursuit[.]'" Stogner, 539 U.S. at 611.[35]  A judicial decision that is unexpected and

indefensible by reference to the law which had been expressed after the previous

limitations period had expired, and that authorizes criminal prosecution that previously

had been barred, therefore falls squarely within the prohibitions of the Due Process

Clause.  See Hunt v. Tucker, 875 F. Supp. 1487, 1509 (N.D. Ala. 1995), aff'd, 93 F.3d

735 (11th Cir. 1996) ("[A] retrospective judicial determination that effectively changes the

statute of limitation and revives a previously barred criminal prosecution is in the nature

of an ex post facto law and thus violates the defendant's right to substantive due

process.").

### 3.    The Connecticut Supreme Court's Prior Expressed Law

The Connecticut Supreme Court's decision, overruling its earlier interpretation of

the 1976 statute of limitations, and then applying the new expansive interpretation for

the first time in Mr. Skakel's case, is contrary to federal law as articulated by the United

States Supreme Court.  The Connecticut court, in holding that the 1976 repeal of certain

---

[35] "'The statute [of limitations] is … an amnesty, declaring that after a certain time … the offender shall be at liberty to return to his country … and … may cease to preserve the proofs of his innocence.'"  Stogner, 539 U.S. at 611 (quoting F. Wharton, Criminal Pleading and Practice § 316 at 201 (8th ed. 1880)).  Reviving a time-barred prosecution "'inflict[s] punishments where a party, by law, was not liable to any punishment.'"  Id. (quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 389 (1798)).

limitations periods could apply in Mr. Skakel's case, overruled two of its own cases that were directly on point. Those cases – both decided after the expiration of the five-year limitations period for non-capital murder and several years before Mr. Skakel's arrest – squarely held that the 1976 statute did *not* apply to offenses committed before 1976. To reach the contrary result in Mr. Skakel's case, the state court simply changed its interpretation of the 1976 statute, accepting arguments that on each previous occasion it had considered and unanimously rejected. Such a construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," see Bouie, 378 U.S. at 354, and giving that new construction retroactive effect violates due process.

The legal issue controlling Mr. Skakel's Motion to Dismiss that was filed in the state trial court – that is, whether Connecticut's 1976 amendment to its limitations statute may be applied to his case – was squarely decided not once but twice, before the State charged him with Martha Moxley's murder. See State v. Paradise, 189 Conn. 346 (1983); State v. Crowell, 228 Conn. 393 (1994). Those two unanimous decisions left no doubt that the limitations period for a non-capital murder that occurred in 1975 was five years.

The Paradise case squarely held that persons charged with a non-capital murder that predated the 1976 amendment to Section 54-193 must be charged within five years of the offense. That outcome was based on two legal rulings, each of which squarely

applies to Mr. Skakel's case and – had the Connecticut Supreme Court adhered to them – would bar his prosecution.

First, the court held in <u>Paradise</u> that the statute of limitations in effect at the time of the offense that the State charged here "provided for a five-year period of limitations on all felony offenses." <u>Paradise</u>, 189 Conn. at 348 (citing Conn. Gen. Stat. § 54-193).[36] That limitations statute was also in effect at the time of Martha Moxley's murder, and the underlying offense – non-capital murder charged under Conn. Gen. Stat. § 53a-54a – was also the same.

Second, <u>Paradise</u> held that the 1976 amendment to the limitations statute – the amendment that for the first time abolished the limitations period for Class A felonies such as non-capital murder – is not "to be applied retroactively" to offenses that pre-dated the amendment. <u>Paradise</u>, 189 Conn. at 347 & 353. The court, drawing a clear distinction between "the legislature's power to enact retrospective legislation" and the question whether ***this*** statute was retroactive "by its terms," 189 Conn. at 347, flatly and

---

[36] The court stated that it was not deciding "whether this statute, which does not specifically cover ***capital*** offenses, bars prosecution of a person for a crime for which the punishment is or may be death." <u>Paradise</u>, 189 Conn. 348 n.1 (emphasis added). In fact, the State later successfully proceeded against the two <u>Paradise</u> defendants on capital murder charges. <u>State v. Ellis</u>, 197 Conn. 436 (1985). Under Connecticut law, capital murder is murder involving one of six special circumstances, such as killing a law enforcement officer, acting for pecuniary gain or killing while under a sentence of life imprisonment. Conn. Gen. Stat. § 54a-54b (Rev. to 1975). The question reserved in <u>Paradise</u> and answered in <u>Ellis</u> has no effect on the limitations period applicable to Mr. Skakel because he was not charged with capital murder.

unanimously rejected the State's argument that the "procedural" nature of the statute of limitations and "considerations of good sense and justice mandate its retrospective application[.]" Id. at 350. Applying a presumption against retrospective application of criminal statutes, and finding "nothing in General Statutes § 54-193 which indicates a clear legislative intent that the statute have a retrospective effect," the court held that the charges were time-barred. Id. at 353.

The ruling in Paradise left no doubt that the prosecution of a non-capital murder committed in Connecticut in 1975 must be commenced in or before 1980. And assuming any doubt remained, the Connecticut Supreme Court removed it with its decision nine years later in State v. Crowell, 228 Conn. 393. In Crowell, the State again sought retrospective application of a criminal limitations statute – this time an act that extended the five-year limitations period to seven years for child sex offenses. As was the case in Paradise, the pre-existing limitations period had expired before the defendant was charged. "These facts," the Crowell court observed, "make clear that in Paradise, we considered the identical issue raised in this appeal, that is, whether a new statute of limitations may be applied to an offense committed prior to its effective date, where the new statute takes effect before the original statute of limitations expires." Crowell, 229 Conn. at 397. The State acknowledged that Paradise was controlling but argued it should be overruled because it was based on a "faulty premise." Id. In particular, the State contended that "the Paradise court's 'reliance on rules of statutory

construction pertaining to retroactivity is misplaced and should be reconsidered.'" Id. at 398.

The court in Crowell considered, and once again rejected, the State's position. It noted that in Paradise it had already explicitly rejected the same arguments the State advanced in favor of retroactive application of the limitations period. Crowell, 228 Conn. at 398. The Crowell court went on to explain that it nonetheless conducted "a thorough consideration of the parties' arguments in State v. Paradise, supra, and the reasoning behind that decision" and "conclude[d] that it should not be overruled." Id. at 399.

The Crowell decision, coming nearly 20 years after the offense with which the Petitioner was later charged, therefore reaffirmed the Connecticut Supreme Court's ruling in Paradise that the 1976 law abolishing the limitations period for non-capital murder did not apply to offenses that occurred before April 6, 1976. The Paradise case, in turn, was indistinguishable from Mr. Skakel's case. It involved a prosecution for non-capital murder based on conduct that pre-dated the 1976 amendment's expansion of the limitations period beyond five years. And the unanimous ruling unequivocally established that such a prosecution could not be commenced more than five years after the offense occurred – 1980 in this case.

4. **The Connecticut Supreme Court's Decision Was Contrary To Clearly Established Federal Law As Determined By The Supreme Court Of The United States**

The Connecticut Supreme Court's decision to revive Mr. Skakel's time-barred prosecution conflicts with the United States Supreme Court's rulings in <u>Bouie</u>, <u>Marks</u> and <u>Rogers</u>. In each of those cases, the Court held that the Due Process Clause forbids giving retroactive effect to a new and more expansive construction of a criminal statute if that construction is unexpected and indefensible by reference to the law that had been previously expressed. As the Court's explanation of that test in each of those cases makes clear, the Connecticut Supreme Court's decision cannot be squared with those rulings.

a. <u>**Bouie v. City of Columbia**</u>**, 378 U.S. 347 (1964)**

In <u>Bouie</u>, the Supreme Court held that the South Carolina Supreme Court's expansive construction of a trespass statute could not be applied to conduct pre-dating that broad interpretation. The statute forbade "'entry upon the lands of another … after notice from the owner or tenant prohibiting such entry[.]'" <u>Bouie</u>, 378 U.S. at 349-50. The state supreme court applied that statutory prohibition to two defendants who merely remained on the premises after being asked to leave. The Supreme Court reasoned that "[t]here was nothing in the statute [prior to the South Carolina Supreme Court's post-conduct interpretation] to indicate that it also prohibited the different act of remaining on the premises after being asked to leave." <u>Id.</u> at 355. Not only was this

interpretation "at variance with the statutory language," it did not find "the slightest support in prior South Carolina decisions."  Id. at 356 ("In sum, in the 95 years between the enactment of the statute in 1866 and the 1961 decision … the South Carolina cases construing the statute … gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave.") Id. at 356-57.  Thus, the petitioners in Bouie, "had no fair warning of the criminal prohibition under which they now stand convicted," and therefore the application of the court's new interpretation to the petitioners violated due process.  Id. at 361.

The Connecticut Supreme Court's decision to overrule precedent and apply a new interpretation of the 1976 limitations statute to Mr. Skakel is contrary to the reasoning and the holding in Bouie.  In fact, the court's determination in Mr. Skakel's case that the limitations period for class A felonies occurring in 1975 had been abolished in 1976 was even more "unexpected and indefensible" than the South Carolina Supreme Court's interpretation of its trespass statute.  In Bouie, the United State Supreme Court found the new interpretation of the statute to be "unexpected and indefensible" where prior cases interpreting the statute had ***never addressed*** whether prosecution could be predicated on the refusal to obey a request to leave.  Here, however, the Connecticut Supreme Court had already affirmatively addressed the very question at issue – whether the 1976 statute was meant to apply to pre-enactment offenses – and explicitly held that the statute did ***not*** authorize prosecution of the

category of offenses with which Mr. Skakel was later charged. <u>Paradise</u>, 189 Conn.

346. And the court reaffirmed that 1983 holding in 1994, after explicitly rejecting the

State's argument that the case had been wrongly decided. <u>Crowell</u>, 228 Conn. 393.

Thus, for at least 11 of the 19 years between the expiration of the five-year limitations

period and Mr. Skakel's arrest, he had the strongest possible assurance that the 1976

limitations statute could not apply to him.[37] Those rulings on the scope of the 1976

statute were at least as "definite and precise" as the trespass statute in <u>Bouie</u>. In

overruling those two cases, the Connecticut Supreme Court gave the 1976 statute an

interpretation that was "unexpected and indefensible by reference to the law" which that

very court had "expressed" after the then-applicable limitations period had expired.

Under <u>Bouie</u>, the Connecticut Supreme Court violated Mr. Skakel's due process rights.

### b. <u>Marks v. United States</u>, 430 U.S. 188 (1977)

The Connecticut Supreme Court's ruling also conflicts with the Supreme Court's

decision in <u>Marks</u>, a case rejecting on due process grounds the retroactive application

of a broader definition of obscenity where the broadening resulted from the Court's

---

[37] It is sufficient, for purposes of making out a due process violation, that the state's "assur[ance]" that Mr. Skakel was "'safe from its pursuit,'" <u>Stogner</u>, 539 U.S. at 611, took the form of unanimous rulings spanning a period of 11 years. Nonetheless, between 1994 (when <u>Crowell</u> was decided) and 2000 (when the Petitioner was charged), the Connecticut Supreme Court did not so much as hint the contrary – i.e., that <u>Paradise</u> and <u>Crowell</u> were wrongly decided. Indeed, it gave no such indication until nearly four years **after** Mr. Skakel was convicted, when it unexpectedly overruled those decisions in affirming Mr. Skakel's own conviction.

decision to overrule one of its prior cases. The Court had previously articulated in a plurality opinion a three-part test for obscenity. See Memoirs v. Massachusetts, 383 U.S. 413 (1966). Seven years later, in Miller v. California, 413 U.S. 15 (1973), the Court modified, among other things, the third part of the Memoirs test. That third part, which had protected expressive material unless "'utterly without redeeming social value[,]'" was altered to focus the inquiry on "'whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.'" See Marks, 430 U.S. at 190-91. The petitioners in Marks, whose conduct pre-dated the Miller decision, argued they were entitled to jury instructions under the more favorable Memoirs formulation of part three. The United States Supreme Court agreed, because Miller "marked a significant departure from Memoirs[,]" Marks, 430 U.S. at 194, and the petitioners therefore "had no fair warning that their products might be subjected to the new standards." Id. at 195.

The Connecticut Supreme Court's alteration of the law to uphold Mr. Skakel's conviction contains the same features that required reversal in Marks. The Connecticut Supreme Court's opinion in the present case "did not simply clarify" the Paradise and Crowell decisions; it "marked a significant departure from" those prior rulings. See Marks, 430 U.S. at 194. Indeed, a more significant departure could not be imagined. And the Marks Court reversed even though "the Memoirs standards never commanded the assent of more than three Justices at anyone time," Marks, 430 U.S. at 192, and even though persons tried after the Miller decision were entitled to the application of

40

"'any constitutional principle enunciated in <u>Miller</u> which would serve to benefit'" them. <u>Marks</u>, 430 U.S. at 197 (quoting <u>Hamling v. United States</u>, 418 U.S. 87, 102 (1974)).

The case for reversing Mr. Skakel's conviction is even stronger where, unlike in <u>Marks</u>, there was no sign that the prior decisions were vulnerable to change and where nothing in the new interpretation of the 1976 statute was even arguably favorable to the Petitioner. Here, no less than in <u>Marks</u>, the highest court's reversal of – and marked departure from – its own recent case law deprived Mr. Skakel of fair notice that the prosecutor could bring a case that previously was disallowed.

### c.     <u>Rogers v. Tennessee</u>, 532 U.S. 451 (2001)

The Connecticut Supreme Court's retroactive application of its interpretation of the 1976 statute to Mr. Skakel is also inconsistent with the Supreme Court's opinion in <u>Rogers</u>. In <u>Rogers</u>, the Supreme Court held that the judicial abrogation of Tennessee's common law year-and-a-day rule for murder cases was not unexpected or indefensible by reference to the law that previously had been expressed, and thus could be applied retroactively without offending the Due Process Clause. <u>Rogers</u>, 532 U.S. 451. But the Court noted that the year-and-a-day rule, permitting murder charges only if the victim died within a year and a day of the defendant's injurious conduct, was rooted in the incapability of 13th century medical science to establish causation beyond a reasonable doubt when a great deal of time had elapsed between the victim's injury and his death. <u>Id.</u> at 463. Practically every court to have considered the rule before the petitioner

committed his offense had noted that advances in medical science rendered the rule obsolete.  Id.  The first and only mention of the rule by the Tennessee Supreme Court was in 1907, reversing the conviction of the defendant and noting the rule only in passing.  Id. at 464-65.  Moreover, "at the time of petitioner's crime," the year-and-a-day rule had "only the most tenuous foothold as part of the criminal law of the State of Tennessee … [T]he rule had never once served as a ground of decision in any prosecution for murder in the State."  Id. at 464.  Thus, the United States Supreme Court held that "[f]ar from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense."  Id. at 467.

The Connecticut Supreme Court's decision, on the other hand, was anything but "a routine exercise of common law decisionmaking" that "brought the law into conformity with reason and common sense."  Not only was the court interpreting a statute, rather than promoting the evolution of judge-made common law, the court's Paradise and Crowell decisions were recent rulings based on well-established principles of state law. See, e.g., Paradise, 189 Conn. at 351 (noting that for criminal cases, "the law in Connecticut has long been to the contrary" of the rule in the civil field that procedural statutes are presumed to operate retrospectively).  Those decisions were not questioned by the court until 2006, when the court for the first time credited the State's argument, rejected twice before in Paradise and Crowell, that the 1976 statute should

apply retroactively. Thus, the court's decision that "Paradise was wrongly decided,"[38]

State v. Skakel, 276 Conn. at 666, is the "marked and unpredictable departure" from a

court's prior precedent to which Rogers refers. See Rogers, 532 U.S. at 467. The

retroactive application of such a departure to Mr. Skakel therefore offends the

constitutional guarantees of due process articulated by the United States Supreme

Court in Rogers.

---

[38] The stark illegality arising from the retroactive application of the Connecticut Supreme Court's new construction of statutory law cannot be avoided by characterizing the reasoning in Paradise as merely an unfortunate error. That assertion, while candid, is constitutionally irrelevant. Pre-existing law does not magically disappear for ex post facto and due process purposes simply because it is later revoked as a regrettable error. Mr. Skakel's prosecution cannot be saved by arguing that Paradise should have been decided differently in 1983, or that had the Connecticut Supreme Court construed the statute differently the first time, the prosecution of Mr. Skakel would have been constitutionally permissible. The simple fact is that the statutory law in this State between 1983 and 2006, as it applied to the prosecution of Mr. Skakel for the 1975 murder of Martha Moxley, was precisely what the Connecticut Supreme Court said it was at that time, on indistinguishable facts, in Paradise. It is "emphatically the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 177 (1804), and in Paradise, the Connecticut Supreme Court said what the statutory law of this State was in terms that could not have been clearer or more directly applicable to this case: as of 1983, the statute of limitations for a 1975 non-capital murder had expired. Applying Section 54-193 in 2006 to resurrect a 1975 prosecution is therefore "manifestly unjust and oppressive," a denial of the constitutionally required "fair warning," a breach of Mr. Skakel's vested rights, and a violation of the Due Process Clause. Labeling Paradise an "error" thus does nothing to remove the constitutional impediment to retroactive application of the newly announced construction of the statute of limitations. A statute construed to change its effect in this manner violates the Constitution no matter how it is labeled. "The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised." Cummings v. Missouri, 71 U.S. 277, 325 (1867).

### d. Conclusion

The breadth of the Connecticut Supreme Court's approach to retroactivity is of enormous significance. If that approach is permitted, no citizen may rely on a state supreme court's interpretation of its own criminal statutes, no matter how precisely on – point or longstanding or well-settled the prior interpretation. Such an interpretation could be reversed and applied retroactively to a defendant's detriment on the pretext that every citizen is on fair notice that *stare decisis* is not an absolute principle. The right to fair warning in this context would be rendered a nullity by the fact that every judicial decision has the potential of one day being overruled. Such a proposition is so far-reaching that habeas corpus relief is warranted.

### 5. The Connecticut Supreme Court's Application Of Its New statutory Interpretation To The Petitioner Conflicts With The Decisions Of Federal Courts Of Appeals And Another State Supreme Court

The Connecticut Supreme Court's decision also conflicts with rulings from the federal courts of appeals and the highest court of another state, all of which have held that the reversal of recent and binding precedent interpreting a state statute or other provision of law violates the Due Process Clause. These courts have expressly ruled that such new interpretations are "'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]'" <u>Bouie</u>, 378 U.S. at 354. This conflict warrants habeas relief.

First, the Connecticut Supreme Court's decision conflicts with the Eighth Circuit's holding in <u>Moore v. Wyrick</u>, 766 F.2d 1253, 1258-59 (8th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1032 (1986).  There, the court held that a new Missouri Supreme Court construction of that State's felony murder statute may not be applied retroactively because: (1) until that new decision, an earlier controlling opinion reached a different result on indistinguishable facts; (2) no intervening case challenged or weakened the earlier opinion's authority; and (3) the new decision significantly expanded the scope of the statute.

The issue in <u>Moore</u> was whether the defendant, who participated in an armed robbery, could be charged under the felony murder statute where a bystander was killed, not by a shot that the defendant or an accomplice fired, but by one fired by one of the intended victims of the robbery.  <u>Moore</u>, 766 F.2d at 1254.  The Eighth Circuit conceded that the plain language of Missouri's felony murder statute – without more – might have provided fair notice to the defendant that he could be charged under such circumstances.  <u>Id.</u> at 1257.  But the Missouri Supreme Court had previously concluded, in <u>State v. Majors</u>, 237 S.W. 486 (Mo. 1922), that the statute was limited to cases where the killing was committed by the defendant or an accomplice.  "As such," the Eighth Circuit held, "whether or not the plain language of the statute would, absent prior judicial construction, give Moore fair warning that his conduct might constitute felony murder is irrelevant.  Instead, we must determine whether the expanded scope of the Missouri

felony murder statute was foreseeable in light of its previously narrow construction."
<u>Moore</u>, 766 F.2d at 1257-58.  The Eighth Circuit concluded that the expanded
construction of the statute was not foreseeable, because "the issue presented in <u>Majors</u>
and, more importantly, the court's decision in <u>Majors</u> were never reexamined or
questioned by the Missouri courts."  <u>Moore</u>, 766 F.2d at 1258 (concluding that "the
change in law judicially effected … was constitutionally unforeseeable and thus cannot
be applied retroactively").

The Connecticut Supreme Court's decision was an equally unforeseeable
expansion of a criminal statute, because: (1) <u>Paradise</u>, a case dealing with
indistinguishable facts, was controlling; (2) no intervening case challenged or weakened
its authority – indeed, its authority was confirmed by <u>Crowell</u>; and (3) the new decision
significantly expanded the scope of the limitations period to authorize a prosecution that
had previously been barred.  The Connecticut Supreme Court's decision is in square
conflict with the Eighth Circuit's decision in <u>Moore</u>.

Second, the decision below conflicts with the Ninth Circuit's holding in <u>United
States v. Potts</u>, 528 F.2d 883, 886 (9th Cir. 1974) (en banc), that the reversal of one of
its own decisions, which had the effect of expanding the scope of a federal criminal
statute, could not be applied retroactively.  The <u>Potts</u> court overruled an earlier decision
on the ground that it had been based on a misreading of state law, and thus held that an
individual whose felony record had been expunged under Washington law was still a

felon for the purposes of the felon-in-possession-of-firearms laws.  Id. at 884-85 & n.2.

The court further held, however, that its new interpretation could not be applied

retroactively to Potts because at the time he possessed a firearm he lacked notice of

the broader interpretation of the statute.  Id. at 886 ("While Hoctor stood as the law of

this circuit, a person such as Potts, whose sole prior felony conviction had been

expunged pursuant to the Washington statute, could not reasonably have suspected

that his possession of a firearm, in or affecting commerce, would constitute a §

1202(a)(1) violation.").  The Ninth Circuit's conclusion that "due process fairness bars

the retroactive judgment of his conduct using the expanded definition," id. (internal

quotations marks and citation omitted), is also in direct conflict with the Connecticut

Supreme Court's retroactive application of a new and expanded interpretation of a

criminal statute.

Finally, the California Supreme Court held in People v. Martinez, 20 Cal. 4th 225,

240-41 (1999), that its new test for the asportation element in simple kidnapping cases

could not be applied retroactively because the previous line "was laid down" by two

previous decisions of the state supreme court and the defendant "had no fair warning

that it would be redrawn."  Martinez, 20 Cal. 4th at 241.  Noting that the "mere possibility

that this court might reconsider its own precedent is not the equivalent of actually

overruling it," id. at 240 (internal quotations marks and citation omitted), the court

refused to apply the new interpretation retroactively.  The Connecticut Supreme Court's

decisions in <u>Paradise</u> and <u>Crowell</u> did not even hint at a "possibility" that the court might reconsider its own precedent, twice rejecting the same arguments presented by the State in the case at hand.  As such, the Connecticut Supreme Court's retroactive application of a new interpretation also conflicts with the California Supreme Court's decision in <u>Martinez</u>.

**B.    The Connecticut Supreme Court's Decision Regarding The State's Withholding Of Certain Exculpatory Evidence Violates The Petitioner's Constitutional Right To A Fair Trial As Set Forth In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)**

**1.    The Sketch**

**a.    Additional Facts And Procedural History Relevant To This Claim**

The single most important piece of exculpatory evidence in this case was suppressed by the State and physically withheld from the defense until after the jury returned its verdict. This evidence was a composite sketch of a man observed by a neighborhood security guard on the road near the scene of the murder, at around the time of the murder. The evidence was compelling because the man depicted in the sketch strongly resembled Kenneth Littleton – the Skakel tutor who was a principal suspect in the case for years, and the defense's primary target as the possible murderer of Martha Moxley. <u>More importantly, the sketch did not resemble fifteen-year-old Michael Skakel.</u> <u>Compare</u> App. A357 and A388. Yet, despite multiple written discovery requests ***explicitly*** asking for disclosure of any such sketch (and any other evidence

relating to third-party culpability), and despite the fact that those discovery motions were granted by the court well before trial, the State never disclosed it until after Mr. Skakel was convicted. The State also failed to produce its lengthy "profile reports" of Kenneth Littleton and Thomas Skakel.

During pre-trial discovery, the Petitioner filed two comprehensive motions for discovery and inspection seeking, <u>inter alia</u>, exculpatory evidence, evidence that someone other than the Petitioner was involved in the murder or near the scene, and sketches or composite drawings. App. A241 (¶¶ 1, 9, 21, 22, 52, 55); A269 (¶¶ 1, 21, 22, 55, 57). The State did not object to these requests. <u>See</u> Tr.8/15/01 at 9-23. The court ordered compliance with all requests not objected to. Tr.8/15/01 at 9-23. The State thereafter filed a "Notice of Service: State's Disclosure" advising the Court (and Mr. Skakel) that it had delivered "to counsel for defendant" its discovery responses. App. A302. The State later told the Court that it had provided an "open file" and permitted inspection of 1,806 pages of police reports. Tr.8/29/02 at 8-9. However, **the State never produced any sketch**, and no such sketch was included in the "open file" that the State made available for inspection.[39]

---

[39] The State has never made the claim that the sketch was in the file made available to the defense before trial. As part of its post-trial motions, the defense was prepared to offer proof establishing that the sketch was not part of the State's file, but the trial court refused to permit such evidence. Tr. 8/28/02, at 44-45.

Among the 1,800 pages of police reports provided to the defense, only 4 pages (App. A359; A368; A370) referred to a white male being seen by a security guard near the murder scene around 10 p.m. One page refers, in the future tense, to the preparation of a composite sketch. App. A362. Another page refers to Morganti assisting unidentified "investigators" in making a composite sketch. App. A370. However, no such sketch was produced by the State despite being under a court order to do so, and despite its certification to the court that it had complied with the discovery orders. App. A298; A303.

The State argued it was not required to give the defense a copy of the sketch despite two discovery motions requesting sketches or composite drawings. The State claimed its duty was fulfilled by implicitly placing the defense on "notice" that a sketch existed by disclosing police reports making reference to a sketch. Tr.8/28/02 at 67. The State conceded that it probably did not provide a copy of the sketch to trial counsel. Tr.8/29/02 at 6.

The sketch was based on the witness statements of Charles Morganti, Jr., a Belle Haven security guard.[40]  Mr. Morganti reported to police that on the night of the homicide at around 10:00 p.m. he observed a white male walking on Field Point Road near Walsh Lane. App. A359; A363. Morganti related that he had confronted the same

---

[40] The police reports relating to Mr. Morganti and the sketch were attached to the Petitioner's Amended Motion For New Trial and accompanying memorandum of law dated August 26, 2002. See App. A304-A390. The sketch is at App. A357.

man earlier. Morganti described the man as six feet tall, 200 pounds, late 20's to early 30's, dark rimmed glasses, fatigue jacket, tan slacks and blond hair. App. A359. Morganti assisted the Greenwich police department in putting together a "composite picture" of the suspect. App. A362. The physical description provided by Morganti and the composite sketch prepared by the police depicts an individual who strongly resembles the Skakel tutor, Kenneth Littleton.[41]

Despite this similarity to Littleton, the police apparently concluded that the person Morganti saw at around 10:00 p.m. was Carl Wold, a young man who lived in the area. The police evidently were not moved by the fact that both Wold and his father told the police that he arrived home at approximately 8:00 to 8:15 p.m. and did not leave his home thereafter. App. A365-A367. In 1994, Inspector Frank Garr, an inspector in the prosecutor's office, reached the same conclusion despite the chronological impossibility of the Wold hypothesis. App. A370. Notwithstanding two 1975 reports that Carl Wold arrived home at between 8:00 and 8:15 a.m. and did not leave, (App. A365; A367-68**),** Garr wrote in his 1994 report that Carl Wold was the person Morganti saw at around

---

[41] On the date of the murder, Littleton was 23 years old, 6' 1" tall and weighed about 200 pounds. He wore silver rimmed glasses and had dark, wavy hair. App. A303; A375 – A386. Most importantly, the Morganti sketch resembled a photograph of Littleton that was taken a few months before the homicide. The photograph depicts Littleton as a coach at Brunswick School in Greenwich. App. A303; A384; A386.

10:00 p.m. App. A370.[42]

After Mr. Skakel was convicted, but prior to sentencing, his new counsel inquired about the existence of the sketch that had been the subject of multiple discovery demands prior to trial. For the first time, the State's Attorney provided a copy of the sketch to the defense, on August 21, 2002. App. A357 (fax line across top). The State never explained why the sketch had not previously been produced, or where it had been located. Based on this new development, Mr. Skakel filed an amended motion for a new trial on August 26, 2002. App. A304; A338.

The trial court denied Mr. Skakel's motion[43] and refused to hold an evidentiary hearing. The State was never required to justify its conduct or proffer evidence to establish its compliance with applicable law. Instead, the trial court ruled that: (1) the State did not suppress the composite sketch under Brady because the Defendant was "on notice" that such a sketch existed based on the police reports that were provided to the defense; (2) Mr. Skakel's discovery motion only sought the right to "inspect" items; (3) the sketch was not material under Brady because it was inadmissible unless and until the security guard testified, which he did not; and, (4) the amended motion for new

---

[42]Morganti explained that he was replacing a wooden stanchion when he made the observation. App. A370. Some 19 years earlier (November 6, 1975) Greenwich police filed a report that Mr. Robert Bjork of Otter Rock Drive observed Morganti replacing a white road stanchion on the night of the homicide at 9:50 p.m. App. A373.

[43] The trial court heard argument prior to sentencing, and defense counsel supplemented his written offer of proof contained in his August 26, 2002 memorandum during argument. Tr.8/28/02; Tr.8/29/02.

trial was not timely, despite having been filed five days after disclosure of the sketch.

Tr.8/28/02 at 90-91.

        **b.**    **The Connecticut Supreme Court's Finding That The Sketch Was Not "Suppressed" Under <u>Brady v. Maryland</u> Is Contrary To Established Federal Law**

The Connecticut Supreme Court held that the sketch was not "suppressed" under <u>Brady</u>. <u>State v. Skakel</u>, 276 Conn. at 700.[44] The Connecticut Supreme Court found that evidence is not considered suppressed if either a party or his counsel knew, or should have known, essential facts permitting him to take advantage of the evidence. <u>Id.</u> at 701. The supreme court determined that because two investigative reports among 1806 pages of documents made available by the State referenced the sketch, the Petitioner and his counsel had actual notice of the existence of the sketch, which satisfies the requirements of <u>Brady</u>. <u>Id.</u> at 702-03.

The disclosure of exculpatory evidence is a right that the federal constitution provides as part of its basic "fair trial" guarantee. <u>See</u> U.S. Const., amends. V, VI. In <u>Brady v. Maryland</u>, the United States Supreme Court held that suppression by the prosecutor of material evidence specifically requested by defense counsel deprives a defendant of his right to due process. <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); <u>see</u>

---

[44] As discussed <u>supra</u>, the trial court had held both that the sketch was not suppressed and also that it was not material. Because the Connecticut Supreme Court found that the sketch was not suppressed, it did not reach the materiality prong of the <u>Brady</u> test. <u>State v. Skakel</u>, 276 Conn. at 700.

also United States v. Triumph Capital Group, Inc., ___ F.3d ___, 2008 WL 4349318 *9 (2d Cir. 2008) (When the government violates its duty to disclose all material evidence favorable to a criminal defendant and obtains a conviction, it deprives the defendant of his or her liberty without due process of law.").  This doctrine has also been extended to situations where the defendant has failed to request disclosure.  United States v. Agurs, 427 U.S. 97 (1976).

The United States Supreme Court has recognized time and again that governmental deception of the court and jury, or knowing suppression of evidence favorable to the accused, was conduct inconsistent with the most "rudimentary demands of justice." Mooney v. Holohan, 294 U.S. 103, 112 (1935); Napue v. Illinois, 360 U.S. 264 (1959). In its landmark decision in Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court explained that "[t]he principle of Mooney v. Holohan is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." 373 U.S. at 87.  The Court held that the suppression of evidence that would tend to exculpate a defendant results in a proceeding "that does not comport with standards of justice – even when suppression 'is not the result of guile.'" [45] Id. at 87.

---

[45]The Brady Court ruled "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The United States Supreme Court subsequently has modified and expanded the Brady rule. See Giglio v. United States, 405 U.S. 150, 154 (1972) (exculpatory evidence includes "evidence affecting" witness "credibility," where the witness' "reliability" is likely

In <u>Strickler v. Greene</u>, 527 U.S. 263 (1999), a federal habeas claim, the United States Supreme Court found that the prosecution suppressed evidence under <u>Brady</u> even though information had been available to the petitioner's counsel from which he could have learned that the suppressed evidence existed.  In <u>Strickler</u>, the petitioner argued that his conviction was invalid based on the prosecution's failure to comply with <u>Brady</u>.  <u>Id.</u> at 278.  The petitioner had raised a claim during state court habeas proceedings of ineffective assistance of counsel due to his trial lawyer's failure to file a <u>Brady</u> motion, but the claim was denied because the prosecution had had an open file policy.  <u>Id.</u> at 277-78.  During the federal habeas proceedings, the petitioner's counsel was granted the right to examine and copy all of the police and prosecution files in the case.  <u>Id.</u> at 278.  During this examination of the police files, the petitioner's counsel discovered for the first time that there existed materials regarding the police's interviews with the State's key eyewitness that were never turned over to the defense.  <u>Id.</u>  On the

---

"determinative of guilt or innocence"); <u>United States v. Agurs</u>, 427 U.S. 97, 112-13 (1976) (defense request unnecessary); <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995) (exculpatory evidence is evidence the suppression of which would "undermine confidence in the verdict"). Thus, it is now well- established that "the constitutional duty [to disclose] is triggered by the potential impact of favorable but undisclosed evidence," rather than by the type of request, if any, submitted by a defendant. <u>Kyles</u>, 514 U.S. at 434. Furthermore, "whether the prosecutor succeeds or fails in meeting this obligation, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." <u>Id.</u> at 437-8.

basis of this recently discovered information, the petitioner raised the direct claim in the federal proceedings that his conviction was invalid.  Id.

There were eight different documents involved in the claim, all of which could have served to impeach the State's witness.  Id. at 273-75.  There was a dispute whether the petitioner's trial counsel saw three of the documents before trial.  Id. at 275.  The prosecutor conceded that he himself never saw the remaining five documents until long after the trial, and that they were not in the file that was made available to the petitioner's trial counsel through the prosecutor's open file policy.  Id.  Therefore, even though there was a dispute regarding three of the documents, the district court assumed that the petitioner proceeded to trial without having seen at least five of the eight documents.  Id.  The district court did not hold an evidentiary hearing to determine whether the three disputed documents had actually been disclosed to the defense because the court was satisfied that the "potentially devastating impeachment material" contained in the other five documents warranted the entry of summary judgment in the petitioner's favor.  Id. at 290.

In the course of its discussion regarding whether the evidence was "suppressed," the Supreme Court first commented on the prosecution's open file policy.  The Court stated:

> We certainly do not criticize the prosecution's use of the open file policy.
> We recognize that this practice may increase the efficiency and fairness of
> the criminal process.  We merely note that, if a prosecutor asserts that he

complies with <u>Brady</u> through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under <u>Brady</u>.

<u>Id.</u> at 283 n.23. The respondent in the federal habeas proceedings contended, however, that it did not matter that the open file maintained by the prosecution did not contain all it was purported to contain because the factual basis for the discovery of the missing evidence was available to the petitioner at the time of the state habeas claim. <u>Id.</u> at 284. First, the respondent argued that an examination of the witness's trial testimony as well as a letter published in a local newspaper made it clear that the witness had had several interviews with the police. <u>Id.</u> Second, the respondent claimed that the fact that the federal district court had entered a discovery order permitting habeas counsel to review the police's file indicated that diligent counsel could have obtained a similar discovery order during the state court habeas proceedings. <u>Id.</u> at 284-85.

The Supreme Court rejected both of the respondent's contentions relating to whether the prosecution had suppressed the evidence. The Court stated:

> Although it is true that petitioner's lawyers – both at trial and in post-trial proceedings – must have known that [the witness] had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews, or that the notes that [the witness] sent to the detective, existed and had been suppressed. Indeed, if respondent is correct that Exhibits 2, 7, and 8 [the three documents of the eight that trial counsel possibly had been aware of] were in the prosecutor's "open file," it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld.

> The prosecutor must have known about the newspaper articles and [the witness's] meeting with [the detective], yet he did not believe that his prosecution file was incomplete.

Id. at 285.  Thus, the Supreme Court found it important that the prosecution's "open file" had not contained the evidence at issue.  The Court also found it important that even though information had been available to petitioner's counsel from which he may have been able to discover that additional evidence existed, the information was not such that it would have led petitioner's counsel to make that connection.  The Supreme Court also noted that the prosecutor had had the same clues available to himself as well, and he had not thought that his file was incomplete.  Id.

As in Strickler, the Petitioner in the present case should not have been required to piece together information contained on one page of nearly two thousand provided by the prosecution and surmise that the sketch existed, especially in light of the fact that Mr. Skakel had twice specifically requested the production of any sketches prior to trial.  See also United States v. Gil, 297 F.3d 93 (2d Cir. 2002) (one document produced among 2,700 pages of poorly indexed material on the eve of trial considered "suppressed" under Brady where specific discovery requests had been made prior to trial).  Also as in Strickler, because the prosecutor's file contained many other materials and contained two references to a sketch but did not contain the sketch itself, it was "especially unlikely that counsel would have suspected that additional impeaching

evidence was being withheld." Id.  In fact, it was reasonable for Mr. Skakel to assume that the sketch did not exist.

The United States Supreme Court has recognized that the prosecution's failure to turn over certain evidence after a specific request by the defendant leads to the reasonable conclusion that no such evidence exists.  United States v. Bagley, 473 U.S. 667, 682 (1985).  In United States v. Bagley, the defendant filed a discovery request prior to trial seeking the names of all witnesses and information regarding any deals, promises or inducements made to witnesses in exchange for their testimony.  Id. at 669.  The government's main witnesses at trial were two state law enforcement officers who worked with the federal Bureau of Alcohol, Tobacco and Firearms to conduct an undercover investigation of the defendant.  Id. at 670.  After trial, the defendant requested information pursuant to the Freedom of Information Act and discovered that these two witnesses had been paid $300 apiece for their testimony.  Id. at 671-72.  This information had not been provided to the defendant prior to trial, despite his specific request.  Id. at 670-71.

The Supreme Court indicated that the failure to provide this information to the defendant after a specific request had been made suggested that such evidence did not exist.  The Court stated:

> The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist.  In

reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. We agree that the prosecutor's failure to respond fully to a Brady request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

Id. at 682 (1985).

Additionally, the Second Circuit reached a similar conclusion in United States v. Payne, 63 F.3d 1200 (2d Cir. 1995), cert. denied, 516 U.S. 1165 (1996). In that case, the court determined that an affidavit containing valuable impeachment evidence regarding a government witness was "suppressed" within the meaning of Brady.[46] Id. at 1209. Importantly, the court noted:

Further, the government produced for [the defendant] a large volume of other materials concerning [the witness], including numerous documents relating to the federal investigation and her prosecution. Included were publicly available court documents such as the transcript of [her] plea allocution. A defendant receiving such documents from the government could reasonably assume that the court files did not include other undisclosed exculpatory and impeachment documents pertaining to [the witness] ….

Id.

---

[46] Although the court found that the evidence had been suppressed under Brady, the court determined that the defendant did not meet the materiality prong of Brady and thus the defendant's conviction was upheld. United States v. Payne, 63 F.3d at 1211.

As in Bagley and Payne, the fact that no sketch was produced despite two specific requests for the same, and the fact that no sketch was contained in the prosecutor's file, reasonably led to the conclusion that no sketch existed. This conclusion is also supported by the fact that other evidence in this case had been lost in the 25 years since the investigation began. Therefore, despite the fact that a sketch was referenced in the 1994 Garr report, to which the defense had access, it was reasonably believed that no sketch existed.

Additionally, the information made available to Mr. Skakel was not of a character as would lead him to conclude that exculpatory evidence existed. The 1994 Garr report stated, "At that time Mr. Morganti reported the entire episode to the investigators and assisted in the making of a composite sketch of the individual. A complete investigation into the matter was instigated, and it was determined that the individual was one Carl Wold." App. A370. On the basis of this information, Mr. Skakel was led to believe that the sketch was of Carl Wold. Carl Wold was not a suspect in this case. Thus, the provision of this information to Mr. Skakel rather that the production of the sketch itself, from which he could have seen that the sketch resembled Kenneth Littleton, was insufficient to put Mr. Skakel on notice that additionally exculpatory evidence existed.

Despite two written motions for the production of any sketches or composite drawings, and a court order commanding production, the State never produced the sketch. The Connecticut Supreme Court's finding that the State somehow satisfied its

Brady obligation to produce any and all sketches by having an open file policy and dumping on the Petitioner 1,800 pages of other documents – in which a reference to the sketch is buried in two pages – is erroneous.  A prosecutor's Brady obligation cannot be satisfied by such "needle-in-the-haystack" tactics.

The Connecticut Supreme Court's decision distorts Brady and ignores the particular facts of this case.  Brady does not contemplate a treasure hunt.  United States v. Agurs, 427 U.S. 97, 112-13 (1976).  Rather, Brady imposes an **affirmative** disclosure requirement on the State. Moreover, Mr. Skakel **did** ask for the sketch – twice.  Under the circumstances of this case, a reasonable defendant would only have concluded that the State did not have a sketch, because if it had a sketch, the State would have produced it.  United States v. Bagley, 473 U.S. 667, 682 (1985) (incomplete response to specific request represents to defense that evidence does not exist).[47]

Furthermore, the Connecticut Supreme Court wrongly found that Mr. Skakel was not entitled to rely on the State's open file policy as an indication that the documents produced were complete. See Strickler v. Greene, 527 U.S. 263, 283 n.23  (1999)

---

[47] See also Strickler v. Greene, 527 U.S. 263 (1999) (prosecution suppressed evidence under Brady even though information had been available to the petitioner's counsel from which he could have learned that the suppressed evidence existed); United States v. Payne, 63 F.3d 1200 (2d Cir. 1995) (where Government produced a large volume of material in discovery, defendant can reasonably assume that files did not include other undisclosed exculpatory documents); United States v. Gil, 297 F.3d 93 (2d Cir. 2002) (one document produced among 2,700 pages of poorly indexed material considered suppressed under Brady where specific discovery requests had been made prior to trial).

(when the prosecution maintains open file policy, defendant is entitled to rely on fact that file is complete). An open file policy is useless if certain documents are culled out and segregated. Not only was the sketch missing from the file when it was reviewed by the defense, Tr.8/28/02 at 44-5, but also absent was a warrant application that had been prepared for Mr. Skakel's brother, Thomas Skakel.[48]

For these reasons, the Connecticut Supreme Court was incorrect in its determination that the sketch was not "suppressed" under Brady; Mr. Skakel should not have been required to surmise that the sketch existed from the bits of information that were provided to him. Because the Connecticut Supreme Court's decision was contrary to established federal law, habeas relief is warranted.

---

[48] On April 16, 2002, Petitioner's trial counsel filed a discovery motion seeking production of any arrest warrant affidavits and applications. App. A300, ¶3. The State did not object and claimed it had already complied. App. A303. At trial, it became apparent that a warrant application existed for the arrest of Mr. Skakel's brother, Thomas Skakel. Tr.5/8/02 at 30-5; 67;72; 84-91. Only after defense counsel made several oral requests for the warrant, Tr. 5/8/02 at 35-36, 85, did the State comply five days later. Tr.5/13/02 at 90. The trial court excused the late compliance because the defense did not press the issue after it filed its April 16, 2002 discovery motion, and because the application could not be located. Tr.5/8/02 at 87. Apparently, neither Thomas Skakel's arrest warrant application nor the sketch were in the State's file. Consequently, an open file would not have helped the defense find the sketch. The non-disclosure of the arrest warrant affidavit, the sketch and the profiles of Littleton and Thomas Skakel (see discussion infra) evidences a pattern of non-disclosure of exculpatory evidence.

## 2. The Profile Reports

### a. Additional Facts And Procedural History Relative To This Claim

Eight years prior to the Petitioner's arrest, the lead investigator prepared two "profile reports" – one for Kenneth Littleton and one for Thomas Skakel – that contained incriminating evidence pointing to each as the possible killer of Martha Moxley. Tr.5/13/02 at 76-7; 81. The State never disclosed the reports[49] despite the Petitioner's pretrial discovery motion that sought all exculpatory information including any evidence that someone other than the Petitioner was involved in the commission of the murder.[50] App. A274, ¶ 22.

The Petitioner filed a motion for new trial pursuant to Connecticut Practice Book § 42-53 within five days of the verdict. The motion sought a new trial on the ground, inter alia, that the State made belated disclosures of Thomas Skakel's arrest warrant affidavit and videotaped police interviews of Kenneth Littleton in violation of the rule in

---

[49] The issue of the Littleton profile report first arose when former State's Attorney Inspector John Solomon testified at trial. See Tr.5/10/02 at 84; Tr.5/13/02 at 60-2; 72-3; 76-7; 80-2; Tr.5/22/02 at 133. Solomon testified that he had prepared the report in 1992 and included most of the important information that had made Littleton a suspect. Tr.5/13/02 at 62-82. The State's Attorney incorrectly stated that the report had been given to defense counsel. Tr.5/13/02 at 61. Defense counsel asked the trial court for a copy of the report during his examination of Littleton, but the court denied the request by responding "not right now." Tr.5/13/02 at 77. The Littleton report consisted of forty-three (43) pages. Tr.5/13/02 at 81.

[50] The State did not object to this discovery request and the court ordered production. Tr.8/15/01 at 9. Nevertheless, the summary profile reports were not provided to the defense.

Brady. App. A472. New counsel appeared prior to sentencing and filed an amended motion for new trial, which included the additional claims relating to the suppression of the sketch as well as the State's failure to disclose the summary profile reports.[51] App. A304.

At oral argument on the amended motion for new trial, the trial court reviewed the profiles *in camera*, marked them under seal as a State's Exhibit, and denied the amended motion for new trial and request for evidentiary hearing. Tr.8/28/02 at 59, 89, 93. The trial court ruled that the profiles were protected from disclosure under the work-product doctrine because they contained the mental impression of the author, former Inspector Solomon. Tr.8/28/02 at 88-89. The trial court also ruled that as to the new issues raised in the amended motion for new trial that had not been raised in the original motion for new trial, no cause was shown as to why these arguments could not have been raised in the original motion. Tr.8/28/02 at 93. The trial court stated that these facts, coupled with the trial court's estimation that the claims lacked merit in general, persuaded the court that the interests of justice would not be served by permitting the late filing of the new arguments. Tr.8/28/02 at 94.

---

[51] The Petitioner submits that the record is sufficient for this Court to review this issue. However, if this Court were to disagree, then the trial court erred in refusing to grant the defense an evidentiary hearing on this issue and the matter should be remanded for that purpose.

The Connecticut Supreme Court, rather than address the merits of the Petitioner's <u>Brady</u> claim as the trial court had done, simply ruled that the trial court acted within its discretion in rejecting the Petitioner's <u>Brady</u> claim as time-barred.  <u>State v. Skakel</u>, 237 Conn. at 711.

> **b.    The Connecticut Supreme Court's Decision Ignored The Requirements Established By The United States Supreme Court In <u>Brady v. Maryland</u> And Its Progeny**

The Connecticut Supreme Court's ruling, that the Petitioner's <u>Brady</u> claim was time-barred, ignored established United States Supreme Court precedent.  A prosecutor's <u>Brady</u> obligation is independent of a defendant's request for <u>Brady</u> materials.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 682-83 (1985); <u>see also</u> <u>United States v. Coppa</u>, 267 F.3d 132, 144 (2d Cir. 2001).  This circuit has held that a defendant does not waive a <u>Brady</u> claim grounded in due process.  <u>United States v. Jackson</u>, 345 F.3d 59, 68-69 (2d Cir. 2003), <u>cert. denied</u>, 540 U.S. 1157 and 541 U.S. 956 (2004).

Therefore, a <u>Brady</u> violation can still occur regardless of the conduct of a defendant in raising the issue.  The Connecticut Supreme Court effectively permitted a state court rule of practice (requiring motions for new trial to be filed within five days of the verdict) to trump the due process requirements set forth in <u>Brady</u> and its progeny which cannot be waived.  Whether or not the issue was raised in a timely manner or not, a <u>Brady</u> violation occurred when the State failed to turn over the profile reports.  The

State had an affirmative obligation to do so regardless of whether or when the issue was raised by the Petitioner.

        **c.**    **Considering The Issue On The Merits, The State Was Required To Provide The Summary Profile Reports Relating To Littleton And Thomas Skakel To The Defendant Pursuant To <u>Brady v. Maryland</u>.**

Whether or not the profile reports are work product,[52] the work product doctrine cannot trump the State's obligation to disclose exculpatory information under <u>Brady</u>. Thus, the State's work product is discoverable if the information is exculpatory. <u>United States v. Armstrong</u>, 517 U.S. 456, 474-75 (1996); <u>Mincey v. Head</u>, 206 F.3d 1106, 1133, n.53 (11th Cir. 2000), <u>cert. denied</u>, 531 U.S. 926 (2001); <u>United States v. DeMarco</u>, 407 F. Supp. 107, 111 n.2 (C.D. Cal. 1975); <u>see</u> <u>also</u> Connecticut Practice Book §§ 40-11 (duty to disclose exculpatory information) and 40-14 (prosecutor's work product protected except for exculpatory material).

Evidence is favorable to the accused if it either tends to show the accused is not guilty or impeaches a prosecution witness. <u>United States v. Bagley</u>, 473 U.S. at 676; <u>see also</u> <u>United States v. Triumph Capital Group, Inc.</u>, ___ F.3d ___, 2008 WL 4349318 *9 (2d Cir. 2008) ("Evidence is favorable if it is either exculpatory or impeaching."). The Littleton and Thomas Skakel profiles are favorable to the Petitioner because they would

---

[52] "To be protected under this doctrine, the work of the attorney must be such that it forms an essential step in the procurement of data and must involve duties normally performed by attorneys." <u>Barksdale v. Harris</u>, 30 Conn. App. 754, 761, 622 A.2d 597, 601, <u>cert. denied</u>, 225 Conn. 927, 625 A.2d 825 (1993).

have assisted him with his claim that he was not the killer. See Boyette v. Lefevre, 246 F.3d 76, 91 (2d Cir. 2001) (finding that evidence that could have helped the defense suggest an alternative perpetrator is favorable to the accused under Brady). Additionally, there is no doubt that the profile reports were suppressed because they were not produced to the defense despite a specific request for the type of information contained in the profile, Tr. 5/13/02 at 77, 81, and despite a discovery order.

Finally, the reports were material. The Second Circuit has outlined the U.S. Supreme Court's law on materiality as follows:

> Several well-established propositions guide a materiality analysis. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the court must determine whether, in the absence of the undisclosed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. Second, the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35, 115 S.Ct. 1555. Third, "once a reviewing court ... has found constitutional error, there is no need for further harmless-error review." Id. at 435, 115 S.Ct. 1555. Fourth, the reviewing court must consider the suppressed evidence "collectively, not item by item." Id. at 436, 115 S.Ct. 1555.

Boyette v. Lefevre, 246 F.3d at 91-92.

In Boyette, the Second Circuit found suppressed evidence material under Brady based on the lack of evidence, including the lack of physical evidence, tying the petitioner to the crime. In the same fashion, the Petitioner's defense of third party

culpability in this case was central to his defense.  <u>See</u> Part II.B., <u>supra</u>.  The

suppressed profile reports are directly supportive of that defense.  There was no

physical evidence tying the Petitioner to the crime, and he had an alibi.  Therefore,

these profile reports, which supported the defense that someone else committed the

crime, are highly material.

### d.    Conclusion

The Connecticut Supreme Court's decision that the Petitioner's <u>Brady</u> claim was

untimely raised improperly permits a state court rule of practice to override the State's

affirmative requirements under <u>Brady</u>, duties which exist independent of any request or

raising of the issue by the Petitioner.  Considering the claim on the merits, the profile

reports were improperly withheld under <u>Brady</u>, which supersedes any work product

claims.

### C.    The Connecticut Supreme Court's Decision That Mr. Skakel Was Properly Transferred To Adult Court Violates The Due Process Clause Of The United States Constitution

### 1.    Facts And Procedural History Relevant To This Claim

At the time of his arrest, Mr. Skakel was 39 years old.  He was 15 years old at

the time of the alleged offense.  Because he was a juvenile at the time of the murder,

Mr. Skakel was charged as a delinquent in the juvenile matters division of the trial court.

Pursuant to Connecticut General Statutes Section 17-60a (Rev. to 1975), the

State requested that Mr. Skakel's case be transferred to the regular criminal docket.

That statute provides that a murder case within the jurisdiction of the juvenile matters division may be transferred to the regular criminal docket if the following factors are found after a hearing:

> (1) the child has committed the act for which he is charged and (2) there is no state institution designed for the care and treatment of children to which said court may commit such child which is suitable for his care or treatment or (3) the safety of the community requires that the child continue under restraint for a period extending beyond his majority and (4) the facilities of the superior court provide a more effective setting for disposition of the case and the institutions to which said court may sentence a defendant are more suitable for the care or treatment of such child.

Conn. Gen. Stat. § 17-60a (Rev. to 1975).

On June 20, 21 and 28, 2000, the juvenile court held a probable cause hearing limited to the issues of establishing Mr. Skakel's age and whether there was probable cause to believe that he committed the crime. The juvenile court issued its decision on August 17, 2000 and concluded that probable cause existed. The court also ordered an investigation by the probation office pursuant to Connecticut General Statutes Section 17-66 (Rev. to 1975).[53] Joseph Paquin, supervisor of Juvenile Probation Services in the Judicial District of Stamford/Norwalk, prepared a three-page report, which the juvenile court in turn provided to counsel.

---

[53] Section 17-66 provides that prior to the disposition of a delinquency case, the probation department shall investigate the child's age, habits and history, his family circumstances and background, home conditions, the habits and character of his parents or guardians, and the child's school adjustment. The court may also order a complete physical or mental examination. See Conn. Gen. Stat. § 17-65 (Rev. to 1975).

On October 20, 2000, the juvenile court held another hearing pursuant to Section 17-60a at which evidence was presented regarding the second, third and fourth factors set forth in that statute – the availability of institutions for the care and treatment of the "child," the safety of the community, and whether the facilities of the adult criminal division of the superior court provided a more effective setting for disposition of the case. Evidence was also presented regarding the probation department's investigation and report pursuant to Section 17-66. The State offered no evidence at the hearing.[54]

The defense called Mr. Paquin to testify regarding his report. He admitted that he had never done a report of this nature before, and stated that he had focused principally on the question of what state facilities might be available for Mr. Skakel, if he were found to have committed the act charged. Tr.10/20/00 at 6-7. He acknowledged that Mr. Skakel had no prior or subsequent criminal record. Tr.10/20/00 at 6. Mr. Paquin had checked only with the Long Lane School, and had not investigated whether a suitable facility was available out of state for the Petitioner. Tr.10/20/00 at 8-10, 11-12. Mr. Paquin stated that he had, in the past, placed others, including children, in

---

[54] Judith Kallen, a program director with the Department of Children and Families, had testified at the earlier hearing on June 21, 2000 regarding referrals from the juvenile court. Ms. Kallen indicated that her agency was responsible for placing individuals found to be delinquent and referred by the juvenile court. She stated that the agency's regulations "ended" at age 18, and that the only state incarceration facility for serious juvenile offenders, Long Lane School, was required to discharge youths after age 18. In general, she testified, the juvenile system had no ability to deal with an individual who was 39 years old at the time of disposition. Tr.6/21/00 at 93-94.

facilities outside the state, depending on their needs.  Tr.10/20/00 at 10-11.  When asked whether there was any facility where Mr. Skakel could get adequate treatment, Mr. Paquin admitted that he did not know what the Petitioner's psychological or psychiatric needs were because there had been no such examination of him.  Tr.10/20/00 at 14.

The defense also presented testimony from Clinton Roberts, a private sentencing consultant and a ten-year veteran state probation officer who had prepared numerous alternative sentencing proposals.  Mr. Roberts testified that there was at least one facility within the state that, on the same site, accommodated both youths and adults.  Tr.10/20/00 at 30.  This facility was principally involved in the treatment of substance abuse problems.  Tr.10/20/00 at 30.  Mr. Roberts also testified that in general, in the juvenile system, if there were a unique situation that programs or institutions within Connecticut could not meet, facilities outside the state would be an alternative.  Tr.10/20/00 at 32-33.

Finally, the defense called Bernadette Coomaraswamy, a state magistrate and lawyer, to testify.  Ms. Coomaraswamy was a pioneer in the juvenile justice system and served in a variety of capacities within the system including advocate, or prosecutor, in Fairfield County in 1975.  Tr.10/20/00 at 43.  Ms. Coomaraswamy explained that during that period of time, the focus of the juvenile system was on treatment and rehabilitation, rather than punishment.  Tr.10/20/00 at 48-49.  Ms. Coomaraswamy also testified that

she participated in the placement of individuals with special needs in out of state facilities.  Tr.10/20/00 at 46-47.

Ms. Coomaraswamy was a neighbor of both the Moxleys and Mr. Skakel's family in 1975 and had known the Defendant since age 12.  Tr.10/20/00 at 51-52.  She opined that even if Mr. Skakel were responsible for the acts charged – which she did not personally believe – she would not view him as a danger to the community.[55] Tr.10/20/00 at 52; Tr.6/26/00 at 119-31.

The juvenile court issued its ruling on January 31, 2001, finding there was "no available or suitable state institution designed for the care and treatment of children to which the Juvenile Court could commit, the now forty year old, respondent that would be suitable for his care and treatment, should he be adjudicated delinquent for the murder of the victim."  In Re Michael S., No. DLOO-01028, at 6-7 (App. A399-400).  The court further found that "the facilities of the adult criminal division of the Superior Court afford and provide a more effective setting for the disposition" of the case, and "the institutions to which the adult criminal division of the Superior Court may sentence a defendant are more suitable for the care and treatment" of Mr. Skakel, should he be found guilty.  Id. at

---

[55] The State concluded that Mr. Skakel was not a danger to the community, and did not seek transfer under that theory.  Tr. 6/26/00 at 59.  Thus, this point is not at issue in the present appeal and the testimony presented on this issue is not summarized.  The Defendant offered substantial evidence that, after suffering from substance abuse problems and learning disabilities as a young adult, he recovered and has been a productive and trustworthy citizen for many years.

7 (App. A400).  Accordingly, the juvenile court ordered that the case be transferred to

the regular criminal docket.

> **2.      The Connecticut Supreme Court's Decision That The Petitioner Was Appropriately Transferred To Adult Court, Based On An Administrative Regulation, Was Improper**

The Connecticut Supreme Court's resolution of the juvenile transfer issue was

based entirely on an administrative regulation promulgated by the Connecticut

Department of Children and Families ("DCF") in 1994.  The regulation provides:

> As used in Sections 17-a-145-48 to 17a-145-99, except as otherwise provided therein:
>
> (e) "Child" means any person under eighteen years of age not related to the owner of the child care facility.

Regs. Conn. State Agencies § 17a-145-48.  The Connecticut Supreme Court

interpreted that regulation to mean that anyone over the age of eighteen is not

considered a "child," and thus is not within the jurisdiction of the DCF.  <u>State v. Skakel</u>,

276 Conn. at 660 & n.24.

The Connecticut Supreme Court relied on the 1994 DCF regulation to conclude

that (1) even though the mandatory investigation under Connecticut General Statutes

Section 17-66 (Rev. to 1975) was not completely performed in this case, it was of no

consequence because the DCF regulation required Mr. Skakel to be transferred to the

adult docket simply because of his age; (2) the juvenile court properly relied on this

1994 regulation at the time of the transfer hearing even though it was not in place in

1975 because the transfer statute required the juvenile court to look at **_current_** options

for placement rather than options that may have existed in 1975; thus, because Mr.

Skakel was over eighteen, there were no current options available to him for placement

at the time of transfer; and (3) the juvenile court was not required to consider out of

state placement of Mr. Skakel because the court could only consider placement for

those persons committed, admitted or transferred to the DCF; because Mr. Skakel was

over eighteen, DCF had no jurisdiction over him and could not place him anywhere,

including out of state facilities.  State v. Skakel, 273 Conn. at 660-62.

In so ruling, the Connecticut Supreme Court improperly relied on the DCF

regulation and erroneously determined that the Petitioner's age alone mandated his

transfer to the adult docket.  The Connecticut Supreme Court ignored Mr. Skakel's

argument on appeal that an administrative regulation should not be permitted to trump a

statute enacted by the legislature.  The applicable commitment statute, Section 17-68

(Rev. to 1975), is completely silent as to what is to occur if a delinquent is over the age

of eighteen when he is arrested for a crime committed while a juvenile.  Despite this

silence, the Connecticut Supreme Court relied on a subsequently-enacted

administrative regulation to conclude that anyone over the age of eighteen cannot be

committed as a juvenile delinquent under Section 17-68, even if the crime were

committed as a juvenile.

In effect, the DCF regulation relied upon by the Connecticut Supreme Court completely abrogates a right conferred upon Mr. Skakel by the legislature: the right to juvenile status. By virtue of the 1975 juvenile delinquency statutes, the legislature created a right to juvenile status for Mr. Skakel, who was charged with committing a crime while under the age of sixteen.[56] This right to juvenile status included benefits such as a determination of delinquency rather than criminality, confidentiality, limitations with respect to sentencing, erasure of files, and isolation from the adult criminal population. State v. Angel C., 245 Conn. 93, 103 (1998). However, because Mr. Skakel was not arrested until well after the age of eighteen, the DCF regulation relied upon by the Connecticut Supreme Court wholly deprived him of all of the rights that would have been available to him had he been apprehended in a timely manner while still under the age of eighteen.

For example, under the 1975 statutory scheme, Mr. Skakel was afforded a transfer hearing pursuant to Section 17-60a (Rev. to 1975) before being transferred to the adult docket. Pursuant to that hearing, in order to transfer Mr. Skakel to the adult criminal division, the juvenile court was required to find:

> (1) the child committed the act for which he is charged and (2) there is no
> state institution designed for the care and treatment of children to which

---

[56] The right to juvenile status is not created directly by the United States Constitution. See State v. Angel C., 245 Conn. 93, 104 (1998). Any special treatment accorded to a juvenile because of his or her age results from statutory authority rather than from any inherent or constitutional right. Id. at 104-05.

said court may commit such child which is suitable for his care and treatment or (3) the safety of the community requires that the child continue under restraint for a period extending beyond his majority and (4) the facilities of the superior court provide a more effective setting for disposition of the case and the institutions to which said court may sentence a defendant are more suitable for the care or treatment of such child.

Conn. Gen. Stat. § 17-60a (Rev. to 1975).  The central issue under consideration by the juvenile court in this case was the second statutory factor, namely, whether there was a state institution to which the juvenile court could commit Mr. Skakel.  State v. Skakel, 273 Conn. at 660.  However, by operation of the 1994 DCF regulation, Mr. Skakel would ***never*** have been able to prove that there was an institution to which he may have been committed pursuant to the second statutory factor.  Thus, the application of the 1994 DCF regulation effectively made it ***impossible*** for Mr. Skakel, who was not arrested until he was 39 years old, to remain within the jurisdiction of the juvenile court.  A transfer hearing under Section 17-60a was absolutely unwinnable by application of the 1994 DCF regulation, thus stripping Mr. Skakel of his right to juvenile status that was conferred by the legislature.

Further, the application of the 1994 DCF regulation abridged another statutory right conferred upon Mr. Skakel by the legislature, namely, the right to a complete investigation under Connecticut General Statutes Section 17-66 prior to transfer to the adult docket.  The Connecticut Supreme Court concluded that the Section 17-66 investigation was mandatory and that it was not properly completed by the juvenile court

in this case.  <u>State v. Skakel</u>, 276 Conn. at 660.  However, the supreme court

determined that the juvenile court's failure to accomplish the required statutory

investigation was of no consequence because, pursuant to the 1994 DCF regulation,

Mr. Skakel was required to be transferred to adult court due to his age, regardless of

what the investigation showed.  <u>Id.</u>  Therefore, the 1994 DCF regulation rendered Mr.

Skakel's statutory right to a complete investigation under Section 17-66 a nullity.

The 1994 DCF regulation is the only basis upon which the Connecticut Supreme

Court concluded that because Mr. Skakel was over the age of eighteen, he was not

within the jurisdiction of DCF and, thus, transfer to the adult docket was required.  The

1975 juvenile statutes do not compel such a result as they are silent as to the procedure

that is to be employed when a juvenile defendant is not apprehended until after the age

of eighteen.  Therefore, the Connecticut Supreme Court improperly permitted an

administrative regulation to abridge the rights conferred upon Mr. Skakel by statute.

It is well settled that an administration regulation that alters, abridges, enlarges or

modifies a statute is beyond the power of an agency to enact.  <u>Alcorn ex. rel. Baskin v.

Bartlett</u>, 13 Conn. Supp. 463, 1945 WL 638, at *5 (1945).[57]  A regulation that imposes

additional requirements beyond those contained in a statute cannot be effective to

override the statute.  <u>Id.</u> (citing <u>Hammerberg v. Holloway</u>, 131 Conn. 616, 621 (1945));

---

[57] Federal courts charged with the task of determining whether a state statute and a
state regulation conflict apply state law in analyzing the issue.  <u>See, e.g.</u>, <u>D.A.B.E., Inv.
v. City of Toledo</u>, 393 F.3d 692, 696-97 (6th Cir. 2005) (applying Ohio law).

see also 30 Op. Atty Gen. 135 (Mar. 24, 1958) (administrative rule or regulation may not amend, alter, enlarge or restrict terms of a legislative enactment); 29 Op. Atty. Gen. 143 (Jan. 12, 1956) (same). When a statute and a regulation conflict, the statute must prevail. Comm'r of Admin. Servs. v. Gerace, 40 Conn. App. 829, 834, cert. granted in part, 237 Conn. 916 (1996) and appeal dismissed by 239 Conn. 701 (1997).[58] The Connecticut Supreme Court's decision in permitting the 1994 DCF regulation to abridge Mr. Skakel's statutory rights is therefore contrary to established law.[59]

### 3. The Connecticut Supreme Court's Improper Reliance On The 1994 DCF Regulation Violated The Petitioner's Right To Due Process Of Law

The improper application of the 1994 DCF regulation deprived Mr. Skakel of due process of law as guaranteed by the federal constitution. See U.S. Const., amend. XIV. The United States Supreme Court has recognized that particular state statutes may create a liberty interest in juvenile status. Kent v. United States, 383 U.S. 541, 556-67; see also State v. Angel C., 245 Conn. 93, 104 (1988); State v. Skakel, 276 Conn. at 658. Connecticut's 1975 juvenile statutes created such a liberty interest in Mr. Skakel, as the statutes provided for mandatory, exclusive, and original jurisdiction in the juvenile

---

[58] Federal law is the same. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92 (1988).

[59] As discussed supra in Footnote 56, because Mr. Skakel's right to juvenile status is statutory rather than constitutional, the right may be limited or withdrawn. See State v. Angel C., 245 Conn. at 105. However, any limitations on this statutory right may necessarily only be imposed by the *legislature*, not by an administrative regulation.

court.  State v. Skakel, 276 Conn. at 658-69; Conn. Gen. Stat. § 17-59 (Rev. to 1975).

Transfer from the juvenile court in 1975 could only occur after a hearing in which certain

criteria were established.  Conn. Gen. Stat. § 17-66 (Rev. to 1975).[60]  As a result of the

juvenile court's original and exclusive jurisdiction pursuant to the 1975 statutes, Mr.

Skakel had a vested right to juvenile status.  Cf. State v. Angel C., 245 Conn. at 106-09.

A liberty interest in juvenile status created by statute cannot be taken away

without due process of law.  Kent v. United States, 383 U.S. at 557; see also State v.

Angel C., 245 Conn. at 106 ("[I]f a statute vests a juvenile with the right to juvenile

status, then that right constitutes a liberty interest, of which the juvenile may not be

deprived without due process, i.e., notice and a hearing.").  In the present case, Mr.

Skakel was denied due process of law in that the transfer hearing pursuant to Section

17-60a was unwinnable by virtue of the application of the 1994 DCF regulation.  It is

well settled that in order to satisfy the constitutional requirement of due process, the

process afforded to a citizen must be meaningful.  Bell v. Burson, 402 U.S. 535, 541-42

---

[60] In contrast to the 1975 juvenile statutes, Connecticut's **current** statutory scheme does **not** create a liberty interest in juvenile status for juveniles charged with a capital felony, Class A or B felony, or arson murder.  See State v. Angel C., 245 Conn. at 104. This is because the present-day transfer statute provides for mandatory transfer to the adult docket without a hearing for juveniles charged with such crimes.  Id. at 96 n.1 (quoting Conn. Gen. Stat. § 46b-127(a)).  The juvenile court never obtains exclusive jurisdiction over those juveniles charged with the enumerated crimes and, thus, juveniles have no vested right to juvenile status.  Id. at 108-09.  In contrast to the current statutory scheme, the 1975 juvenile statutes did not provide for such mandatory transfer, thus vesting a right to juvenile status in all persons who committed a crime under the age of 16.

(1971) ("The hearing required by the Due Process Clause must be meaningful."); <u>State v. Long</u>, 268 Conn. 508, 525, <u>cert. denied</u>, 543 U.S. 969 (2004) ("The fundamental requisite of due process of law is the opportunity to be heard … [which] must be at a meaningful time and in a meaningful manner.").  Because the application of the 1994 DCF regulation rendered the transfer hearing an utterly meaningless exercise in that Mr. Skakel would never have been able to meet the second statutory factor set forth in Section 17-60a, Mr. Skakel was deprived of his liberty interest in his juvenile status without due process of law.

Mr. Skakel was further deprived of his liberty interest in his juvenile status without due process of law in that the mandatory investigation required under Section 17-66 in transfer hearing situations was not fully performed.  The Connecticut Supreme Court's affirmance of the juvenile court's application of the 1994 DCF regulation effectively eliminated Mr. Skakel's right to a complete and full investigation as required under Section 17-66.  Without the thorough completion of this mandatory investigation, Mr. Skakel was not provided the full process afforded by law prior to the deprivation of his liberty interest in his juvenile status.

In effect, the Connecticut Supreme Court's application of the 1994 DCF regulation afforded Mr. Skakel a hearing under Section 17-60a that he could not win, and allowed him an investigation under Section 17-66 that he could not have.  Because this result clearly offends due process, habeas corpus relief should be granted.

4.    **The Connecticut Supreme Court's Retrospective Application Of The 1994 DCF Regulation Violates The Due Process And Ex Post Facto Clauses Of The United States Constitution**

The Connecticut Supreme Court's affirmance of the juvenile court's retrospective application of the 1994 DCF regulation violates the Due Process Clause.  The Ex Post Facto Clause prohibits any statute "which makes more burdens on the punishment for a crime, after its commission."  Beazell v. Ohio, 269 U.S. 167, 169 (1925); United States v. Juvenile Male, 819 F.2d 468, 470 (4th Cir. 1987); see also U.S. Const., art. 1, § 10. As discussed supra, the Due Process Clause prohibits the judicial branch from expanding statutes retroactively, just as the Ex Post Facto Clause prohibits the enactment of statutes to accomplish that same end.  The application of the 1994 DCF regulation violates the Due Process and Ex Post Facto Clauses because it imposed a greater, more burdensome and more onerous punishment than the law in effect at the time the crime was committed.[61]  Had Mr. Skakel been adjudged delinquent under the law in effect in 1975, he would have been sentenced to at most four years.  See Conn. Gen. Stat. § 17-69(a)-(b) (Rev. to 1975).  However, because the 1994 regulation was retrospectively applied to him and he was thus transferred to the adult criminal division of the superior court, Mr. Skakel was sentenced to 20 years to life.  This dramatic

_____

[61] Administrative regulations have the force of law.  Teresa T. v. Ragaglia, 272 Conn. 734, 751 (2005).

retrospective increase in the punishment for the crime violates the Due Process and Ex Post Facto Clauses.

The 1994 DCF regulation cannot be interpreted merely as a procedural mechanism that is allowed to be applied retroactively. The regulation "is 'procedural' only in the most superficial, formal sense." United States v. Juvenile Male, 819 F.2d at 471.

> [Application of the regulation] is no mere change in venue …; it is instead a means by which to impose on certain juveniles the harsher sentences applicable to adults. … The significance is that the transferred defendant is suddenly subject o much more severe punishment. Only by closing one's eyes to the actual effect of the transfer can one label this radical increase in the applicable punishment a procedural change. … If applied to [the Petitioner] retroactively, the [regulation] would have the undisputed effect of increasing the applicable punishment. … [T]his change can only be characterized as substantive.

Id.;[62] see also United States v. Baker, 10 F.3d 1374, 1394-95 (9th Cir. 1993), overruled on other grounds, United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000) (holding that

---

[62] In United States v. Juvenile Male, the defendant was arrested for the murder of three relatives that took place in 1981 when the defendant was 15 years old. The authorities lost track of the defendant and did not arrest him until 1986, when he was 20 years old. In the interim, Congress amended the Juvenile Delinquency Act to provide that individuals who commit certain crimes at the age of 15 may be prosecuted as adults. The district court applied this amendment to the defendant retroactively, ruling the amendment a procedural change in the law. The Fourth Circuit reversed, holding that the amendment was substantive because it increased the punishment for the offense, and that retroactive application of the amendment to the defendant violated the Ex Post Facto Clause. 819 F.2d at 469-72. The Fourth Circuit stated: "We are bound by the result Congress dictated when it drafted the law in effect in 1981 – that fifteen-year-old

applying amended transfer statute retroactively violates the Ex Post Facto Clause because it exposed juvenile to a much more severe sentence); In re Daniel H., 237 Conn. 364, 376 (1996) (substantive change in juvenile law is to apply prospectively only).

Because the 1994 regulation affected the severity of the punishment applied to Mr. Skakel by mandating his transfer from juvenile court, the regulation is a substantive law that should not have been retrospectively applied to Mr. Skakel.  This retroactive application violated the Due Process and Ex Post Facto Clauses and, as such, habeas corpus relief should be granted.

> **D.  The Connecticut Supreme Court's Decision Regarding The Prosecutorial Misconduct That Took Place At The Petitioner's Trial Violates The Due Process Clause Of The United States Constitution**

The Petitioner was convicted of murder based on a series of falsified stories manufactured by the State during its closing argument to mislead the jury, appeal to their emotions, and obtain a conviction at any cost.  The list of serious misconduct includes:

- The State intentionally distorted the chronology of events to fabricate a forensic cover-up allegedly perpetrated by the Petitioner, without a shred of evidence to support its false claims.

- The prosecution argued that the "Skakel family" had conspired to fabricate an alibi, despite the fact  that the alleged "conspiracy"

---

offenders should be tried as juveniles, even if they are not charged until they reach the age of 20."  Id. at 472.

never occurred according to any witness, including the State's witnesses.

- The State improperly argued to the jury that the "Skakel family" believed that the Petitioner was guilty of murder – that they had a "killer" living under their roof – and thus obtained a conviction based on the "family's" opinion about his guilt.

- The State called the Petitioner a "spoiled brat" and a "killer" to inflame the jury's passions.

- The State told the jury that the Petitioner masturbated on the victim's body despite the absence of any proof that he did so, and extensive proof that no such thing ever happened.

- The State improperly manipulated the evidence by showing the jury a production that literally fabricated a false confession.

The State, in short, presented the jury with deliberate distortions and half-truths in a manner calculated to heighten its anger toward the Petitioner and his family.

The United States Supreme Court has stated:

The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.  It is fair to say that the average jury, in a greater or less degree, has confidence that these

obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).

The Supreme Court has also stated:

This Court has recognized that prosecutorial misconduct may "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). To constitute a due process violation, the prosecutorial misconduct must be " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)).

Greer v. Miller, 483 U.S. 756, 765 (1987).

Finally, the Supreme Court has noted that prosecutorial misconduct is especially prejudicial to a party where the case against him is not strong, and where the instances of misconduct are "pronounced and persistent[,]" making "a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger v. United States, 295 U.S. at 89.

1. **Facts Relevant To This Claim**

a. **The State's False And Misleading Story About A Forensic Cover-Up By Michael Skakel And His Family**

The State had no forensic or physical evidence linking Mr. Skakel to this murder. It turned this weakness into a strength by devising an elaborate story about a forensic

"cover-up" perpetrated by Michael Skakel during the 1990s, more than 15 years after the murder. The State first noted the fact that Mr. Skakel had told people that he had masturbated in a tree near the murder scene. Tr.6/3/02 at 10-12 (App. A410-12). The State then argued – falsely – that Mr. Skakel only started telling people his masturbation tale after Dr. Henry Lee became involved in the case in the early 1990s. Thus, according to the State, the masturbation story was fabricated by "the Skakels" in 1992 as a shrewd anticipatory measure necessitated by the appearance of famed forensic scientist Dr. Henry Lee, whose participation made the Skakels fear the inevitable discovery of DNA evidence linking Mr. Skakel to the murder scene. This theory became central to the State's case.

The prosecutor told the jury this story over and over again in both phases of his closing argument:

> This, as you review the evidence, is where the absolutely weird masturbation story acquires significance. It's incorrect to say this is not a forensic case. . . . Henry Lee presented to you some weeks ago the history of DNA in solving crimes. By 1991 or 1992, it was the real deal in criminal investigation. When this case, this investigation was revived in late 1991, every criminal investigator on the planet was totally attuned to this miraculous new technology and of course that would include the PIs the Skakel family had hired to assist them in the defense, Sutton Associates. . . . You didn't have to be a fly on the wall when the Sutton Associates came into the picture in 1992 to understand why the defendant soon was serving up his bazaar [sic] tale of masturbation in a tree to his friend, Andy Pugh, and later to Richard Hoffman. . . . And not knowing what traces may have been recovered from her body and of course the crime scene investigation or from her clothing or exactly who he may have related this horrible tale to, particularly in his years at Elan, he needed

some kind of explanation.  Tr. 6/3/02 at 10-12 (App. A410-12).

In 1992, he told somewhat the same story to Andy Pugh . . . .  And he asked Pugh to please return Sutton Associates, and their persistent phone calls.  This of course to get out the appropriate explanation should there be semen at the scene one day connected to the crime. Id. at 18 (App. A418).

So, it is Michael Skakel who has set the buffet menu here.  As a result, starting in 1992 with Andy Pugh, the defendant having already consulted with Sutton Associates, has spun a tale of tree climbing, spying and masturbating that occurred after his return from Terriens.  Id. at 93-94 (App. A425-26).

[T]hat does not mean that you cannot consider the sudden presence of Sutton Associates particularly as it relates to the defendant's Andy Pugh masturbation story.  This is simply more evidence of what the defendant was doing to avoid a successful prosecution.  Id. at 110 (App. A442).

[H]ow about the bloody smears on Martha's thighs[?]  What better evidence could you ask for when you are trying to reason out just what [defendant] meant when he started talking about his masturbation stories?  Id. at 112 (App. A444).

The only person on earth who knew the defendant had masturbated anywhere was the defendant so why ever mention it to Andy Pugh – only one conceivable reason, to help explain himself should his DNA ever be discovered.  Id. at 113 (App. A445).

The State's elaborate story of a forensic cover-up is demonstrably false.  First,

the undisputed evidence at trial, elicited by the State itself, clearly showed that the

Petitioner had confided the masturbation incident to a friend, Michael Meredith, in **1987**,

some five years before Dr. Lee and Sutton Associates became involved. Tr. 5/20/02 at

112, 127.[63]  Second, to support its made-up theory, the prosecutor incorrectly told the jury that DNA was "the real deal" in solving crimes by 1991/1992, and that by late 1991 "every criminal investigator on the planet was totally attuned to this miraculous new technology and of course that would include the PIs the Skakel family had hired to assist them in the defense, Sutton Associates."  6/3/02 at 10-12 (App. A410-12).  Once again, this factual claim has absolutely no basis in the record evidence.  In fact, the State's statement of "fact" is directly contrary to the undisputed evidence at trial.[64]

The State's false argument carried devastating force, if believed, because it demonstrated that Mr. Skakel possessed a grotesque consciousness of guilt, and simultaneously focused the jury on the State's extreme (and groundless) allegation that Mr. Skakel had masturbated on the victim's lifeless body.   In truth, the prosecution spun this story to inflame the passions of the jury and misdirect its attention.  In the process, the State overstepped the bounds of zealous advocacy, conduct which requires reversal.

---

[63] Mr. Skakel told the same thing to another friend, Andrew Pugh, sometime in **1991**, not 1992.  Tr. 5/20/02 at 163.

[64] Far from being an established forensic tool in 1992, forensic DNA analysis <u>was just emerging</u> at that time.  Dr. Lee testified that DNA testing had been "just introduced, we just started learning DNA" in 1991.  Tr. 5/7/02 at 156; <u>see</u> <u>also</u> Testimony of Dr. Terri Melton, Tr. 5/15/03 at 50 (in 1993 the field of DNA was still "in its infancy.").

### b. The State's False Story About A Skakel Family Conspiracy To Orchestrate A Fabricated Alibi

The State liked the "cover-up" theme because it simultaneously (1) explained why it took the State twenty-five years to charge Michael Skakel, (2) showed a familial consciousness of guilt, and (3) played into the State's theme that Michael Skakel and his family believed that their privileged station somehow put them above the law.  So, again without a shred of evidence to support it, the State fabricated an elaborate story about a Skakel family "conspiracy" to falsify evidence that would supply an alibi for Mr. Skakel.  This devastating "cover-up" theme not only conveyed a familial verdict of guilt, it also gutted the credibility of all alibi witnesses in one argumentative thrust, and appealed to the jury's sense of outrage that a wealthy family thought it was able to trick the police by concocting a false alibi.  The State's conduct was grossly egregious because it was deliberate and false.

In his summation, the prosecutor repeatedly told the jury that Rushton Skakel, Sr. had orchestrated a series of false alibi statements given by the Skakel children, and certain Skakel relatives, to the Greenwich police. The State told the jury:

> And, then the alibi, that is the cornerstone of the defense here.  . . . You will want to look at how it was produced.  Somebody had the bright idea to get the players out of town in the immediacy of the investigation on October 31.  . . . Not until after their return from Windham did the alibi begin to come up.  Indeed, you just heard of the events of November 15 a lot last week, how father Rushton took all of his kids, Terrien as well, as a group, to give their stories to the police.  By whom was it produced [?]  Tr. 6/3/02 at 20-21 (App. A420-21).

Let's stay with the alibi.  Why is it so suspect.  How was it produced.  What did the Skakel family do – and I didn't really hear much from Mr. Sherman on this – what did the Skakel family do to put this together.  Someone seeing the police all over the place decided, had the good sense to get the players out of the area.  The oldest brother had already gone off to D.C. [for college], so the first thing the next morning Littleton was ordered to take the four players, Michael, John, Thomas and Jim Terrien, out of the way for awhile, for a short trip upstate . . . .  The importance of that sudden brief one night trip is that the alibi didn't begin to take shape until some time after the return from Windham.  Id. at 97 (App. A429).

And then you had the additional fact of two weeks after the murder, father Skakel, father Rushton Skakel, escorting the entire family together plus Jim Terrien almost like leading the VonTrapp family over the alps to the police station to give their recorded but unsworn statements.  Id. at 97-98 (App. A429-30).

Consider what the family group did to advance the alibi here in the courtroom.  Id. at 98 (App. A430).

Yet, even on this basic fact, the defendant's witnesses couldn't get on the same page.  Id. at 98 (App. A430).

Brother John, cousin Georgeann, they spoke to the police in 1975, as did everybody else.  They were not under oath at that time.  Certainly they were a lot more malleable then as 16 and 17 year olds then they are now as adults.  Id. at 100 (App. A432).

Julie Skakel is the best example of a family support group continuing to this day to do whatever it takes to keep the wraps on Michael Skakel.  Id. at 102 (App. A434).

And then [Rushton Skakel, Sr.] escorted or rehearsed a group of alibi witnesses down to the police station a few weeks later.  Id. at 110 (App. A442).

By the time Detective Lunney arrived at the Skakel home to collect that four iron [golf club], they had 36 hours to dispose of the evidence.  In fact,

they were already on their way to Windham.  Id. at 112 (App. A444).

And the most amazing thing about these dozen admissions of the
defendant, it is not like they were produced as a group.  It is not like they
were marched down to the Greenwich Police Station by Dad to all give an
alibi. Id. at 129 (App. A461).

Thus, according to the State, the senior Mr. Skakel had "ordered" the family tutor,

Ken Littleton, to whisk some (but not all) of the "players" in the conspiracy to the Skakel

home in upstate Windham, New York, to fabricate an alibi.  Once this was accomplished,

then Mr. Skakel "escorted" and "led" the "rehearsed" alibi witnesses to give their false

statements to the Greenwich police. This story of a family "alibi" conspiracy has no

evidentiary support; in fact, the evidence was all to the contrary. The State's own

witness Ken Littleton – who was the family "tutor baby sitter" in charge of the children at

the time of the murder, and who by his own admission would have "love[d] to screw"

Michael Skakel – completely undermined the State's alibi conspiracy story.  Tr. 5/13/02

at 141, 138.[65]  The prosecutor also misrepresented the circumstances under which the

Skakels gave statements to the Greenwich police a few weeks later.[66] The State's

---

[65] Notwithstanding his dislike for the defendant, Mr. Littleton testified that he was never
asked by the Skakels to cover up anything.  Tr. 5/13/03 at 5,9, 16.   Mr. Littleton
admitted that it was his idea to take the kids up to Windham.  Id. at 23.  Rushton Skakel,
Sr. was not even home.  Moreover, Littleton flatly denied hearing the children discuss
the murder at any time to, from or at the Windham home. Tr. 5/9/02 at 176.
[66] Greenwich police officers had immediate access to the Skakel children, and
questioned them even before the Windham trip.  Tr. 5/29/03 at 75.  The police officers
testified that the Skakels were fully cooperative with the investigation from the moment
the police arrived at the scene on October 31, 1975, and did nothing to hinder police

overreaching cannot be justified and the grave consequences of this misconduct require a new trial. State v. Payne, 260 Conn. at 456-57.

> ### c. The State's Argument That The "Skakel Family" Believed That They "Had a Killer Living Under Their Roof"

The foregoing "conspiracy" and "cover-up" allegations against the Skakel family were part of a larger story told by the State to the jury. Well beyond attacking the alibi witnesses, the State created a theme that the Skakel family itself believed that Mr. Skakel killed Martha Moxley because, otherwise, they would not have sent him to Elan. The State argued:

> One thing that I submit helps tie all this together, particularly on the subject of Elan, and really see the truth, is the defendant's very presence at that place. The defense scoffs at the idea despite I think such clear evidence of a cover up. Why was the defendant at Elan. This is really not a matter of seeing the forest from the trees. It is genuinely transparent.

> Clearly, the defendant had a major problem. Already he was an alcoholic, a substance abuser. Already he was beyond the control of his family. He was becoming suicidal. I doubt his family was even aware of the sexual turmoil he was going through. Elan was a last resort but why exactly so drastic a resort.

> You heard from Rogers and Coleman he was being hidden from the police

---

access to evidence or witnesses during the initial investigation, despite the fact that police had no warrants. Tr. 5/8/02 at 20-21; Tr. 5/9/02 at 26. The State also knew from a police report prepared on November 15, 1975 that Rushton Skakel, Sr. did not "march" his hand-selected alibi witnesses to the police station to give an alibi, but rather, he responded to Detective Lunney's request to interview particular witnesses. Tr.5/28/02 at 83; See Police Report, 11/15/75, App. at A337. According to the police report, Detective Lunney requested James Terrien's appearance at the police department. Id.

is probably part of it.  It is likely also, if it was a private juvenile justice system, basically a family's response is what can we do to make sure this doesn't happen again.  And where does that ring the truest, at that horrible general meeting with the monster himself, Joe Ricci.

One thing, every client of Elan who was there during that particular era recalls vividly, is Joe Ricci referring to a file and telling the defendant that he wasn't getting our of that ring until he explained why he killed her and then being forced to where a sign, confront me on the murder of my neighbor.

Where did Ricci get that information.  Clearly he didn't get it from the police.  Why did Ricci have that information.  Why did Ricci confront the defendant with that information.  The answer, the only one that makes sense, lies in why the defendant was there in the first place, lies in why his family felt a need to put him in that awful place.  Why, ***because that's what they decided that they had to do with the killer living under their roof***.

Tr. 6/3/02 at 129-31 (App. A461-63) (emphasis added).

In this improper summary of the evidence, the State asked the jury to conclude

that Michael Skakel was guilty of murder ***because even his own family thought he***

***was the "killer.***"  This theory of guilt was terribly improper, for three reasons. ***First***, any

belief of the Skakel family concerning the Petitioner's guilt is irrelevant and inadmissible

as evidence.[67]  If the evidence is inadmissible, then a fortiorari, an argument based on

---

[67] See Conn. Evid. Code 703(a) (opinion testimony is inadmissible if it embraces an ultimate issue to be decided by the jury).  See Arpan v. United States, 260 F.2d 649, 658 (8th Cir. 1958) (reversing murder conviction based, in part, on mother's testimony that she believed her son had shot the victim: "Clearly, it was immaterial in the legal establishing of appellant's guilt what the mother's thoughts or opinion in the matter may have been."); State v. Lahti, 597 P.2d 937, 938 (Wash. App.), cert. denied, 92 Wash.2d 1036 (1979) (alleged suspicions of ex-wife about abuse could not have been shown

the evidentiary theory is inadmissible. The issue of the Petitioner's guilt was for the jury to decide without consideration of the opinions of others. ***Second***, the State told the jury that the Petitioner's <u>family</u> believed him to be guilty.  The prejudice of this argument is extreme.  See <u>Arpan v. United States</u>, 260 F.2d 649, 659 (8th Cir. 1958) ("getting of the fact before the jury, that the [defendant's own] mother had been of the opinion that appellant was guilty, was a crossing into the issue of guilt and that it might cast shadows of prejudice upon the jury's resolution of that question"). ***Third***, the State asked the jury to infer what the Skakels told Elan's director, Mr. Ricci, about the Petitioner's guilt. Otherwise, the State argued, Ricci would not have forced the Petitioner to accuse himself.  Ricci did not testify, and the Skakels who testified were not questioned regarding what they said to Ricci. The State argued that Mr. Skakel was guilty because the Skakels must have told Ricci that he was guilty. Such evidence would have been inadmissible hearsay if proffered at trial; thus, it was improper to ask the jury to infer such evidence during the State's closing argument.

### d. The State's Scripted Argument Calling Petitioner "The Killer" And "Spoiled Brat"

The State also found it necessary to engage in highly prejudicial name-calling. Thus, it called Mr. Skakel "the killer." Tr. 6/3/02 at 131 (App. A463) (the family sent him

---

"without improperly substituting [the witness's] judgment for that of the jury."); <u>State v. Gourley</u>, 578 P.2d 713, 717 (Kan. 1978), <u>denial of habeas corpus aff'd</u>, 208 F.3d 226 (10th Cir. 2000) (error to admit statement of defendant's half-brother expressing opinion that defendant had committed the murder; harmless error).

to Elan because that's what they decided that they had to do with the killer living under their roof.").  The prosecutor also twice called defendant a "spoiled brat" during both phases of his summation. Tr. 6/3/02 at 16; 126 (App. A416, A458).  Exactly this type of conduct has repeatedly been condemned as unacceptable in a trial where a person's liberty is at stake.  See Boyle v. Million, 201 F.3d 711, 717 (6th Cir. 2000) ("name calling … [is a] tactic[] so deplorable as to define the term 'prosecutorial misconduct.'"); United States v. Thompson, 39 F.3d 320, 320 (5th Cir. 1994), cert. denied, 513 U.S. 1197 (1995) (quoting Hall v. United States, 419 F.2d 582, 587 (5th Cir. 1969) ("Prosecutors should not engage in name calling.  The use of 'shorthand characterization[s]' of a defendant has always been discouraged."); see also State v. Couture, 194 Conn. 530, 562-64 (1984), cert. denied, 469 U.S. 1192 (1985) (murder conviction reversed because prosecutor called defendant "cold-blooded killer" and coward); State v. Oehman, 212 Conn. 325, 335 (1989) (improper to call defendant "spoiled killer.")

e.    The State's False Allegation That The Petitioner Masturbated On The Victim's Body

There was no semen found on the victim's body or at the scene of the crime, and the State knew it, yet the State wanted the jury to believe that Mr. Skakel masturbated on the victim's body because that image would ensure passionate outrage.[68] The State

---

[68] See Tr.6/3/02 at 112 (App. A444) ("It is unquestionable that when the defendant repeatedly struck Martha with the golf club, crouched over her to stab her, masturbated

wanted the jury to believe that Mr. Skakel's non-inculpatory admission of teenage, peeping-tom masturbation was actually something else entirely: a confession to murder. It also wanted the jury to believe there was actual forensic support for this fabrication.

To defend its indefensible conduct, the prosecution claimed that this argument was justified due to the testimony of Greg Coleman.[69]  Even though the masturbation story was untrue, the State seized on its prejudicial potential and made it a central focal point of its closing argument. Worse, the State intentionally distorted the forensic evidence to fit the discredited tale.[70] The actual physical evidence was that there was **no** semen found anywhere on or near the body. Tr.5/8/02 at 102, 153. The State's argument improperly invited the jury to speculate that the Petitioner had committed a monstrous act.

---

on her that he got plenty of her blood on himself."); <u>see</u> <u>also</u> <u>Id.</u> at 12 (App. A412) (claiming the Petitioner administered the ultimate and sickest of "humiliations").
[69] Coleman, who died of a heroin overdose prior to trial, testified via prior testimony that the Petitioner told him in November, 1978 that he had returned two days after the murder and masturbated on the victim's body.  Tr. 5/17/02 at 138, 160.  Of course, the story was not true and could not have been true. The murder occurred during the nighttime on October 30, 1975, and the body was found just past noon the very next day.  Tr. 5/7/02 at 155-160.  Coleman was the **only** "witness" who said anything about masturbating on the body, and the State knew that the masturbation could not have occurred as this sole witness had testified.
[70] The State argued that the blood smear on Exhibit 23 supported its masturbation claim ("This is evidence … that he masturbated on her body.") This claim was groundless and highly prejudicial.

     **f.**     **The State's Misuse Of The Evidence In Its Audio-Visual Presentation Of A Fictional Confession During Closing Argument**

In the coup-de-grace of its improper closing argument -- during its <u>rebuttal</u> presentation providing the final images that the jurors took with them before deliberations -- the State showed the jury an audio-visual presentation it had made to "prove" its case. In this presentation, the State literally produced an audio-visual confession by flashing gruesome images of the victim's body at the murder scene while simultaneously playing an edited audiotape of defendant's admission of "guilt" – ***about a different event.*** The prosecutor turned Mr. Skakel into a narrator of the murder by splicing together a deceptively edited version of his taped interview with Richard Hoffman, in which the Petitioner described his guilty feelings about masturbation, as a voice-over to horrific photographs of the murder scene. The State also created deceptive visual connections by simultaneously showing a transcript of the edited Hoffman interview in connection with the gruesome photos. This video production went beyond the pale; in the hands of the State, an admission of masturbation literally became a confession to murder.[71]

---

[71] The Court is urged to view the State's video presentation. The computer disk was marked as a State's Exhibit during the argument on the Amended Motion For New Trial. Tr.8/28/02 at 51.Two passages are especially improper. First, as the State played the audio tape of Mr. Skakel's guilty feelings about masturbating, "I remember just like having the feeling of panic like, oh, shit, you know, like my worry of what I went to bed with, I don't know, you know what I mean, I had a feeling of panic," it displayed digital

Courts have found it improper to allow the prosecution to replay audio or video evidence during closing arguments.[72] The State's use of its audio-visual display during its closing argument was improper because it vastly distorted the meaning and import of the images presented and appealed to the passions, prejudices and emotions of the jury. The State confronted a credible alibi defense, and had no physical or forensic evidence tying the Petitioner to the crime. Thus, any evidence containing possible

---

photos of the victim's slain body. See Tr.6/3/02 at 138 (App. A470). This visual distortion of the evidence changed its meaning, intentionally. The State juxtaposed images that did not go together. Worse still, the State altogether left out key words contained in the actual testimony that it purported to display. The actual testimony was "And then I was like 'I'm running home,' I ran home, and I remember thinking 'Oh my God. I hope to God nobody saw me jerking off.' And I remember thinking before I went to bed that I was gonna tell Andy Pugh that I thought I saw somebody in there that night. And then I woke up, went to sleep, and then I woke up to Mrs. Moxley saying 'Michael have, have you seen Martha?" I'm like, "What?" And I was like still high from the night before, a little drunk, then I was like "What?" I was like "Oh my God, did they see me last night?" And I'm like 'I don't know,' I'm like, and I remember just having a feeling of panic. Like 'Oh shit.' You know. Like my worry of what I went to bed with, like may …, I don't know, you know what I mean I just had, I had a feeling of panic. And um, I said 'Maybe she's in our barn, I don't know." State's Trial Exhibit 80, at 103-107. The State's version deleted the essential reference to Mr. Skakel's fear that someone saw him masturbating the prior night. This crossed the line from advocacy into fabrication of evidence.

[72] People v. Ammons, 622 N.E.2d 58, 60 (Ill. App. 1993), cert. denied, 631 N.E.2d 711 (Ill. 1994) (error to allow the prosecutor in closing argument to play an audiotape of defendant's statement to police because "allowing such evidence to be reintroduced dramatically overemphasized its credibility"). The jury should pass upon the evidence "free of the overemphasis given any portion of it by verbatim repetition during the trial's waning moments." Id.; see also State v. Muhammad, 820 A.2d 70, 82 (N.J. Super. A.D.), cert. denied, 834 A.2d 408 (2003) (warning against replaying edited video testimony during summation because "[s]killful editing has the capacity to encapsulate the strong points of a party's case, with the corresponding capacity to give the jury a myopic view of the facts.")

admissions or incriminating statements by the Petitioner was crucial to the State's case.[73]  The State's use of the selectively edited snippets of the Petitioner's voice pasted into the graphic photos of the victim conveyed false literal and subliminal messages to the jury. This manipulative use of prejudicially edited evidence during the summation was improper.

> **2.** **The Connecticut Supreme Court's Decision Was An Unreasonable Application Of Established Law And/Or Was Based On An Unreasonable Determination Of The Facts In Light Of The Evidence Presented[74]**

> **a.** **The Forensic Cover-Up**

The Connecticut Supreme Court disagreed with Mr. Skakel's first contention, finding that that the state's attorney did not misrepresent the chronology of events to make it appear that the Petitioner was telling the masturbation story only after Henry Lee became involved in the investigation.  <u>Skakel</u>, 273 Conn. at 750.

The Connecticut Supreme Court did find, however, that the state's attorney's comments about DNA evidence being the "real deal" in criminal investigations, about

---

[73] The prosecution's use of this audio-visual display was also extremely prejudicial because of the fact that the Petitioner did not testify at trial. The prejudice was further compounded by the State's simultaneous projection of graphic photos of the victim's body, which had the effect of sending subliminal messages to the jury in an attempt to arouse their passions.

[74] While findings of fact by the state court enjoy a presumption of correctness under the Anti-Terrorism and Effective Death Penalty Act, this presumption is rebuttable.  <u>See</u> 28 U.S.C. § 2254(e)(1).

which there was virtually no evidence presented, were improper.  Id. at 751.

Notwithstanding that finding, the Connecticut Supreme Court determined that the

Petitioner's due process rights were not violated as a result of this statement.  Id.  The

court decided that Mr. Skakel's counsel's failure to object to the comments at trial

indicates that he did not believe that it was unfair in view of the record of the case at the

time.  Id. at 752.  The court also found that even if the state's attorney's characterization

of the state of DNA evidence in the 1990's was overblown, that characterization did not

represent the kind of "gross or flagrant impropriety for which a new trial is required."  Id.

Therefore, with regard to this issue, the Connecticut Supreme Court found that

one of the instances of the State's conduct was not improper, and that the second

instance was improper but failed to rise to the level of a due process violation.  The first

finding is a factual one, the reasonableness of which is rebuttable.  The second finding

is a determination of law.

### 1.    Misrepresentation Of The Chronology

First, the Connecticut Supreme Court's decision that the State's conduct in

misrepresenting the chronology of events was not improper is based on an

unreasonable determination of the facts.  The inference that was presented to the jury

was that the Petitioner, with the aid of his family and Sutton Associates, fabricated the

masturbation story in 1992 to combat any forensic evidence that may be found at the

scene after the investigation was reopened and Dr. Henry Lee became involved.  This

argument, that the Petitioner "spun a tale" in 1992, had no basis in the evidence presented at trial.  As discussed <u>supra</u>, Mr. Skakel confided the masturbation incident to Michael Meredith five years prior to Dr. Lee's involvement, in 1987.  Tr.5/20/02 at 112, 127.  Mr. Skakel also told the masturbation incident to Andy Pugh in 1991.  Tr.5/20/02 at 163.

The testimony of heroin addict Gregory Coleman, which was used to justify the State's argument that the Petitioner had masturbated on the body, is unworthy of belief.  Coleman's dubious testimony was directly contradicted by the complete lack of forensic evidence found at the scene.  To claim that semen "could" have been present on the victim's body because the medical examiner "only" checked for semen in the victim's pubic area is sheer speculation.  Further, Dr. Lee's testimony that the victim had two bloody smudges on her legs that "could" have been from a hand touching or pushing her leg does not provide "forensic" evidence that the Petitioner masturbated on the body.  Tr.5/8/02 at 149.

Finally, the fact that the Petitioner told several people he had masturbated in a tree the night the victim was killed does not support the inference that he actually masturbated on or near the victim's body.  The evidence established that the tree that the Petitioner claimed to have masturbated in was ***not*** the tree under which the victim's body was found, nor was it near the drag path.  State's Ex. 80 at 88-94 (Petitioner states that he climbed pine tree right at front door of Moxley house and masturbated in

that tree); State's Ex. 13 (showing Moxley front door); Ex. 26B (photograph showing side of Moxley home and location where body was found and where drag path was in relation to front door); Ex. 40 (diagram of crime scene).

Therefore, the court's finding that the inference suggested to the jury by the State was reasonable under the facts was an unreasonable determination of the facts.

### 2. The State's Comment That DNA Evidence Was The "Real Deal"

Second, the supreme court incorrectly found that the State's improper comment about DNA evidence being the "real deal" did not violate the Petitioner's due process rights. This statement was "of sufficient significance to result in the denial of the defendant's right to a fair trial" and the Connecticut Supreme Court's failure to so find was constitutional error. See Greer v. Miller, 483 U.S. 756, 765 (1987).

The State's bizarre story about a forensic cover-up was not a throw-away comment during the heat of battle; it was a centerpiece of the prosecution's closing argument during both its initial summation and its rebuttal. In truth, the entire forensic "cover-up" story was completely made up by the State. Not only was it unsupported by the evidence; in fact, the tale relies on a wild distortion of the evidence. The prosecution simply created the story to inflame the passions of the jury and misdirect its attention. In the process, the State overstepped the bounds of zealous advocacy.

The prosecutor told the jury that DNA was "the real deal" in solving crimes by 1991/1992, and that by late 1991 "every criminal investigator on the planet was totally attuned to this miraculous new technology and of course that would include the PIs the Skakel family had hired to assist them in the defense, Sutton Associates." Tr.6/3/02 at 10-12 (App. A410-12). This assertion was an important predicate to the State's forensic cover-up theory: the Skakels by 1992 knew that DNA testing was "the real deal" in crime scene investigation; they knew that it would be used to link Mr. Skakel to the crime scene; so therefore, they concocted the masturbation story. But once again, this factual claim has absolutely no basis in the record evidence. In fact, the State's statement of "fact" is directly contrary to the undisputed evidence at trial. Far from being an established forensic tool in 1992, forensic DNA analysis <u>was just starting</u> at that time. Thus, under questioning by the State, Dr. Lee testified that DNA testing had been "just introduced, we just started learning DNA" in 1991. Tr.5/7/02, at 156. Likewise, Dr. Terri Melton, the State's expert who testified about hair samples found at the crime scene, stated that "the very first" mitochondrial DNA testing was being performed in the early 1990s, and in 1993 the field was still "in its infancy." Tr.5/15/03, at 50. The State's argument on this crucial point was a total fabrication.

The State's false forensic cover-up story was a prominent part of its closing argument. It was gravely prejudicial, which was precisely why the State made it a centerpiece of its presentation. No defendant could recover from its damning

implications.  Therefore, the Connecticut Supreme Court's decision, finding no due process violation, was an unreasonable application of law as the prosecutor's statement was "of sufficient significance to result in the denial of the defendant's right to a fair trial."  See Greer v. Miller, 483 U.S. 756, 765 (1987).

### b.  The Conspiracy To Fabricate An Alibi

The Connecticut Supreme Court rejected Mr. Skakel's claim that the State's argument was based on facts not in evidence.  State v. Skakel, 273 Conn. at 754.  The court found that the State's argument that Littleton was told to take the four boys to Windham was founded on "reasonable inferences drawn from the testimony" of Littleton and Mr. Skakel's father.  Id.  The court further determined that the state's attorney did not go beyond the bounds of proper argument when he urged the jury to infer that Mr. Skakel's father had been instrumental in orchestrating the Petitioner's alibi.  Id. at 755. The court stated: "Although the state's attorney did not, and could not, point to any direct evidence of a concerted effort by the [Petitioner's] father or other members of the Skakel family to orchestrate an alibi for the [Petitioner], it was reasonable for the state's attorney to implore the jury to infer, on the basis of circumstantial evidence, that such an effort had been undertaken on the [Petitioner's] behalf."  Id.

The Connecticut Supreme Court's decision was unreasonable based upon the facts presented at trial.  This story of a family "alibi" conspiracy is outrageous.  There was no evidentiary support for it.  In fact, much like the forensic cover-up story reviewed

above, the evidence was all to the contrary.  The State's own witness Ken Littleton –

who was the family "tutor baby sitter"; Tr. 5/13/02 at 141; in charge of the children at the

time of the murder, and who by his own admission would have "love[d] to screw" Mr.

Skakel; id. at 138; – completely undermined the State's alibi conspiracy story.

Notwithstanding his dislike for the Petitioner, Mr. Littleton testified that he was never

asked by the Skakels to cover up anything.  Tr.5/13/03, at 5,9, 16.   Mr. Littleton

admitted on cross-examination that it was *his* idea to take the kids up to Windham and

away from a murder scene in their own backyard.[75]  Id. at 23.  Rushton Skakel, Sr. was

not even home.  The State's claim that Littleton was "ordered" to take the "players" to

Windham is unsupported by the testimony of any witness.  Moreover, when the State

tried to elicit additional facts in support of its conspiracy story, Littleton flatly *denied*

hearing the children discuss the murder at any time to, from or at the Windham home.

Tr.5/9/02 at 176.  In response to the frustrated prosecutor's questioning, Littleton stated

that he heard nothing of the kind despite having spent "just about" every minute with the

children during the Windham excursion.  Tr.5/13/02 at 142.

The prosecutor also falsified the circumstances under which the Skakels gave

statements to the Greenwich police a few weeks later.  There was nothing suspicious

about these circumstances, and no inference of conspiracy is suggested by the facts.

---

[75]     The State led Mr. Littleton initially to say he was "directed" to take the children to
Windham, Tr.5/9/02 at 175, but under cross-examination he admitted that it was his own
idea to do so.

The Greenwich police officers had immediate access to the Skakel children, and
questioned them even **before** the Windham trip.  Tr.5/29/03, at 75.  The police officers
themselves testified that the Skakels were fully cooperative with the investigation from
the moment the police arrived at the scene on October 31, 1975, and did nothing to
hinder police access to evidence or witnesses during the initial investigation, despite fact
that police had no warrants.   Tr.5/8/02 at 20-21 (Officer Keegan testifies that Mr. Skakel
gave full cooperation to police for first three months of investigation); Tr.5/9/02 at 26
(Det. Lunney, same testimony).

In fact, as the prosecutor stood before the jury telling its tale of a conspiracy to
deliver a fabricated alibi, the State knew full well that Detective James Lunney had
contacted Rushton Skakel, Sr. to bring the children down to give recorded statements to
the police regarding the events of October 30, 1975.  See Tr. 5/28/02 at 83.  The State
also knew from a police report prepared on November 15, 1975 that Rushton Skakel, Sr.
did not "march" his hand-selected alibi witnesses to the police station to give an alibi, but
rather, he responded to Detective Lunney's request to interview particular witnesses.
The police report states as follows:

> Detective James Lunney contacted Rushton Skakel and requested that he
> appear at the detective bureau with his following described children for an
> interview which would be tape-recorded.  Mr. Skakel was agreeable, and
> appeared at the detective bureau with his children.  …  The following
> described youths were also requested to appear at the detective bureau
> for the tape-recorded interview.  Andrea Shakespeare ….  James Terrien
> ….

<u>See</u> Police Report, 11/15/75, App. A276.  According the police report, Detective Lunney requested James Terrien's appearance at the police department.  All of this is directly contrary to the innuendo created by the prosecutor's remarks that Rushton Skakel, Sr. dragged Mr. Terrien to the police station in order to provide his son, Michael Skakel, with an alibi.

Once again the misconduct is manifest.  The State's overreaching cannot be justified, and the Petitioner was denied a fair trial as a result of these statements.  The Connecticut Supreme Court's finding that the comments were not improper is unreasonable in light of all of the facts presented at trial.

        **c.**      **The Family's Belief That They "Had a Killer Living Under Their Roof"**

The Connecticut Supreme Court also disagreed with the Petitioner's claim that that the State improperly argued that the Petitioner's family believed that he had killed the victim, which is why Mr. Skakel was sent to Elan, and that the State improperly told the jury that it could infer that the Petitioner's family told Elan administrators that the Petitioner had been involved in the murder.  <u>State v. Skakel</u>, 273 Conn. at 755-56.  The Petitioner argued to the supreme court that this argument was based on improper opinion evidence and hearsay.  <u>Id.</u> at 758.

The Connecticut Supreme Court found that the state's attorney's argument that the Petitioner had been sent to Elan because of his involvement in the murder was

based upon the testimony of Rogers and Coleman, which was not hearsay.  Id. at 758.

The court noted that Rogers and Coleman both testified that the Petitioner had told

them that his family had sent him to Elan to shield him from police.  Id.

The Connecticut Supreme Court also determined that the State's second

argument was focused on the likelihood that the Petitioner had disclosed his

involvement in the murder to members of his family.  Id. at 759.  The court found that

the inference urged by the state's attorney was appropriately based on the evidence.

Id.  Thus, the state's argument as to what Elan administrators likely had learned from

the Petitioner's family about his involvement in the murder was not improper.  Id.

The Connecticut Supreme Court's decision that no misconduct occurred was

unreasonable in light of the facts presented at trial.  In this grossly improper summary of

the evidence, the State asked the jury to conclude that Mr. Skakel was guilty of murder

***because even his own family thought he was the "killer***."  This is not a theory of

guilt based on evidence, it is demogoguery.  The State asked the jury to take three

impermissible steps to reach the sought-after conclusion.

First, the belief of the Skakel family concerning the Petitioner's guilt, which the

State asked the jury to use as its guide, is irrelevant, highly prejudicial, and inadmissible

as evidence.  See Conn. Evid. Code 703(a) (opinion testimony is inadmissible if it

embraces an ultimate issue to be decided by the jury); see also Arpan v. United States,

260 F.2d 649, 658 (8th Cir. 1958) (reversing murder conviction based, in part, on

mother's testimony that she believed her son had shot the victim: "Clearly, it was immaterial in the legal establishing of appellant's guilt what the mother's thoughts or opinion in the matter may have been."); State v. Lahti, 597 P.2d at 938 (alleged suspicions of ex-wife about abuse could not have been shown "without substituting [the witnesses' judgment for that of the jury."); State v. Gourley, 578 P.2d at 717-18 (error to admit statement of defendant's half-brother expressing opinion that defendant had committed the murder; harmless error). If the evidence is inadmissible, then *a fortiorari*, an argument based on the evidentiary theory is inadmissible.[76] The issue of the Petitioner's guilt was for the jury to decide without consideration of the conclusions or opinions of others.

Second, at issue were the opinions of Mr. Skakel's own family. The very reason the State's argument was so powerful on this point is also the reason is it was so improper. The State told the jury that Petitioner's ***family*** believed him to be guilty. The prejudice of this argument is extreme. As the federal court stated in Arpan v. United States, supra, in explaining why the admission of such evidence required reversal, "getting of the fact before the jury, that the [defendant's own] mother had been of the opinion that appellant was guilty, was a crossing into the issue of guilt and that it might cast shadows of prejudice upon the jury's resolution of that question . . . ." 260 F.2d at

---

[76] None of the Skakels ever testified that they believed Michael was guilty of the murder. The point here is that such evidence would not have been allowed, and arguing the inference was totally improper.

659. Not only a mother here, according to the State, but an entire family had concluded that the Petitioner was guilty. "A jury would perhaps not be likely to be bothered too much about the question of an accused's guilt, where it was made to appear to them that both his father and mother had indicated such a belief." Id. at 657.

Third, the State asked the jury to infer what the Skakels told Elan's director, Joe Ricci, about the Petitioner's guilt. Why else, the State asked, would Mr. Ricci have forced Mr. Skakel to accuse himself? There are plenty of alternative answers to that question, but the point here is that the suggested answer was improper. Mr. Ricci didn't testify at all, and the Skakels who testified were not asked the question that the State "answers" in its argument. Whatever "the Skakels" told Mr. Ricci was left to speculation. It was also rank hearsay: The State was arguing the inference as an out-of-court statement used to prove the truth of the matter asserted, *i.e.*, Mr. Skakel was guilty because the Skakels must have told Ricci that he was guilty. Such evidence would have been inadmissible hearsay if proffered at trial. It was improper to ask the jury to infer such evidence during the State's closing argument.

Based on the foregoing evidence, the Connecticut Supreme Court's conclusion that these statements by the prosecutor were not improper is an unreasonable determination of the facts.

### d. The State's Name-Calling Of The Petitioner

The Connecticut Supreme Court found that the State's referring to Mr. Skakel as "the killer" was not improper under the circumstances. <u>State v. Skakel</u>, 273 Conn. at 759. The court noted that when the word "killer" was considered in the "fuller context of the argument in which it was used, it is clear that the state's attorney's use of that word was neither gratuitous nor inflammatory; rather, the state's attorney employed the term merely as a shorthand for 'the person who had killed the victim.'" <u>Id.</u> at 759-60. The court found the use of the term was "benign." <u>Id.</u> at 760.

The Connecticut Supreme Court decided that the State's use of the phrase "spoiled brat," although grounded in the evidence, was "injudicious." <u>Id.</u> at 759, 761. However, the court determined, "When the objectionable references are viewed in the broader context of the entire trial, however, it is apparent that they were isolated, relatively innocuous and not unduly prejudicial to the [Petitioner]." <u>Id.</u> at 761. The court found that the comments did not affect the fairness of the trial and that no due process violation had occurred. <u>Id.</u>

### 1. The State's Use Of The Term "Killer"

The Connecticut Supreme Court's determination that the prosecution's use of the term "killer" in reference to Mr. Skakel was not improper was an unreasonable finding of fact based on the evidence adduced at trial. The use of the term "killer" was not merely "shorthand" for "the person who had killed the victim" as the supreme court found.

Rather, the reference was aimed directly at the Petitioner. The prosecutor stated that the Skakels sent the Petitioner to Elan because "that's what they decided that they had to do with ***the killer living under their roof***." Tr. 6/3/02 at 131 (App. A463) (emphasis added). There is no plausible way that this reference can be interpreted as a generic reference to "a" killer, *i.e.*, the person who killed Martha Moxley; rather, this was a direct statement that that Mr. Skakel was "the" killer. This was an improper characterization because whether the Petitioner was in fact "the killer" was the ultimate issue to be decided by the jury.[77] See Bates v. Bell, 402 F.3d 635, 646 (6th Cir.), cert. denied, 546 U.S. 865 (2005) ("[Prosecutors] cannot put forth their opinions as to … guilt of a defendant…. '[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.'") (quoting United States v. Young, 470 U.S. 1, 18-19 (1985)). The facts presented at trial dictate only one conclusion: this reference was wholly improper.

### 2. The State's Use Of The Phrase "Spoiled Brat"

The Connecticut Supreme Court's finding that the State's improper use of the phrase "spoiled brat" did not amount to a due process violation was an unreasonable application of established law. This statement was "of sufficient significance to result in

---

[77] See State v. Couture, 194 Conn. 530, 562 (1984), cert. denied, 469 U.S. 1192 (1985) ("No man on trial for murder can be official characterized as a murderer or as 'a cold-blooded killer'").

the denial of the defendant's right to a fair trial" and the Connecticut Supreme Court's finding to the contrary was a denial of due process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).

United States Supreme Court law is clear that a prosecutor may not use closing argument to inflame the passions and prejudices of the jury.  See United States v. Young, 470 U.S. 1, 8 n. 5, (1985) (discussing ABA Standards For Criminal Justice 3-5.8 (2d ed.1980)). Name-calling is an attempt to improperly inflame the passions and prejudices of the jury.  Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir. 2005), cert. denied, 547 U.S. 1181 (2006).

Improper tactics by counsel such as name-calling have been denounced by the courts and have been found to be a violation of a defendant's right to a fair trial or to warrant new trials.  New York Central R. Co. v. Johnson, 279 U.S. 310, 317-18 (1929) (stating in argument that opposing party had syphilis was grounds for reversal) (civil case); Ross v. United States, 180 F.2d 160, 166-67 (6th Cir. 1950) (calling defendants "con men" and "fly-by-nighters" deprived defendant of constitutional right to fair trial); Volkmor v. United States, 13 F.2d 594, 595 (6th Cir. 1926) (prosecutor calling defendant a "skunk," "a weak-faced weasel," and "a cheap, scaly, slimy crook" required reversal).

In the present case, calling the Petitioner a "spoiled brat" was not based on the evidence, and the totality of evidence of the Petitioner's guilt was very weak, including a complete absence of *any* forensic evidence whatsoever tying Mr. Skakel to the crime.

Compare Malicoat v. Mullin, 426 F.3d at 1256 (while prosecutor's calling petitioner a "monster" was improper, it did not undermine fundamental fairness because comment was based on evidence and due to strength of prosecution's case). Therefore, it was contrary to established law for the Connecticut Supreme Court to find that the prosecutor's improper name-calling did not violate the Petitioner's right to a fair trial.

### e.  Masturbation On The Victim's Body

The Connecticut Supreme Court disagreed with the Petitioner's claim that the state's attorney improperly stated that Mr. Skakel had masturbated on the victim's dead body. State v. Skakel, 273 Conn. at 761-62. The Petitioner had claimed to the supreme court that the State's argument was improper because it was based on incredible testimony from Gregory Coleman. Id. at 762. The court found that the fact that the jury could have concluded that some or all of Coleman's testimony was unbelievable did not mean that the state's attorney could not properly argue inferences from that testimony. Id.

Mr. Skakel also argued to the supreme court that the state's attorney improperly argued that two red marks found on the victim's right and left thighs substantiated his contention that the Petitioner had masturbated on the victim. Id. The court determined that Henry Lee's testimony, that the marks were consistent with bloody hands trying to force the victim's legs apart, coupled with the Petitioner's alleged statement to Coleman that he had masturbated on the body, provided a sufficient factual basis for the State's

argument. Id. at 763. The court noted that the argument also found support in the Petitioner's statements to other witnesses that he had masturbated in a tree next to the victim's house. Id.

The Petitioner also argued that the State's argument was inconsistent with the fact that the autopsy failed to disclose the presence of semen. Id. The court acknowledged that although the autopsy failed to detect the presence of semen in the victim's pubic area, nothing in the report indicated an attempt to determine whether semen was present on other areas of the victim's body. Id. at 763-64. The court found that because the autopsy did not rule out the possibility of the existence of semen on other body parts, the state's attorney's argument suggesting that possibility was not improper. Id. at 764.

The Connecticut Supreme Court's decision was an unreasonable determination of the facts as presented at the trial. There was no semen found on the victim's body and there was no semen found at the scene of the crime, and the State knew it. Nonetheless, the State wanted the jury to have the image in its mind that Mr. Skakel masturbated on the victim's body because that image would ensure passionate outrage. It wanted the jury to believe that Mr. Skakel's non-inculpatory admission of teenage, peeping-tom masturbation was actually something else entirely: a confession to murder. So, the prosecutor told the jury that Mr. Skakel had, in fact, masturbated on the body as the crowning humiliation. To further mislead the jury, the State presented this argument

as if it were supported by the forensic evidence developed by Dr. Lee, which was also not true.

The State first made its masturbation claim to the jury in closing argument while projecting a blown-up version of Exhibit 23, which was a photograph of the victim showing a ***blood*** smear on her thigh:

> This is where this photo acquires great significance, though. That was taken from the crime scene. That's not a bruise. That's not any other kind of injury. Rather, it's a smear, as Dr. Lee testified. Dr. Lee also testified that you just see the one on the left side, there is also one on the right side. This is evidence that somewhere in the bloody assault scene, somewhere during the drag episode but certainly most likely under the tree [where the body was found], he [Michael Skakel] administered the ultimate and sickest of humiliations.

Tr.6/3/02 at 12 (App. A412).[78]

Later, in his rebuttal, the prosecutor repeated the claim:

> It is unquestionable that when the defendant repeatedly struck Martha with the golf club, crouched over her to stab her, masturbated on her that he got plenty of blood on himself.

Tr.6/3/03 at 112 (App. A444).

---

[78] The "humiliation" was not explicitly identified by the State at this point, but it was an unmistakable reference to the State's claim that the Petitioner had masturbated on the victim's body. Or, as the State put it a few sentences later, that he had "masturbated not in that cedar tree by John Moxley's room and not in that monkey tree that's on the side of the house, but rather in the vicinity of Martha Moxley's body." Tr.6/3/02 at 12 (App. A412). At sentencing, the prosecutor repeated the claim, arguing that Petitioner viciously beat the victim "and then as the evidence so strongly suggested and through his own words attempted to void his seed upon her inert body." Tr.8/29/02 at 36.

This was prosecutorial misconduct at its worst.  It represented cynical overreaching based on a demonstrably false fragment of discredited testimony.  To defend its indefensible conduct, the prosecution claimed that this argument was justified due to the testimony of one of its witnesses, an individual named Greg Coleman.  Mr. Coleman, who had died of a heroin overdose prior to trial, had previously testified (while high on heroin) that Mr. Skakel had told Mr. Coleman in November 1978, at Elan, that he had returned two days after the murder and masturbated on the victim's body.  Tr.5/17/78 at 138, 160.  (This conversation occurred while Mr. Coleman guarded Mr. Skakel using a baseball bat.  Id. at 157.  Mr. Coleman was "dead-on" certain about the accuracy of this testimony.  Id. at 160.  Of course, the story was not true and could not have been true.  The murder occurred during the nighttime on October 30, 1975, and the body was found just past noon the very next day.  Tr.5/7/02 at 155-160 (Officer Keegan).  Coleman was the *only* "witness" in the entire trial who said anything about masturbating on the body, and the State knew that the masturbation could not have occurred as this sole witness had testified.

Rather than accept the undeniable fact that the masturbation story was untrue, the State seized on its extreme prejudicial potential and made it a central focal point of its closing argument.  Instead of leaving the story to one side, or telling the jury it was a story without forensic corroboration, the State chose to distort the forensic evidence to fit the discredited tale.  The actual physical evidence was that there was *no* semen found

anywhere on or near the body, period; there was only blood.  The State, however, misled the jury by arguing: (i) that the masturbation episode was part of the "unquestionable" sequence of events at the murder scene, and (ii) that the small smear of blood on the victim's thigh actually supported its masturbation theory: "This is evidence . . . that he" masturbated on his body, said the prosecutor.  Tr.6/3/02 at 12 (App. A412).  But how does a small blood smear on a bloody victim's thigh support in any way the claim that the defendant masturbated on her body?  This argument invited the jury to find that Petitioner had committed a monstrous act based on pure speculation masquerading as "forensic proof."   It was terribly improper.  <u>See</u> <u>United States v. Young</u>, 470 U.S. 1, 9 n.7 ("In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record.  It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.").

In light of all of the facts presented at trial, the Connecticut Supreme Court's conclusion that the prosecutors comments did not constitute misconduct was unreasonable.

### f.    The State's Audio-Visual Presentation

Finally, the Connecticut Supreme Court decided that the State's use of an audiovisual display during its rebuttal argument was not improper.  <u>State v. Skakel</u>, 273 Conn. at 764.  The Petitioner had argued that the State deceptively spliced together an

edited version of the tape recorded interview with ghostwriter Richard Hoffman to make it appear as if the Petitioner's comments about masturbating in a tree were a confession to the murder.  Id. at 768.  Mr. Skakel had claimed that this was compounded by the fact that the voice-over was played while gory photographs of the murder scene were shown on the large screen.  Id.

The supreme court concluded that it was proper for the state's attorney to play for the jury portions of the tape-recorded interview with Hoffman.  Id. at 767.  The court stated that it was not likely that the State's presentation confused the jury or prejudiced Mr. Skakel.  Id. at 769.  The court indicated that the presentation was not deceptive.  Id. The court concluded that the playing of the presentation did not violate Mr. Skakel's right to a fair trial.  Id.

The court's finding that the State's use of the deceptive audio-visual display was proper is an unreasonable determination of fact given the evidence.  The key factor with regard to this issue is that the State distorted and altered the evidence presented at trial in its presentation.  The State's most egregious misconduct occurred when it played incomplete excerpts from the Hoffman tape regarding the Petitioner's feeling of "panic" after he was awoken in the morning by Mrs. Moxley and his discussion of what he "went to bed with" the night before.  Simultaneously, the State displayed a photograph of the victim alive, along with gruesome crime scene photos of the victim's dead body.  The inference that the State strongly and improperly presented to the jury was that the

Petitioner "admitted" that he "went to bed with" the knowledge that he had killed the victim, which was patently false.

The State deliberately omitted portions of the Hoffman tape that clearly contradicted this conclusion.[79]  The result of the State's improper tactics was to utterly obscure the truth.  The omitted passage just before the excerpts highlighted by the State clearly indicates that the Petitioner was talking about his panic regarding masturbating in the tree, not about his involvement in the murder of Martha Moxley.  By omitting this passage, the State deliberately misrepresented the Petitioner's statements.

There is absolutely no good faith interpretation of the Petitioner's statements that supports the State's maneuver in arguing that the Petitioner's statements were an admission of guilt regarding the murder.  Therefore, even though the State's scheme did not alter or splice any of the Petitioner's words themselves, the State's machinations deliberately changed their meaning.  That this misconduct occurred during rebuttal,[80]

---

[79] In the tape, immediately prior to the excerpt highlighted by the State, the Petitioner stated that he had just masturbated in a tree in the Moxleys' yard.  He stated, "[A]nd I remember thinking 'Oh my God.  I hope to God nobody saw me jerking off.  …  And then I woke up, went to sleep, and then I woke up to Mrs. Moxley saying 'Michael have, have you seen Martha?'  I'm like, 'What?'  And I was like still high from the night before, a little drunk, then I was like, 'What?'  I was like 'Oh my God, did they see me last night?'"  State's Ex. 80, at 103-06.  These statements immediately preceded the Petitioner's discussion of his "panic" and "what he went to bed with."

[80] In fact, showing the importance and power of the State's audio-visual presentation, the jury asked to have the rebuttal summation played back during deliberations.

preventing the Petitioner from responding to the State's gross mischaracterization, heightens the egregiousness of the State's actions.

Because of these facts, the state court's determination that the State's conduct was not improper is an unreasonable determination of fact, and habeas relief is warranted.

### 3. The Cumulative Effect Of The State's Misconduct

As discussed <u>supra</u>, each instance of prosecutorial misconduct was improper and was prejudicial. However, when viewed collectively, it is even more apparent that the State's conduct was improper and that it amounted to a denial of due process. In connection with a habeas corpus petitioner, improper remarks are analyzed to determine whether they are so flagrant to amount to a denial of due process. <u>Bates v. Bell</u>, 402 F.3d at 647. Four factors are considered: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. <u>Id.</u> Analysis of these factors demonstrates that the misconduct in the present case was so flagrant that it constitutes a due process violation warranting habeas relief.

First, the State's remarks were certainly intended to mislead the jury. Many of the remarks made were complete misrepresentations of the evidence presented at trial. As such, the Petitioner was prejudiced. "Second, the improper conduct was not isolated

to one comment, [or to] one section of the argument...." Id. at 648.  In the present case, the Petitioner has highlighted six instances of improper conduct by the State; thus, it is apparent that the misconduct was not isolated.

Regarding the third factor of whether the comments were deliberate or accidental, the Bates court commented, "Third and most regrettably, the misconduct was plainly deliberate.  We are not confronted with an off-hand remark in a heated trial.  Instead, the prosecutors in this case opted to select inappropriate arguments and use them repeatedly during summation." Id.  The same is true in the present case.  All of the comments by the State were calculated and deliberate.  None were off-the-cuff remarks that were simply blurted out in a passionate moment.  This especially so in the case of the audio-visual display, which undoubtedly took hours upon hours to prepare, edit and practice.

Finally, the evidence against the Petitioner was decidedly weak.  The State had no physical or forensic evidence connecting the Petitioner to the murder. Its entire case against the Petitioner was based on supposed "admissions" made by the Petitioner that were either highly equivocal in nature, or highly questionable in authenticity, or both.  There was an alibi which, if believed, placed the Petitioner miles away from the scene at the time of the murder. Additionally, more than a quarter-century had passed since the crime, and so memories were lost or faded and witnesses had died, or grown ill.  Much

of the testimony received in evidence was hearsay. These circumstances rendered the misconduct severely prejudicial by any measure.

For these reasons, the prosecutorial misconduct that occurred during summation warrants habeas corpus relief.

### E. The Petitioner's Federal Due Process Rights Were Violated Due To The Admission Of Coerced Confessions

#### 1. Additional Facts Relevant To This Claim

The most damaging pieces of evidence presented against Mr. Skakel at trial were statements supposedly made by him under conditions of shocking brutality. Mr. Skakel was physically beaten and psychologically tortured at Elan using tactics that cannot be sanctioned by any civilized government. See Statement of Facts at 9-18.

#### 2. The Connecticut Supreme Court's Decision

The Connecticut Supreme Court held that the Petitioner's federal due process claim failed as a matter of law because the inculpatory statements were not procured by any State official or person acting on behalf of the State. State v. Skakel, 273 Conn. at 720. The state supreme court relied exclusively on Colorado v. Connelly, 479 U.S. 157 (1986) in making its decision. Skakel, 273 Conn at 720.

3. **The Connecticut Supreme Court's Decision That The Admission Of Coerced Confessions Did Not Offend The Federal Due Process Clause Was An Unreasonable Application Of Federal Law**

The Connecticut Supreme Court's reliance on <u>Colorado v. Connelly</u> was improper. It is well settled that the use of an involuntary confession in a criminal trial is a denial of due process of law. <u>Mincey v. Arizona</u>, 437 U.S. 385, 398 (1978). In order to be voluntary, a confession must be the product of an essentially free and unconstrained choice by the maker. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973). If the accused's will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961). The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it, including both the characteristics of the accused and the details of the interrogation. <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 226. Factors that may be taken into account include the youth of the accused, lack of education, intelligence, the lack of any advice as to the accused's constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment. <u>Id.</u> The United States Supreme Court has also specifically held that the due process clause of the Fourteenth Amendment prohibits confessions that are obtained by torture or beating. <u>Brown v. Mississippi</u>, 297 U.S. 278, 286 (1936).

Although the Supreme Court held in <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986) that state action is required in order for the admission of an involuntary confession to constitute a violation of a defendant's federal due process rights, the decision in <u>Colorado v. Connelly</u> is distinguishable, is not controlling in this case, and should not have been relied upon by the Connecticut Supreme Court. The confession at issue in <u>Colorado v. Connelly</u> was not obtained by force or by any other coercive tactics; rather, the confession was entirely voluntary and was produced by the defendant's self-generated compulsion, as a result of his mental illness, to reveal his involvement in the crime. <u>Id.</u> at 160-62. The focus of the <u>Connelly</u> court was on the effect of the defendant's mental illness. <u>Id.</u> at 164-65. In contrast, in the present case, at issue is the use of torture or beating, which is more akin to the situation in <u>Brown v. Mississippi</u>, 297 U.S. 278.

Further, the decision in <u>Colorado v. Connelly</u>, at the time it was rendered, was a marked deviation from the law on the issue of confessions and should not be followed. As one commentator has noted:

> In the beginning, due process challenges involving the voluntariness of confessions focused on coercive police conduct. As confession law evolved, courts employed the totality of circumstances test to determine whether a confession was voluntary. In the 1960's, coercive police conduct and mental state became the crucial factors in voluntariness determinations. However, in 1986 [with the decision in <u>Colorado v. Connelly</u>], the U.S. Supreme Court traveled back in time fifty years, abandoning the totality of circumstances test to again require the existence of coercive police conduct to find a confession involuntary.

Ron Woodman, Hurdling the Police Coercion Requirement:  State Alternatives to Colorado v. Connelly, 4 U.D.C. L. Rev. 31, 32 (1998).  The Connelly court failed to recognize *all* forms of involuntariness or coercion as being antithetical to due process, which in turn reflected a refusal to acknowledge free will as a value of constitutional consequence, a value with which the Supreme Court had traditionally been concerned. Colorado v. Connelly, 479 U.S. at 176 (Brennan, J. dissenting).  Because the decision in Colorado v. Connelly ignores this important principle, the decision is unsound and should not have been relied upon by the Connecticut Supreme Court.

For these reasons, the Connecticut Supreme Court's decision, relying on Colorado v. Connelly, was an unreasonable application of federal law, warranting habeas relief.

## IV.  CONCLUSION

Wherefore, for the foregoing reasons, the Petitioner's Petition For A Writ Of Habeas Corpus should be granted.

**THE PETITIONER,**
**MICHAEL C. SKAKEL**

BY     /s/_____

HUBERT J. SANTOS
Federal Bar No. ct00069
Email: hsantos@santos-seeley.net
HOPE C. SEELEY
Federal Bar No. ct 4863
Email: hseeley@santos-seeley.net
SANDRA SNADEN KUWAYE
Federal Bar No. ct18586
Email: ssnaden@santos-seeley.net
SANTOS & SEELEY, P.C.
51 Russ Street
Hartford, CT 06106
Tel: (860) 249-6548
Fax:(860) 724-5533

## <u>CERTIFICATION</u>

I hereby certify that on October 27, 2008, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Michael O'Hare, Esq.
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT  06067
Tel. No. (860) 258-5887
Fax No. (860) 258-5968
E-mail: michael.ohare@po.state.ct.us
Federal Bar No. ct 05318

/s/_____
HOPE C. SEELEY