**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL C. SKAKEL, | : | |
| Petitioner, | : | Case No. 3:07 CV 1625 (PCD) |
| | | |
| v. | : | |
| | | |
| PETER J. MURPHY, | : | JANUARY 15, 2009 |
| Respondent. | : | |

**OBJECTION TO PETITIONER'S MOTION FOR SUMMARY JUDGMENT**
**AND REPLY TO PETITIONER'S MEMORANDUM IN SUPPORT THEREOF**

The respondent hereby objects to the petitioner's motion for summary judgment on his application for a writ of habeas corpus filed pursuant to 28 U.S.C. §2254. In his application, the petitioner claims that he is entitled to federal habeas corpus relief because the state conviction that resulted in his imprisonment was obtained in violation of his rights under the United States Constitution. Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254 by a Person in State Custody (hereinafter "Habeas Corpus Petition"), paragraph 19. On October 27, 2008, pursuant to the order of this court, the petitioner and the respondent filed cross-motions for summary judgment. For the reasons set forth herein, in the respondent's motion for summary judgment and in the memorandum of law submitted in support of that motion, this court should deny the petitioner's motion for summary judgment and grant the respondent's motion for summary judgment.

I.  **ARGUMENT**

In his petition for a writ of habeas corpus, the petitioner sets forth six grounds for habeas corpus relief. Specifically, the petitioner claims that: (1) the Connecticut Supreme Court's reinterpretation of the law governing application of the statute of limitations violated his right to due process and his right against prosecution under ex post facto laws; (2) the

trial court violated his right to due process and to present a defense when it refused to hold an evidentiary hearing regarding his claim that the state had withheld exculpatory evidence in violation of the United States Supreme Court's ruling in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) the trial court violated his right to due process of law when permitted his case to be transferred to the adult criminal docket; (4) the misconduct of the prosecutor deprived him of due process of law and a fair trial; (5) the trial court violated his right to confrontation when it admitted the prior testimony of a witness; and (6) the trial court violated his right to due process when it admitted evidence of confessions that were the product of coercion. Habeas Corpus Petition, paragraph 19.

In his motion for summary judgment, the petitioner alleges that "there are no genuine issues as to any material facts and that [he] is entitled to judgment as a matter of law." Petitioner's Motion for Summary Judgment, dated October 27, 2008. In the memorandum in support of his motion, however, the petitioner has not briefed his claim that the trial court violated his right to confrontation when it admitted the prior testimony of a witness. See Petitioner's Memorandum of Law in Support of Motion for Summary Judgment, dated October 27, 2008 (hereinafter "Petitioner's Memorandum"), at 23-126. Accordingly, the petitioner's confrontation claim, which is set forth as Ground Five of paragraph 19 in his habeas corpus petition, should be deemed abandoned and relief thereon should be denied. See Issacs v. Head, 300 F.2d 1232, 1253 n.6 (11th Cir. 2002), cert. denied, 538 U.S. 988, 123 S.Ct. 1805, 155 L.Ed.2d 683 (2003) (issues not raised in initial brief ordinarily considered abandoned); United States v. Stevens, 487 F.3d 232, 242 n.1 (5th Cir.), cert. denied, __ U.S. _, 128 S.Ct. 336, 169 L.Ed.2d 236 (2007) (inadequately briefed issues deemed abandoned).

In order to prevail on his remaining five claims, the petitioner must show that the state court ruling being challenged in each claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . ." 28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. 362, 399 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In Williams v. Taylor, Justice O'Connor, writing for the court, explained that "*the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings . . . of the [Supreme Court] as of the time of the relevant state-court decision.*" (Emphasis added.) Id., 529 U.S. at 411. Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme Court's] jurisprudence." Id. Here, the claims raised by the petitioner fail because they are not based on the holdings of the United States Supreme Court.

Indeed, although the petitioner cites the correct standard in his memorandum of law; Petitioner's Memorandum at 23-24; he fails to apply this standard in any of the claims that he advances. Instead, with respect to each of his claims, the petitioner simply argues that the Connecticut Supreme Court erred in its ruling. It is clear, therefore, that the petitioner seeks *de novo* review of the state supreme court's decision. In Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the United States Supreme Court stated that when considering claims for habeas corpus relief, it does "not reach the question of whether the state court erred. . . ." Id., 538 U.S. at 71. Rather, the court considers "the only question that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law." Id. When such review is applied to the petitioner's claims in this case, it is clear that he is not entitled to habeas corpus relief under § 2254.

**A.** **The Petitioner Is Not Entitled to Habeas Corpus Relief Because the State Supreme Court Overruled its Existing Precedent to Hold His Prosecution Was Not Time-barred**

The petitioner claims that he is entitled to federal habeas corpus relief because his conviction was "obtained and affirmed in violation of the Ex Post Facto Clause and the Due Process Clause." Habeas Corpus Petition, paragraph 19, Ground One. Specifically, the petitioner contends that his rights under the federal constitution were violated when the state supreme court overruled its own precedent to hold that his prosecution was not barred by the statute of limitations. Id.

The petitioner's claim fails for several reasons. First, the petitioner is not entitled to federal review of his claim because the trial court's ruling permitting his prosecution was based on state law and did not implicate his rights under the federal constitution. Memorandum in Support of Respondent's Motion for Summary Judgment, dated October 27, 2008 (hereinafter "Respondent's Memorandum"), at 10-12. Second, the petitioner cannot obtain relief on his federal claim because it was not properly raised in the Connecticut Supreme Court and is, therefore, unexhausted. Respondent's Memorandum at 12-17. Finally, if considered on the merits, the petitioner's claim fails because it is not based upon "clearly established federal law" and because the Connecticut Supreme Court's ruling was neither "contrary to" nor "an unreasonable application of" the controlling precedent of the United States Supreme Court. 28 U.S.C. § 2254 (d)(1). Respondent's Memorandum at 17-23.

When the petitioner's arguments in his memorandum of law are considered, it is clear that his claims fails for two reasons. First, the petitioner's attempt to extend the United States Supreme Court's holding in <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 84

4

S.Ct. 1697, 12 L.Ed.2d 894 (1963), the principal case on which he relies, to a circumstance to which it clearly does not apply demonstrates that his claim is not based upon clearly established federal law. Second, the petitioner is unable to present any authority in support of his claim that the Connecticut Supreme Court's ruling was contrary to, or an unreasonable application of, controlling United States Supreme court precedent.

### 1. The petitioner's claim is not based on clearly established federal law as determined by the Supreme Court

In advancing his claim, the petitioner points out that the United States Supreme Court has long held that certain legislative acts are prohibited by the Ex Post Facto Clause. These acts include:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

Petitioner's Memorandum at 27-28, quoting Calder v. Bull, 3 U.S. (Dall.) 386, 390-91, 1 L.Ed. 648 (1798). The petitioner next asserts that in Stogner v. California, 539 U.S. 607, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003), the Supreme Court expanded the protection of the Ex Post Facto Clause beyond the core concerns of Calder to prohibit legislative enactments that would authorize the revival of "criminal prosecutions that the passage of time had previously barred." Petitioner's Memorandum at 29, quoting Stogner, 539 U.S. at 610.

The petitioner then argues that in Bouie v. City of Columbia, supra, the Supreme Court "held, with respect to the elements of the offense, that a judicial construction of a

statute may not be given retroactive effect if that construction is '"unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]"'" Petitioner's Memorandum at 28, quoting Bouie, 378 U.S. at 354. The petitioner concludes that in Bouie, the "Supreme Court recognized that the Due Process Clause prohibits *courts* from achieving through the judicial decision-making many of the same retroactive changes in criminal law that would be forbidden under the Ex Post Facto Clause if attempted by the legislative branch." (Emphasis in original.) Petitioner's Memorandum at 29. The petitioner provides the following quote from Bouie in support of his conclusion:

> If a state legislature is barred by the *Ex Post Facto* Clause from passing ...
> a law, it must follow that a State Supreme Court is barred by the Due
> Process Clause from achieving precisely the same result by judicial
> construction.

Petitioner's Memorandum at 29, quoting Bouie, 378 U.S. at 353-54.

Thus, the petitioner implies that Bouie prohibits a state supreme court from reviving an expired prosecution through judicial interpretation in the same manner that Stogner v. California bars the legislature from doing so by statute. See Stogner, 539 U.S. at 632-33. When the language of Bouie is fully considered, however, it becomes clear that the petitioner's expansive reading of the case goes well beyond the Supreme Court's holding.

In Bouie v. City of Columbia, supra, the South Carolina Supreme Court upheld the convictions of two criminal defendants by expanding the definition of the crime of which they had been convicted. Id., 378 U.S. at 348-49. In the United States Supreme Court on the granting of certiorari, the defendants claimed that they were denied due process of law because the statute under which they were convicted failed to afford them fair notice that the conduct in which they had engaged was criminal. The Supreme Court agreed and reversed the defendants' convictions. Id., at 349.

6

In its decision, the court observed that it is a "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime . . . ." Bouie v. City of Columbia, supra, 350.  The court stated, therefore, that "[t]here can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. Id., at 352.  The court, therefore, concluded that:

> [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, §10, of the Constitution forbids.  An ex post facto law has been defined by this Court as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action" or "that aggravates a crime, or makes it greater than it was, when committed. Calder v. Bull, [supra].  If a state legislature is barred by the Ex Post Facto Clause from passing **such** a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.

(Emphasis added.)  Bouie, 378 U.S. at 353-54.

In this case, the petitioner claims that his right to due process was violated when the Connecticut Supreme Court overruled its own precedent and held that his prosecution was not barred by the statute of limitations. Habeas Corpus Petition, paragraph 19, Ground One.  In order to obtain federal habeas corpus relief, the petitioner's claim must be based on "clearly established federal law." 28 U.S.C. § 2254(d)(1).  [T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings . . . of the [Supreme Court] as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 411. When the language of Bouie is considered in context, it is clear that the holding is limited to the proposition that the due process bars retroactive application of an unforeseeable judicial expansion of a criminal statute that criminalizes previously innocent conduct.  The  state supreme court's ruling in this case did

not involve an expansion of the basis for the petitioner's criminal liability. Accordingly, the Supreme Court's ruling in <u>Bouie v. City of Columbia</u> cannot provide the petitioner with "clearly established federal law" on which to base his claim.

Indeed, by arguing for an overly broad interpretation of <u>Bouie</u>, the petitioner in this case commits the same error as the petitioner in <u>Rogers v. Tennessee</u>, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d (2001). In <u>Rogers</u>, the court observed that "[t]o the extent the petitioner argues that the Due Process clause incorporates the specific prohibitions of the Ex Post Facto Clause as identified in <u>Calder</u>, the petitioner misreads <u>Bouie</u>." <u>Id</u>., 532 U.S. at 458. The court acknowledged that its opinion in <u>Bouie</u> "does contain some expansive language that is suggestive of the broad interpretation for which the petitioner argues." <u>Id</u>. The court stated, however, that such language was dicta. <u>Id</u>., at 459. The court explained that:

> Our decision in <u>Bouie</u> was rooted firmly in well established notions of *due process*. Its rationale rested on the core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what had previously been innocent conduct. And we couched its holding squarely in terms of that established due process right, and not in terms of the ex post facto related dicta to which the petitioner points.

(Citations omitted; emphasis in original.) <u>Rogers</u>, 532 U.S. at 459. Finally, the court stated that "[c]ontrary to the petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of <u>Calder</u> into due process limitations on the retroactive application of judicial decisions." <u>Id</u>.

Here, the petitioner's claim is based entirely on his assumption that the ex post fact principles of <u>Stogner v. California</u>, <u>supra</u>, which preclude the legislature from reviving an expired prosecution by statute, apply to the Connecticut Supreme Court's decision in this

case through Bouie. See Petitioner's Memorandum at 29-30. The United States Supreme Court's decision in Rogers, however, makes clear that the court has never extended Bouie as far as the petitioner's claim requires. The petitioner's claim, therefore, is not based on clearly established federal law. See Williams v. Taylor, 529 U.S. at 411. Accordingly, the petitioner is not entitled to federal habeas corpus relief. See Vasquez v. Strack, 228 F.3d 143, 148 (2nd Cir. 2000), cert. denied sub nom Vasquez v. Mazzuca, 531 U.S. 1166, 121 S.Ct. 1128, 148 L.Ed.2d 994 (2001) ("If petitioner's claim requires us to apply a rule of law that was not clearly established Federal law as determined by the Supreme Court at the time of the state court determination, Section 2254 (d)(1) bars relief.")

### 2. The state and federal cases cited by the petitioner lend no support to his statute of limitations claim

The petitioner claims that the Connecticut Supreme Court's ruling in this case was "contrary to clearly established federal law as determine by the Supreme Court of the United States." Petitioner's Memorandum at 37. In support of his claim, the petitioner contends that the Connecticut Supreme Court's decision to revive the petitioner's time-barred prosecution conflicts with the United States Supreme Court's rulings in Bouie v. City of Columbia, supra; Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); and Rogers v. Tennessee, supra. The petitioner argues that in each of those cases, the Supreme Court held that "the Due Process Clause forbids giving retroactive effect to a new and more expansive construction of a criminal statute if that construction is unexpected and indefensible by reference to the law that had been previously expressed." Petitioner's Memorandum at 37. The petitioner's argument is unpersuasive because he misconstrues the holding in each of the cases on which he relies.

In each case cited by the petitioner, the critical factor for the court in determining whether retroactive application of the new construction of the statute resulted in a denial of due process was whether the new construction deprived the defendant of fair warning that his conduct was criminal.  In Bouie and in Marks, the Supreme Court found that retroactive application of the new judicial construction of the statutes in question did deprive the defendants of fair warning that their conduct was criminal, and thus, resulted in a denial of due process. See Bouie, 378 U.S at 352-54; Marks, 430 U.S. at 191-92.

In Rogers, the court held that retroactive application of the Tennessee Supreme Court's abandonment of an archaic common law rule was not "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue" and thus, did not violate due process. Rogers, 532 U.S. at 462.  The court made clear, however, that its decision was based on the fact that Tennessee court's ruling did not deprive the defendant of fair warning that his conduct was criminal. Id., at 458-60.

In this case, the petitioner can make no claim that the Connecticut Supreme Court's reinterpretation of the statute of limitations denied him fair warning that the conduct for which he was convicted – a brutal murder – was criminal.  Accordingly, the cases cited by the petitioner lend no support to his claim. Cf. Rose v. Locke, 423 U.S. 48, 53, 96 S.Ct. 243, 243 L.Ed.2d 185 (1975) (per curium) (upholding defendant's conviction under statute prohibiting "crimes against nature" because, unlike Bouie, the defendant "[could] make no claim that [the statute] afforded no notice that his conduct might be within its scope").

The petitioner also argues that the Connecticut Supreme Court's decision is in conflict with rulings from federal courts of appeal and the highest court of another state. Petitioner's Memorandum at 44.  It is well established, however, that a decision of a federal

appeals court cannot serve as basis for habeas corpus relief where it has "no counterpart in Supreme Court jurisprudence." <u>Del Valle v. Armstrong</u>, 306 F.3d 1197, 1200 (2nd Cir. 2002); <u>see</u> <u>also</u> <u>Mask v. McGinnis</u>, 252 F.3d 85, 90 (2nd Cir. 2001) (petitioner not entitled to habeas corpus relief where he could show only that the state court "unreasonably applied clearly established *Second Circuit* precedent" [emphasis in original]).  The same rational would apply with even more force with respect to reliance on a state court decision. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. at 411.

Accordingly, the petitioner has failed to show that the Connecticut Supreme Court's ruling was contrary to, or an unreasonable application of clearly establish federal law.  The petitioner's claim should, therefore, be rejected.

**B.    The Petitioner Is Not Entitled to Habeas Corpus Relief Because the State Failed to Disclose Allegedly Exculpatory Evidence in Violation of <u>Brady v. Maryland</u>**

The petitioner claims that his right to a fair trial was violated when the state suppressed allegedly exculpatory evidence in violation of the United States Supreme Court's decision in <u>Brady v. Maryland</u>, <u>supra</u>. Habeas Corpus Petition, paragraph 19, Ground Two.  Specifically, the petitioner claims that the state violated his rights under <u>Brady</u> when it failed to disclose a composite sketch and two "profile reports" prepared by an investigator. <u>Id</u>.  The petitioner has failed to show that federal habeas corpus relief is warranted with respect to either claim.

**1.    The petitioner is not entitled to habeas corpus relief because the state failed to disclose the composite sketch**

The petitioner claims that the state violated his rights under <u>Brady v. Maryland</u> when it failed to disclose a composite sketch of an individual who was seen walking on a nearby

street on the evening of the victim's murder. Habeas Corpus Petition, Paragraph 19, Ground Two.   The petitioner's claim fails because the Connecticut Supreme Court reasonably applied the controlling precedent of the United States Supreme Court in rejecting the petitioner's claim.

After the jury he jury returned a verdict of guilty, the petitioner filed a motion for a new trial pursuant to Practice Book § 42-53. On August 26, 2002, the petitioner filed an amended motion for a new trial and requested that the court hold an evidentiary hearing on the claims set forth in the amended motion. Defendant's Amended Motion for New Trial and Request for an Evidentiary Hearing, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, Appendix L.  In his amended motion for a new trial, the petitioner claimed that the state had violated his rights under Brady when it failed to disclose the composite sketch of the individual observed by Charles Morganti, Jr., a security guard on duty near the crime scene on the night of the victim's murder.  The state objected to the motion, arguing that the petitioner had failed to establish a Brady violation with regard to the composite sketch because it had not been suppressed. Id., at 6-7.

The trial court held a hearing on the petitioner's motion.  Transcript of proceedings on August 28, 2002, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter "Transcript, 8/28/02"), Appendix N.  During the hearing, the court asked petitioner's trial counsel whether, prior to trial, he had received the 1975 report that referred to Morganti's willingness to participate in the production of a composite sketch and the 1994 report that referred to the completed sketch. The petitioner's counsel answered in the affirmative with respect to both reports. Transcript, 8/28/02 at 35, Appendix N. Thereafter, the trial court rejected the petitioner's claim regarding the

composite sketch because the petitioner had failed to show that the sketch had been suppressed. Transcript, 8/28/02 at 89-91, 93-94, Appendix N.

On appeal, petitioner claimed that the state's failure to disclose the composite sketch prior to trial violated his rights under Brady. Petitioner's Supreme Court brief at 32-33, 43-44, Appendix A.  The state supreme court rejected the petitioner's claim.  The court concluded that the trial court had properly found that the petitioner and his trial counsel were on notice of the existence of the composite sketch through the investigative reports disclosed to them by the state. State v. Skakel, 276 Conn. 633, 702-703, 888 A.2d 985, cert. denied, _ U.S. _, 127 S.Ct. 578, 166 L.Ed.2d 428  (2006), Appendix D.  The court held, therefore, that the petitioner "failed to establish that the state suppressed the composite drawing within the meaning of Brady." Id., at 707.

The petitioner now claims that the Connecticut Supreme Court's ruling that the composite sketch was not suppressed within the meaning of Brady is contrary to clearly established federal law. Petitioner's Memorandum at 48.  On this issue, the state supreme court correctly identified the principles announced in Brady and its progeny as governing the analysis of the petitioner's claim. See State v. Skakel, 276 Conn. at 699, Appendix D. Thus, in order to prevail, the petitioner must show that "the state court's adjudication of his claim involved an 'unreasonable application of [those principles].'" Bell v. Cone, 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).  When the arguments raised by the petitioner in his memorandum of law are considered, it is clear that he failed to do so.

The petitioner complains, in essence, that it was unreasonable for the Connecticut Supreme Court to find that he had "actual notice" of the existence of the composite sketch based on two investigative reports that were included among the 1806 pages of documents

that were disclosed to him. Petitioner's Memorandum at 53.  The petitioner's trial counsel, however, expressly advised the trial court that he was aware of the two reports at the hearing on the petitioner's motion for a new trial. Transcript, 8/28/02 at 35, Appendix N; State v. Skakel, 276 Conn. at 698-99, Appendix D.  Consequently, the volume of the discovery provided by the state is irrelevant to the issue of whether the petitioner's counsel knew, or should have know, about the composite sketch. See United States v. Payne, 63 F.2d 1200, 1208 (2nd Cir. 1995), cert. denied, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996);  United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982),  cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

The petitioner also claims that the Connecticut Supreme Court's ruling was an unreasonable application of the controlling United States Supreme Court precedent because in Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the court "found that the prosecution suppressed evidence under Brady even though information had been available to the petitioner's counsel from which he could have learned that the suppressed evidence existed." Petitioner's Memorandum at 55.  The facts of Strickler, however, are significantly different from the facts of this case.

In Strickler, the prosecution failed to disclose the existence of eight documents that could have been used to impeach the state's primary witness at trial. Id., 527 U.S. at 273-75.  While there was a dispute as to whether some of the documents were in the prosecutor's file when it was made available to the petitioner's counsel, the respondent conceded that five of the documents were never disclosed. Id., at 275.  In finding that the documents were suppressed, the Supreme Court noted that:

> Although it is true that petitioner's lawyers . . . must have known the [the witness] had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews existed or had been suppressed.

Strickler, 527 U.S. at 285. In contrast to the facts of Strickler, the petitioner's counsel in this case acknowledged that he was in possession of the reports that would have made him aware of the existence of the composite sketch. State v. Skakel, 276 Conn. at 698-99, Appendix D. Thus, there is nothing in the United States Supreme Court's ruling in Strickler v. Greene to suggest that the Connecticut Supreme Court's decision in this case "involved an unreasonable application of clearly establish Federal law. . . ." 28 U.S.C. § 2254(d)(1).

The petitioner also argues that in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court "recognized that the prosecution's failure to turn over certain evidence after a specific request by the defendant leads to the reasonable conclusion that no such evidence exists." Petitioner's memorandum at 59. In Bagley, despite the defendant's specific requests for such information, the prosecutor failed to disclose documentation indicating that two government witnesses had received payment for their testimony. Bagley, 473 U.S. at 671-73. The court noted that "the more specifically the defense requests certain evidence . . . the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, *and to make pretrial decisions on the basis of this assumption*." (Emphasis added.) Id., at 682-83.

In citing Bagley in support of his challenge to the Connecticut Supreme Court's ruling, the petitioner apparently overlooks the fact that the only issue before the court in Bagley was the "standard of materiality to be applied" for the purposes of Brady. United States v. Bagley, supra, 669. The case, therefore, has no bearing on the state supreme court's ruling on the issue of suppression. In any event, the language of Bagley on which

the petitioner relies is dicta and, therefore, cannot be the basis for a claim of relief under § 2254(d)(1). <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. at 411.

Finally, the petitioner cites the Second Circuit's decision in <u>United States v. Payne</u>, <u>supra</u>, in support of his claim. In <u>Payne</u>, the defendant claimed that the government's failure to disclose the affidavit of a prosecution witness that contradicted her testimony at trial violated his rights under <u>Brady</u>. The government argued that it was under no obligation to disclose the affidavit because the defendant could have obtained it from the court file which was available to the public. <u>Payne</u>, 63 F.3d at 1208. The court noted that "evidence is not considered to have been suppressed within the meaning of the <u>Brady</u> doctrine if the defendant or his attorney '"either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."'"<u>Id</u>., <u>quoting</u> <u>United States v. Zackson</u>, 6 F.3d 911, 918 (2nd Cir. 1993). The court concluded, however, that there was nothing in the record to indicate that the defendant's counsel "was aware of facts that would have required him to discover the affidavit through his own diligent investigation on behalf of his client." <u>Payne</u>, 63 F.3d at 1209. The court, therefore, rejected the government's argument and ruled that the affidavit had been suppressed. <u>Id</u>.

The Second Circuit's ruling in <u>Payne</u> lends no support to the petitioner's claim because the due diligence of counsel was not an issue in this case. Here, the petitioner's trial counsel was provided with documents containing "the essential facts permitting him to take advantage of [the] evidence." <u>United States v. Payne</u>, <u>supra</u>, 1208. In any event, the petitioner cannot base his claim for relief under § 2254(d)(1) on a circuit court ruling. <u>Del Valle v. Armstrong</u>, 306 F.3d at 1200; <u>Mask v. McGinnis</u>, 252 F.3d at 90.

Accordingly, the petitioner has failed to show that the Connecticut Supreme Court's ruling that the composite sketch was not suppressed within the meaning of Brady was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399.

### 2. The petitioner is not entitled to habeas corpus relief because the state failed to disclose the profile reports

The petitioner claims that the state violated his rights under Brady v. Maryland when it failed to disclose two "profile reports" prepared by John Soloman, a former inspector for the state's attorney's office. Habeas Corpus Petition, Paragraph 19, Ground Two. The petitioner's claim fails because the Connecticut Supreme Court reasonably applied the controlling precedent of the United States Supreme Court in rejecting the petitioner's claim.

The jury returned a verdict of guilty on June 7, 2002. Judgment, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, Appendix J. On June 12, 2002, the petitioner filed a motion for a new trial pursuant to Practice Book § 42-53. Defendant's Motion for New Trial, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, Appendix K. The petitioner's motion made no mention of the profile reports. Two and a half months later, on August 26, 2002, the petitioner filed an amended motion for a new trial and requested that the court hold an evidentiary hearing on the claims set forth in the amended motion. Defendant's Amended Motion for New Trial and Request for an Evidentiary Hearing, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, Appendix L.

In his amended motion for a new trial, the petitioner claimed that the state had violated his rights under Brady when it failed to disclose the profile reports prepared by John Solomon. Defendant's Amended Motion for New Trial and Request for an Evidentiary

Hearing, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, Appendix L. The state opposed the petitioner's motion, claiming that it was untimely under Practice Book § 42-54. State's Objection to Defendant's Amended Motion for New Trial and Request for Evidentiary Hearing, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 1, Appendix M. After a hearing, the trial court rejected the petitioner's claim because he failed to raise it within the five-day period prescribed by Practice Book § 42-53. Transcript, 8/28/02 at 93-94, Appendix N.

On appeal, petitioner claimed that the state's failure to disclose the profile reports violated his rights under <u>Brady</u>. Petitioner's Supreme Court brief at 32-33, 43-44, Appendix A. The state supreme court rejected the petitioner's claim, ruling that the trial court had acted within its discretion when it denied the petitioner's claim on the ground that it had not been raised in a timely manner. <u>State v. Skakel</u>, 276 Conn. at 710, Appendix D.

The petitioner now claims that the "Connecticut Supreme Court's ruling that the Petitioner's <u>Brady</u> claim was time-barred ignored established United States Supreme Court precedent." Petitioner's Memorandum at 66. Nevertheless, the petitioner is unable to cite a single Supreme Court case in support of his claim. Instead, the petitioner relies on <u>United States v. Jackson</u>, 345 F.3d 59 (2nd Cir. 2003), <u>cert</u>. <u>denied</u>, 541 U.S. 956, 124 S.Ct. 1705, 158 L.Ed.2d 391 (2004), a Second Circuit case which he cites for the proposition that <u>Brady</u> claims may not be waived. Petitioner's Memorandum at 66. He assails the Connecticut Supreme Court's ruling, stating that the court "effectively permitted a state court rule of practice . . . to trump the due process requirements set forth in <u>Brady</u> . . . ." <u>Id</u>. Finally, the petitioner asserts, in effect, that <u>Brady</u> claims are not subject to state procedural rules. <u>Id</u>.

In fact, it is well established that federal constitutional claims are subject to state procedural rules and may be defaulted in state court. Indeed, in <u>Lambrix v. Singletary</u> 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed. 771 (1997), the United States Supreme Court observed that "[s]tate procedural rules 'are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system." <u>Id</u>., 520 U.S. at 525. Thus, a state prisoner who defaults his federal claim in state court pursuant to an independent and adequate state procedural rule will be denied federal habeas review absent a showing of cause for the default and actual prejudice arising therefrom or that failure to consider the federal claim will result in a fundamental miscarriage of justice. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); <u>Wainright v. Sykes</u>, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Accordingly, the petitioner's claim is entirely without merit.

**C.     The Petitioner Is Not Entitled to Habeas Corpus Relief Because of the Manner That the State Court Applied a State Statute When Transferring Him to the Adult Criminal Docket**

The petitioner claims that he was deprived of his right to due process of law when the state supreme court upheld the ruling of the juvenile court transferring his case to the adult criminal docket. Habeas Corpus Petition, paragraph 19, Ground Three. Specifically, the petitioner claims that he was denied due process "when the Connecticut Supreme Court permitted a state regulation to abrogate [his] statutory rights under Connecticut General Statutes Sections 17-60a and 17-66." <u>Id</u>. The petitioner's claim should be rejected for two reasons. First, the petitioner is barred from obtaining relief on his claim because it was not properly raised in state court and is, therefore, unexhausted. Respondent's Memorandum at 40-41. If considered on the merits, the petitioner's claim should be

rejected because it is based entirely on state law and is not cognizable in a federal habeas corpus proceeding. Respondent's Memorandum a 41-44.

In his memorandum of law, the petitioner claims that the he is entitled to federal habeas corpus relief for three reasons. Petitioner's Memorandum at 74 to 84. Specifically, the petitioner claims that the Connecticut Supreme Court's ruling on his transfer to the adult criminal court violated his right to due process because: (1) the court's ruling was contrary to established state law; (2) the application of a Department of Children and Families (DCF) regulation denied him a meaningful hearing on his transfer; and (3) the court applied the 1994 DCF regulation to his case retrospectively. Id. If this court considers the merits of the petitioner's claim, he is not entitled to relief for any of these reasons.

First, the petitioner claims that "the Connecticut Supreme Court improperly relied on the DCF (Department of Children and Families) regulation and erroneously determined that the Petitioner's age alone mandated his transfer to the adult docket." Id., at 75. The petitioner is not entitled to federal habeas corpus relief on this claim because it is not based on federal law. "A federal court may not issue the writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). "A federal court conducting habeas review is limited to determining whether a petitioner's custody is in violation of federal law." Dunnigan v. Keane, 137 F.3d 117, 125 (2nd Cir. 1998). Accordingly, the petitioner's claim is without merit and should be rejected.

The petitioner next claims that the application of the 1994 DCF regulation to his case denied him of his due process right to a meaningful hearing on the determination of whether his case should be transferred to the adult criminal court. Petitioner's Memorandum at 79-81. The petitioner asserts that under Kent v. United States, 383 U.S.

541, 557, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), a liberty interest in juvenile status created by statute cannot be taken away without due process of law. The petitioner further asserts that under Bell v. Burson, 402 U.S. 535, 541-42, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), any hearing required by due process must be meaningful. Petitioner's Memorandum at 80-81. The petitioner contends that the application of the 1994 DCF regulation to his case violated due process because it rendered his transfer hearing meaningless.

The regulation of which the petitioner complains defines "child," in pertinent part, as "any person under eighteen years of age. . . ." Regs. Conn. State Agencies § 17a-145-48; Petitioner's Memorandum at 74. Because the petitioner was forty years old at the time of his transfer hearing, the application of the DCF regulation to his case precluded his commitment to DCF as a child and, therefore, required his transfer to the adult criminal docket. Petitioner's Memorandum at 75. Because the regulation made it impossible for him to maintain his status as a juvenile, the petitioner contends that its application to his case rendered his transfer hearing meaningless and, therefore, violated his right to due process of law. Petitioner's Memorandum at 80-81.

The petitioner's claim fails because he presents no authority for the proposition that the application of a standard which a particular litigant cannot meet renders "meaningless" any proceeding in which that standard is applied to the litigant. But more importantly, for the purposes of this proceeding, the petitioner has presented no such authority based on the precedent of the United States Supreme Court.

In order to prevail on his claim, the petitioner must show that the state court ruling being challenged "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . ."

21

28 U.S.C. § 2254(d)(1). "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings . . . of the [Supreme Court] as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. at 411. Because his claim is not based on United States Supreme Court precedent, the petitioner has failed to show that he is entitled to federal habeas corpus relief.

Finally, the petitioner claims that the retroactive application of the 1994 DCF regulation to his case – a prosecution for a 1975 murder – violated his right to due process of law. Petitioner's Memorandum at 82. The petitioner asserts that "the Due Process Clause prohibits the judicial branch from expanding statutes retroactively, just as the Ex Post Facto Clause prohibits the enactment of statutes to accomplish that same end." <u>Id</u>. The petitioner contends that application of the DCF regulation to his case resulted in an enhancement of his punishment "by mandating his transfer from juvenile court. . . ." <u>Id</u>., at 84. The petitioner claims, therefore, that retroactive application of the DCF regulation to his case "violated the Due Process and Ex Post Facto Clauses" and entitles him to federal habeas corpus relief. <u>Id</u>. The petitioner's claim fails for two reasons.

First, the petitioner made no claim in his habeas corpus petition that his right to due process was violated by the retroactive application of the 1994 DCF regulation to his case. <u>See</u> Habeas Corpus Petition, paragraph 19, Ground Three. Rule 2 of the Rules Governing Section 2254 Cases requires the petitioner to "specify all grounds for relief" that he is seeking. Rule 15(b)(2) of the Federal Rules of Civil Procedure provides that "an issue not raised in the pleadings" can be tried by the consent of the parties. <u>See</u> Rule 11 of the Rules Governing Section 2254 Cases (application of the Rules of Civil Procedure to habeas petitions). Consequently, in <u>Winthrop v. Williams</u>, 507 U.S. 680, 113 S.Ct. 1745,

123 L.Ed.2d 407 (1993), the United States Supreme Court held that the district court erred in granting relief to a petitioner whose claim not properly raised in his habeas corpus petition. Id., 507 U.S. at 696. Here, the petitioner's claim regarding retroactive application of the DCF regulation was not properly raised in his habeas corpus petition and should not, therefore, be considered.

Second, the petitioner's claim is not based on "clearly established Federal law, as determined by the Supreme Court of the United States. . . ." 28 U.S.C. § 2254(d)(1). The petitioner's claim is premised on the notion that "the Due Process Clause prohibits the judicial branch from expanding statutes retroactively, just as the Ex Post Facto Clause prohibits the enactment of statutes to accomplish that same end." Petitioner's Memorandum at 82. The petitioner cites the United States Supreme Court's ruling in Bouie v. City of Columbia in support of his contention. Petitioner's Memorandum at 29, 82. The expansive reading of Bouie on which the petitioner relies, however, was rejected by the court in Rogers v. Tennessee, supra.

In Rogers, the court stated that "[t]o the extent the petitioner argues that the Due Process clause incorporates the specific prohibitions of the Ex Post Facto Clause as identified in Calder, the petitioner misreads Bouie." Rogers v. Tennessee, 532 U.S. at 458. The court explained that its holding in Bouie was far more narrow than the petitioner proposed. The court stated that:

> Our decision in Bouie was rooted firmly in well established notions of *due process.* Its rationale rested on the core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what had previously been innocent conduct.

(Citations omitted; emphasis in original.) <u>Rogers</u>, 532 U.S. at 459.  Finally, the court stated that "[c]ontrary to the petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of <u>Calder</u> into due process limitations on the retroactive application of judicial decisions." <u>Id</u>.

It is, thus, clear that <u>Rogers</u> deprives the petitioner of any support for his claim that the state supreme court violated his right to due process when it applied the 1994 DCF regulation to his case.  Accordingly, the petitioner's claim is not based on clearly established federal law and must, therefore, be rejected. <u>See</u> 28 U.S.C. § 2254(d)(1); <u>Williams v. Taylor</u>, 529 U.S. at 411.

**D.    The Petitioner Is Not Entitled to Habeas Corpus Relief Because of the Alleged Impropriety by the Prosecutor During His Closing Argument**

On appeal, the petitioner claimed that his right to a fair trial was violated as a result of the prosecutor's misconduct during his closing argument. Petitioner's Supreme Court brief at 62, Appendix A.  The Connecticut Supreme Court rejected each of the petitioner's misconduct claims. <u>State v. Skakel</u>, 276 Conn. at 742-69, Appendix D.  The petitioner now restates his prosecutorial misconduct claim in support of his petition for federal habeas corpus relief.  Habeas Corpus Petition, paragraph 19, Ground Four.  The petitioner's claim should be denied because the Connecticut Supreme Court reasonably applied clearly established federal law in rejecting the petitioner's claim.

In his memorandum of law, the petitioner claims that he was "convicted of murder based on a series of falsified stories manufactured by the State during its closing argument . . . ." Petitioner's Memorandum at 84.   Specifically, the petitioner claims that the prosecutor: (1) misrepresented the record in arguing that the petitioner engaged in a

24

"forensic cover-up"; (2) argued facts that were not in evidence to persuade the jury that the petitioner's family participated in a conspiracy to fabricate an alibi for him; (3) improperly argued that the petitioner's family believed that he had killed the victim; (4) used inflammatory terms to refer to the petitioner; (5) argued that the petitioner had masturbated on the victim's body based on incredible testimony; and (6) presented the jury with a misleading audiovisual presentation. Id., at 100-122. The petitioner argued that the cumulative effect of the prosecutor's misconduct denied him of his right to due process. Id., at 122-24.

In advancing this claim, the petitioner does little more than reiterate the arguments that he made to the state supreme court and ask this court to reach a different conclusion. This court, however, does not review the petitioner's claims *de novo*. Rather, to obtain federal habeas relief, the petitioner must show that the state court decision was either "contrary to, or involved an unreasonable application of clearly establish Federal law . . ."; or that it was "based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d)(1) and (2). The petitioner's claim fails because he cannot make either showing.

### 1. The prosecutor's argument regarding a "forensic cover-up"

On appeal, the petitioner claimed that the prosecutor misrepresented the record in arguing that he had fabricated a story about masturbating at the crime scene to explain the presence of any of his semen that might have been found there. The petitioner complained that the prosecutor's argument was improper for two reasons. The state supreme court rejected both aspects of the petitioner's claim. State v. Skakel, 276 Conn. at 750-52. The petitioner now contends that he is entitled to federal habeas relief on both aspects of his claim. The petitioner, however, falls far short of showing that he is entitled to such relief.

### a.    Misrepresentation of the chronology of events

On appeal, the petitioner claimed that the prosecutor intentionally misrepresented the chronology of events to make it appear as though the petitioner and his investigators had devised the masturbation story only after Dr. Henry Lee became involved in the investigation in the early 1990s. Petitioner's Supreme Court brief at 51-52, Appendix A. The Connecticut Supreme Court rejected the petitioner's claim as unsupported by the record.  The court noted that the prosecutor repeatedly mentioned Michael Meredith's testimony during his closing argument and explicitly stated that the petitioner had related his story to Meredith in 1987, five years before Dr. Lee was involved in the case. Moreover, the court stated that, in light of the conduct of the petitioner and Sutton Associates, the private investigators that the Skakel family had hired, it was not improper for the prosecutor to argue that the petitioner, or Sutton Associates, or both, considered it urgent for Andrew Pugh, a friend to whom he had related the story in 1991, to repeat the story to the investigators in 1992.  The court concluded that because the prosecutor had merely asked the jury to draw reasonable inferences from the evidence, his argument was not improper. State v. Skakel, 276 Conn. at 750-51, Appendix D.

The petitioner now claims the Connecticut Supreme Court's ruling was based on an unreasonable determination of the facts and that he is, therefore, entitled to habeas relief under § 2254(d)(2). Petitioner's Memorandum at 101-103.  It is well established, however, that appellate tribunals do not assess credibility or find facts.  State v. Lawrence, 282 Conn. 141, 156, 920 A.2d 236 (2007); see Weil v. Miller, 185 Conn. 495, 502, 441 A.2d 142 (1981) ("This court cannot find facts; that function is . . . exclusively assigned to the trial courts.") Accordingly, the issue decided by the state supreme court –  whether there

was sufficient evidence to support the inference that the prosecutor asked the jury to draw – was a question of law and not of fact. See United States v. Suarez, 588 F.2d 352, 354 (2nd Cir. 1978) (prosecutor may argue reasonable inferences based on the evidence). The petitioner's claim should, therefore, be assessed under § 2254(d)(1) rather than § 2254(d)(2). In any event, the petitioner's claim fails under either subsection because the record provides an adequate basis for the inferences urged by the prosecutor.

First, the petitioner argues that the prosecutor asked the jury to infer that he had first fabricated the masturbation story in 1992, after Dr. Lee became involved in the case. The petitioner contends that the prosecutor's argument is unsupported by the record because the evidence shows that he told Meredith about the masturbation in 1987 and told Pugh the story in 1991. Petitioner's Memorandum at 102. When the record is considered, however, it is clear that the petitioner's claim is without merit.

The record reveals that the prosecutor repeatedly mentioned Meredith's testimony during his argument and expressly told the jury that the petitioner related the masturbation story to Meredith during the 1980's. Transcript of proceedings on June 3, 2002, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter "Transcript, 6/3/02") at 17-18, 114, 120, 133, Appendix T; see State v. Skakel, 276 Conn. at 750, Appendix D. Thus, the prosecutor did not misrepresent the chronology of events with respect to Meredith.

Moreover, the record shows that the petitioner renewed his relationship with Andrew Pugh and told him the masturbation story at approximately the same time that the investigation of Martha Moxley's murder was reopened and Dr. Lee became involved in the investigation. At trial, Lee testified that an early type of DNA testing was put to forensic use

27

in the United States in 1989. He stated further that a more sensitive type of DNA testing was developed for forensic use in the early 1990's. Transcript of proceedings on May 8, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter "Transcript, 5/8/02") at 155, Appendix T. Lee also testified that in 1991, while he was serving as the chief criminalist for the State of Connecticut, he joined the investigation at the request of the state's attorney's office and the Greenwich Police Department. <u>Id</u>., at 132-33. Emmanuel Margolis, a lawyer for Thomas Skakel, testified that the reopening of the investigation was reported in the news media in late 1991. Transcript of proceedings on May 15, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter "Transcript, 5/15/02") at 148-49, Appendix T.

Andrew Pugh testified that he and the petitioner had been close friends at the time of Moxley's death, but that they lost touch with each other for several years after her murder. Transcript of proceedings on May 20, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter "Transcript, 5/20/02") at 143, 163, Appendix T. Pugh testified that he ran into the petitioner in 1991 and that they exchanged telephone numbers at that time. Pugh testified that the petitioner called him approximately a month later. <u>Id</u>., at 163-64. During their conversation, Pugh informed the petitioner that he had concerns about the possibility that the petitioner had been involved in Moxley's murder. The petitioner denied involvement in the Moxley's death, but stated that on the night of the murder, he had masturbated in the tree under which her body was subsequently found. <u>Id</u>., at 164-65.

Pugh testified that over the course of the next month, an individual employed by Sutton Associates called him more than two dozen times in an effort to arrange a meeting

with him.  Pugh stated that the purpose of the meeting was to discuss the murder of Martha Moxley. Transcript, 5/15/02 at 166-68.  Thereafter, Pugh received a second call from the petitioner during which he urged Pugh to meet with the representatives of Sutton Associates.  The petitioner informed Pugh that the Sutton agency was trying to clear his name. Id., at 165-66, 169.

It is well established that a prosecutor may argue reasonable inferences based on the evidence. United States v. Suarez, 588 F.2d at 354.  "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996), quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir. 1993).  Here, the evidence clearly supports an inference that the petitioner was attempting to create an explanation for the possibility that his semen was recovered from the victim's body and that advances in DNA testing, the reopening of the investigation and Dr. Lee's participation in that investigation increased the urgency of the petitioner's need to do so.  It is clear, therefore, that the Connecticut Supreme Court reasonably held that the prosecutor's argument was not improper. State v. Skakel, 276 Conn. at 750-51, Appendix D.

In four instances during his closing argument, the prosecutor suggested that the petitioner divulged his masturbation story to Pugh in 1992.[1]  While the record shows that

---

[1]  The prosecutor stated that "Dr. Gross in 1975, not having heard the word masturbation, that doesn't come up until 1992 or thereabouts . . . in connection with this crime scene. . . ." Transcript, 6/3/02 at 11, Appendix T.  The prosecutor then stated that "when Sutton Associates came into the picture in 1992 . . . the [petitioner] was soon serving up his [bizarre] tale of masturbation in a tree to his friend, Andy Pugh. . . ." Id., at 12.  The prosecutor later stated that "starting in 1992 with Andy Pugh, the [petitioner] (continued...)

Pugh and the petitioner renewed their acquaintance in 1991, it is unclear whether the conversation in which the petitioner claimed to have masturbated in the tree took place in 1991 or 1992. But even if the prosecutor's argument included minor factual inaccuracies, it would not result in impropriety. See United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002) (arguments including factual accuracies that are minor, related to peripheral issues and had no prejudicial effect not improper). Moreover, it made no difference whether the conversations between the petitioner and Pugh took place in 1991 or 1992. The evidence regarding the conversations between Pugh and the petitioner would have supported the inference argued by the prosecutor no matter when they had taken place. Thus, even if the inaccuracies resulted in impropriety, they would not have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 106 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

The petitioner next contends that there was insufficient evidence to show that he masturbated on the victim's body and therefore had a motive to engage in the alleged "forensic cover-up." Petitioner's Memorandum at 102. The petitioner claims that the testimony of Gregory Coleman could not provide an evidentiary basis for such a finding because his testimony was "unworthy of belief." Id. In advancing this claim, the petitioner overlooks the fact that "[i]t is the exclusive province of the trier of fact to weigh conflicting evidence and to make determinations of credibility, crediting some, all or none of any given

---

[1](...continued)
having already consulted with Sutton Associates, has spun a tale of tree climbing, spying and masturbating. . . ." Id., at 94. Finally, the prosecutor said "here he goes, 1992, asking Andy Pugh, please call up Sutton Associates and talk to them about my case." Id., at 113.

witness' testimony." <u>State v. Mullins</u>, 288 Conn. 345, 366, 952 A.2d 784 (2008); <u>accord</u> <u>United States v. Khan</u>, 53 F.3d 507, 514 (2nd Cir. 1995), <u>cert</u>. <u>denied</u>, 516 U.S. 1042, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996) (credibility of witnesses is the province of the jury).

Coleman testified that while they were students at the Elan school, the petitioner told Coleman that he had killed the victim by hitting her with a golf club. The petitioner also told Coleman that he returned to the body two days later and masturbated on it. Transcript of proceedings on May 17, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk (hereinafter Transcript, 5/17/02), at 136-38, Appendix T. The jury was, of course, entitled to credit any or all of Coleman's testimony. <u>See</u> <u>State v. Mullins</u>, <u>supra</u>, 366. Thus, if credited by the jury, Coleman's testimony was sufficient to establish that the petitioner masturbated on the victim's body.[2]

The petitioner also complains that Dr. Lee's testimony concerning the reddish marks found on the interior of the victims thighs did not provide "forensic" evidence that the petitioner masturbated on the victim's body. Petitioner's Memorandum at 102. Lee testified that the reddish marks were consistent with bloody hands attempting to push the victim's legs apart. <u>State v. Skakel</u>, 276 Conn. at 762-63, Appendix D; Transcript, 5/8/02 at 149, Appendix T. While Lee's testimony may not constitute forensic evidence that the petitioner masturbated on the victim's body, when coupled with Coleman's testimony, it provides an adequate factual basis for the jury to infer that the petitioner did so. Accordingly, the petitioner's claim is without merit.

---

[2] Coleman testified at the petitioner's hearing in probable cause pursuant to General Statutes § 54-46a, but died before the petitioner's trial. The transcript of Coleman's testimony was introduced into evidence at the petitioner's trial under the former testimony exception to the hearsay rule. <u>Skakel</u>, 276 Conn. at 711, Appendix D.

Finally, the petitioner claims that "the fact that the Petitioner told several people he had masturbated in a tree the night the victim was killed does not support the inference that he actually masturbated on or near the victim's body." Petitioner's Memorandum at 102. In support of his contention, the petitioner argues that "the tree that the Petitioner claimed to have masturbated in was *not* the tree under which the victim's body was found, nor was it near the drag path." (Emphasis in original.) Id. The petitioner's claim fails because it is not supported by the record.

The record shows that in 1987, the petitioner told Michael Meredith that on the night of the murder, he climbed a tree from which he could see into Martha Moxley's window, and that he masturbated while watching her through the window. Transcript, 5/20/02 at 112, Appendix T. However, in 1991 or 1992, the petitioner told Andrew Pugh that he was masturbating in the tree under which the victim's body was subsequently found. Id., at 165. The evidence presented at trial makes clear that the tree referred by Meredith and the tree referred to by Pugh were different trees. Transcript of proceedings on May 7, 2002, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 86-87, 116, Appendix T; State's Exhibits 4, 14 and 40, Appendix U. The record shows, therefore, that in the earlier 1990's, when the advent of DNA technology made it even more urgent for the petitioner to explain away the possible presence of his semen at the crime scene, the petitioner changed the tree in which he claimed to have been masturbating from the tree in front of Martha Moxley's window to the tree under which her body was found. Thus, contrary to the petitioner's claim, the evidence strongly supports the inference that the petitioner masturbated on the victim's body and that he devised a story about masturbating in a tree in an effort to conceal that fact.

Accordingly, the Connecticut Supreme Court reasonably concluded that the prosecutor's argument did not misrepresent the chronology of events regarding the "forensic cover-up" carried out by the petitioner.

**b.    Comment that DNA evidence was the "real deal"**

During his closing argument, the prosecutor asserted that by 1991 or 1992, DNA was "the real deal" and that "every criminal investigator on the planet was totally attuned to this miraculous new technology." Transcript, 6/3/02 at 11, Appendix T.  On appeal, the petitioner claimed that theses assertions were improper because they were unsupported by the record. Petitioner's Supreme Court brief at 52-53, Appendix A.  In rejecting the petitioner's claim, the Connecticut Supreme Court noted that there was not a great deal of testimony regarding the state of DNA science in 1992.  The court concluded, therefore, that the prosecutor's comments "might be characterized as something of an overstatement of that testimony." State v. Skakel, 276 Conn. at 751, Appendix D.  Nevertheless, the court observed that by 1992, "professional investigators, such as Sutton Associates, undoubtedly were aware of DNA technology and its enormous potential in the forensic arena." Id. Noting that the petitioner did not object to the comments at trial and recognizing that advocates must be afford leeway in argument, the court concluded that the prosecutor's comments did not deprive the petitioner of his right to a fair trial. Id., at 751-52.

The petitioner now claims that the Connecticut Supreme Court "incorrectly found that the [prosecutor's] improper comment about DNA evidence being the 'real deal' did not violate [his] due process rights." Petitioner's Memorandum at 103.  In order to prevail on his claim, the petitioner must show that the court's ruling was contrary to, or an

unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399. The petitioner clearly cannot do so here.

The controlling precedent for claims of prosecutorial misconduct during argument is the United States Supreme Court's decision in Darden v. Wainwright, supra. In Darden, the court held that when determining whether the prosecutor's remarks violated the defendant's right to a fair trial, "[t]he relevant question is whether the . . . comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id., 477 U.S. at 181. Here, the record clearly supported the prosecutor's assertion that DNA technology was well known to criminal investigators by 1991. Transcript, 5/8/02 at 155, Appendix T.[3] Thus, if improper at all, the prosecutor's comments were nothing more than harmless hyperbole. Accordingly, the state supreme court reasonably concluded that the prosecutor's remarks did not infect the trial with unfairness to such a degree that it resulted in a denial of due process. See Darden, 477 U.S. at 181; Donnelly v. DeChristoforo, 416 U.S. at 643.

### 2. The prosecutor's argument that the Skakel family had created an alibi for the petitioner

In his closing argument, the prosecutor asserted that the petitioner's family, and in particular, the petitioner's father, Rushton Skakel, Sr., "had 'produced' an alibi for the [petitioner] after the murder." State v. Skakel, 276 Conn. at 753-54, Appendix D. Specifically, the prosecutor argued that on the day the victim's body was found, someone in the Skakel family, most likely the petitioner's father, had decided to send the petitioner,

---

[3] The Connecticut Supreme Court also took judicial notice of the fact that DNA technology was being used in criminal investigations in the state as early as 1989. Skakel, supra, 751 n.101, Appendix D; see State v. Hammond, 221 Conn. 264, 278, 604 A.2d 793 (1992).

Thomas Skakel, John Skakel and their cousin, James Dowdle, to the family's hunting lodge in Windham, New York, to shield them from the police and give them time to construct a story. Id., at 754. Finally, the prosecutor asserted that a few weeks after the trip, after the petitioner's alibi witnesses had time to construct a cohesive story, the petitioner's father escorted them to the police station where they gave unsworn statements to the police. Id.

On appeal, the petitioner claimed that the prosecutor "fabricated an elaborate story about a Skakel family 'conspiracy' to falsify evidence that would supply [him with] an alibi . . . ." Petitioner's Supreme Court brief at 53, Appendix A. The petitioner argued that the prosecutor did so "without a shred of evidence" to support his theory. Id. The Supreme Court rejected the petitioner's claim. State v. Skakel, 276 Conn. at 754, Appendix D.

The court concluded that the prosecutor's argument that Kenneth Littleton was directed to take the petitioner and the other children to Windham in order to keep them from being questioned by the police was based on reasonable inferences drawn from the testimony of Littleton and the petitioner's father. State v. Skakel, 276 Conn. at 754-55, Appendix D. The court noted that after the victim's body was discovered, a number of persons had descended on the Skakel residence apparently for the purpose of taking control of the situation. Furthermore, the petitioner, his older siblings and his cousin had been whisked away to Windham as soon as possible after the murder. Id., at 755. Because the only family members to go to Windham were the chief proponents of the petitioner's alibi, the court concluded that it was "proper for the [prosecutor] to argue that the trip had been arranged for the purpose of placing these crucial witnesses temporarily out of reach of the authorities in order to give them time top prepare a unified account of the events that occurred on the night of the murder." Id. Moreover, the court concluded

that it was not improper for the prosecutor to urge the jury "to infer that the petitioner's father had been instrumental in orchestrating the petitioner's alibi." Id.

The petitioner now claims that "[t]he Connecticut Supreme Court's decision was unreasonable based on the facts presented at trial." Petitioner's Memorandum at 105. The petitioner's claim fails because the evidence reasonably supports an inference that the petitioner's family undertook an effort to produce an alibi for him. See United States v. Suarez, 588 F.2d at 354; Ceja v. Stewart, 97 F.3d at 1253-54.

On direct examination, Kenneth Littleton testified that when he returned to the Skakel's house after work on the day following the murder, there were ten to fifteen men in the house whom Littleton believed to be lawyers. He testified that one of the lawyers directed him to take several of the Skakel children to the family's hunting lodge in Windham, New York. Transcript of proceedings on May 9, 2002, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 175-76, Appendix T. Littleton did not recall whether the petitioner's father had returned home at the time he was directed to take the children to the hunting lodge. Id. The following morning, Littleton left for Windham with the petitioner, John Skakel, Tommy Skakel and their cousin, James Dowdle.[4]  The petitioner's older brother, Rushton Skakel, Jr. went back to college that morning. The petitioner's sister, Julie Skakel, and his two younger brothers, Stephen and David, stayed behind at the Skakel residence. Id., at 175-76.

On cross-examination, Littleton testified that the decision to take the Skakel children to the Windham house was "made as a group" and that he probably volunteered to take

---

[4] "Dowdle also was known as James Terrien." State v. Skakel, 276 Conn. at 640 n.5, Appendix D.

the children to the house after he learned about it. Transcript of proceedings on May 13, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 17, 20-23, Appendix T.  On redirect examination, Littleton testified that he could not have know known about the house in Windham prior to that time, so he believed that one of the lawyers told him about it. <u>Id</u>., at 139.  The petitioner's father, Rushton Skakel Sr., testified that he did not recall directing Littleton to take the children to Windham, but  stated that Littleton would not have had the authority  to take the children anywhere without his permission. Transcript, 5/15/02 at 79, Appendix T.

James Lunney, a former detective with the Greenwich Police Department, testified that he contacted the petitioner's father on November 14, 1975, and asked him to bring his children to the police station to provide statements about their activities on the day of the murder.  Lunney testified that the following day, the petitioner's father brought all of his children, with the exception of Rushton Skakel, Jr., to the police station. Transcript of proceedings on May 28, 2002, <u>State v. Skakel</u>, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 83, Appendix T. Lunney testified that the petitioner's father remained in the room with the petitioner while he gave his statement. <u>Id</u>. at 112-13.

In his statement, the petitioner indicated that on the night of the victim's murder, he went with his brothers, Rushton Skakel, Jr. and John Skakel, and his cousin, James Dowdle, to Dowdle's house to watch the televison program "Monty Python's Flying Circus." State's Exhibit 112, Appendix U.  The petitioner claimed that they stayed at Dowdle's house until between 10:30 and 11:00 p.m. and then returned home.  The petitioner indicated that he went to bed shortly after returning home and that he did not leave the house again that night. <u>Id</u>.

The evidence, therefore, shows that on the day that the victim's body was discovered, a group of individuals whom Kenneth Littleton believed to be lawyers descended upon the Skakel house. After consultation with Littleton, and with the acquiescence of the petitioner's father, Rushton Skakel, Sr., the lawyers decided to have Littleton take the petitioner, his brothers, John and Tommy, and his cousin, James Dowdle, to a residence owned by the family in New York. After the petitioner, his brothers and his cousin returned from New York, the petitioner's father escorted them to the police station where they gave the statements regarding their activities on the night of the murder. The petitioner's statement included an alibi for his whereabouts at the time of the victim's murder that relied on his brothers, Rushton, Jr. and John, and his cousin, Dowdle, for confirmation.

This evidence would have permitted the jury to infer that the individuals who appeared at the Skakel residence on the day that the victim's body was discovered were, in fact, lawyers employed by the petitioner's farther who were directing the Skakel family's response to the victim's murder. The jury could also have inferred that the decision to send the petitioner and his brothers to New York was to shield them from investigators and to give them time to create an alibi for the petitioner. Indeed, Dowdle, who was neither a witness nor a suspect, would have had no reason to go to the Windham house except to participate in the production of an alibi for the petitioner. Moreover, the fact that the alibi that the petitioner eventually did offer to the police relied extensively on persons who had accompanied him to New York provides additional basis from which to infer that the purpose of the trip was to allow the time to devise and coordinate a false alibi.

It is, therefore, clear that the inferences that the prosecutor asked the jury to draw regarding the Skakel family's creation of an alibi for the petitioner were reasonably based on the evidence. See Darden v. Wainwright, 477 U.S. at 181-82; Ceja v. Stewart, 97 F.3d at 1253-54. Accordingly, the Connecticut Supreme Court's ruling was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399.

### 3. Prosecutor's argument that the Skakel family believed that the petitioner had killed the victim

In his closing argument, the prosecutor outlined the reasons why the petitioner had been sent to Elan, underscoring the evidence demonstrating that the petitioner's family had sought to shield him from the police and that Elan administrators routinely confronted him about the victim's murder. State v. Skakel, 276 Conn. at 757, Appendix D. He stated that:

> "You heard from Rogers and Coleman [that] he was being hidden from the police is probably part of it. It is likely, also, if it was a private juvenile justice system, basically a family's response is what we can do to make sure this doesn't happen again. And where does that ring the truest? At the horrible general meeting with the monster himself, Joe Ricci."

Skakel, supra, 757-58, Appendix D. The prosecutor emphasized the actions of Joe Ricci, the director of Elan, in confronting the petitioner regarding the murder. Id. The prosecutor then made the following argument:

> "Where did Ricci get that information? Clearly, he didn't get it from the police. Why did Ricci confront the [petitioner] with that information? The answer, the only one that makes sense, lies in why his family felt a need to put him in that awful place. Why? Because that's what they decided they had to do with the killer living under their roof."

Skakel, supra, 758, Appendix D.

On appeal, the petitioner argued that the prosecutor's argument was based on statements that the Skakel family had allegedly made to Joe Ricci. The petitioner,

therefore, claimed that argument was improper because it was based on inadmissible hearsay evidence. Petitioner's Supreme Court brief at 57-58, Appendix A. The Connecticut Supreme Court rejected the petitioner's claim. The court concluded that the prosecutor's argument was not based on the presumed hearsay statements of the Skakel family, but, rather, was based on the testimony of Dorothy Rogers and Gregory Coleman, both of whom testified that the petitioner told them that his family had sent him to Elan to shield him from the police. State v. Skakel, 276 Conn. at 757, Appendix D; Transcript, 5/17/02 at 136-38; Appendix T; Transcript of proceedings on May 16, 2002, State v. Skakel, Case No. CR00-135792-T, Judicial District of Stamford-Norwalk, at 136-38, Appendix T.

The petitioner also claimed that the prosecutor's argument was improper because he "asked the jury to conclude that [the petitioner] was guilty of murder *because even his own family thought that he was the 'killer.'*" (Emphasis in original.) Petitioner's Supreme Court brief at 57, Appendix A. The petitioner argued that "any belief of the Skakel family concerning the [petitioner's] guilt is irrelevant and inadmissible as evidence." Id. The state supreme court rejected the petitioner's argument. The court concluded that the focus of the prosecutor's argument was not on the opinion of Skakel family regarding the petitioner's guilt, but, rather, was on "the likelihood that the [petitioner] had disclosed his involvement in the murder to one or more members of his family." State v. Skakel, supra, 759, Appendix D.

Accordingly, the Connecticut Supreme Court found that it was not improper for the prosecutor to argue that "Elan administrators likely had learned from the [petitioner's] family about [his] involvement in the victim's murder. . . ." Skakel, 276 Conn. at 759, Appendix D.

The petitioner now claims that the Connecticut Supreme Court's ruling "that no misconduct occurred was unreasonable in light of the facts presented at trial." Petitioner's Memorandum at 109. In advancing his claim, however, the petitioner does nothing more than ask this court to accept the interpretation of the prosecutor's argument that was rejected on direct appeal by the state supreme court. Id. The petitioner, however, cannot obtain federal habeas corpus relief on the basis of such a claim.[5]

In order to prevail on his claim, the petitioner must show that the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . ." 28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. at 399. "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings . . . of the [Supreme Court] as of the time of the relevant state-court decision." Id., at 411. Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme Court's] jurisprudence." Id. Here, the petitioner's claim fails because it is not based on the precedent of the United States Supreme Court.

The petitioner is unable to point to a single Supreme Court case that supports his claim. Indeed, the only federal case that the petitioner cites is Arpan v. United States, 260 F.2nd 649 (8th Cir. 1958), a 1958 Eighth Circuit decision. It is well established, however,

_____

[5] The petitioner contends that "the Connecticut Supreme Court's conclusion that these statements were not improper is an unreasonable determination of the facts." Petitioner's Memorandum at 111. It is, however, well-established under Connecticut law that appellate tribunals do not find facts. State v. Lawrence, 282 Conn. at 156; Weil v. Miller, 185 Conn. at 502. Thus, the determination of whether the prosecutor's argument was supported by the record is a question of law. See United States v. Suarez, 588 F.2d at 354; Ceja v. Stewart, 97 F.3d at 1253-54. The petitioner's claim, therefore, should be analyzed under § 2254(d)(1).

that a claim for relief under § 2254(d)(1) cannot be based on a circuit court ruling. Del Valle v. Armstrong, 306 F.3d at 1200; Mask v. McGinnis, 252 F.3d at 90.  In any event, the Eighth Circuit's ruling in Arpan v. United States addressed the admission of immaterial evidence and not improper argument by the prosecutor. See id., 260 F.2d at 658. Thus, the court's decision in Arpan lends no support to the petitioner's claim.  The petitioner's claim is, therefore, entirely without merit and should be rejected.

### 4. Prosecutor's use of the terms "killer" and "spoiled brat" to refer to the petitioner

On appeal, the petitioner characterized the prosecutor's use of the terms "killer" and "spoiled brat" to describe him as "highly prejudicial name-calling." Petitioner's Supreme Court brief at 58, Appendix A.  The Connecticut Supreme Court rejected both of the petitioner's claims.  The court concluded that when viewed in context, the prosecutor's use of the word "killer" was "neither gratuitous nor inflammatory." State v. Skakel, 276 Conn. at 759-60.  Rather, the court found that the prosecutor had merely "used the term as a shorthand for 'the person who had killed the victim.'" Id., at 760.  The court concluded, therefore, that "the challenged reference was benign." Id.  The court observed, however, that "it would have been preferable for the [prosecutor] to have avoided using the moniker, "spoiled brat" in referring to the [petitioner]." Id, at 761.  Nevertheless, the court stated that "[w]hen the objectionable references are viewed in the context of the entire trial . . . it is apparent that they were isolated, relatively innocuous and not unduly prejudicial to the [petitioner]."  The court concluded that "[b]ecause there [was] no likelihood that the challenged comments affected the fairness of the [petitioner's]  trial, his claim of a due process violation [was] clearly without merit. Id.

The petitioner now claims that "it was contrary to established law for the Connecticut Supreme Court to find that the prosecutor's improper name-calling did not violate [his] right to a fair trial." Petitioner's Memorandum at 115. In order to prevail on his claim, the petitioner must show that the state supreme court's ruling was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). The petitioner clearly cannot do so on this record.

The controlling federal precedent for claims of prosecutorial misconduct during argument is the United States Supreme Court's decision in Darden v. Wainwright, supra. In Darden, the court held that when determining whether the prosecutor's remarks violated the defendant's right to a fair trial, "[t]he relevant question is whether the . . . comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id., 477 U.S. at 181. Thus, to be entitled to relief, the petitioner "must show that 'he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" Tankleff v. Senkowski, 135 F.3d 235, 252 (2nd Cir. 1998), quoting Bentley v. Scully, 41 F.3d 818, 823 (2nd Cir. 1994). When the brevity and benign nature of the prosecutor's remarks are considered, it is impossible to conclude that they had a "substantial and injurious effect" on the jury's verdict. See Tankleff, supra, 253; Bentley, supra, 825.

The Connecticut Supreme Court, therefore, reasonably concluded that the prosecutor's remarks did not infect the trial with unfairness to such a degree that it resulted in a denial of due process. See Darden, 477 U.S. at 181; Donnelly v. DeChristoforo, 416 U.S. at 643. Accordingly, the petitioner has failed to show that he is entitled to federal habeas corpus relief. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399.

### 5. Prosecutor's argument that the petitioner had masturbated on the victim's body

In his closing argument, the prosecutor urged the jury to conclude that, after killing the victim, the petitioner pushed her legs apart and masturbated on her dead body. Transcript, 6/3/02 at 12, 112, Appendix T; State v. Skakel, 276 Conn. at 762-63, Appendix D. On appeal, the petitioner claimed that the prosecutor's argument was improper because it was not supported by the record. The petitioner asserted that "[t]here was no semen found on the victim's body or at the scene of the crime, and the state knew it. . . ." Petitioner's Supreme Court brief at 58, Appendix A. The petitioner argued that it was improper for the state to base its argument on Gregory Coleman's testimony because it was inherently unreliable. Id., at 59 n.78. In addition, Coleman stated that the petitioner told him that he masturbated on the victim's body two days after he had killed her. In fact, the victim's body was found the day after she was killed. The petitioner claimed, therefore, that Coleman's "story was not true and could not have been true." Id. The petitioner also maintained that the prosecutor's argument that the blood smears on the victim's thighs supported his claim that the petitioner had masturbated on her body was "groundless and highly prejudicial." Id., at 59 n.79. Finally, the petitioner claimed that the prosecutor's argument was improper because it was inconsistent with the results of the autopsy, which had failed to disclose the presence of semen. Id., at 58-59.

The Connecticut Supreme Court rejected the petitioner's claim. The court noted that the jury was free to credit one aspect of a witness's testimony while discrediting other portions of that testimony. The court concluded, therefore, that it was not improper for the prosecutor to base his argument on Coleman's testimony. State v. Skakel, 276 Conn. at 763, Appendix D. The court also indicated that Lee's testimony regarding the blood

smears on the victims thighs, when coupled with Coleman's testimony, supported the conclusion that the petitioner had masturbated on the victim. Id. Finally the court observed that Dr. Harold W. Carver, the chief medical examiner, testified that although the pathologist who performed the autopsy failed to detect the presence of semen in the victim's pubic region, there was nothing in the autopsy report to suggest that any attempt had been made to determine whether semen was present on any other part of the victim's body. The court ruled that "[b]ecause the autopsy did not rule out the possibility of the existence of semen on those other parts of the victim's body, the [prosecutor's] argument underscoring that possibility was not improper. Skakel, 276 Conn. at 763-64, Appendix D.

The petitioner now contends that the state supreme court's ruling rejecting his claim was the result of "an unreasonable determination of the facts presented at trial." Petitioner's Memorandum at 116.[6] The petitioner's claim fails because the record amply supports the prosecutor's argument that the petitioner masturbated on the victim's body.

At trial, the transcript of Gregory Coleman's testimony from the probable cause hearing was read to the jury. In his testimony, Coleman stated that while they were students at the Elan school, the petitioner told him that he had killed the victim by hitting her with a golf club. The petitioner also told Coleman that he returned to the body two days later and masturbated on it. Transcript, 5/17/02 at 136-38, Appendix T. Dr. Henry Lee testified that the reddish marks found on the inside of the victim's thighs were consistent with bloody hands attempting to push the victim's legs apart. Transcript, 5/8/02 at 149,

---

[6] The petitioner again contends that the Connecticut Supreme Court's ruling was the result of on an unreasonable determination of the facts. Petitioner's Memorandum at 116. It is clear, however, that the determination of whether the prosecutor's argument was reasonably based on the evidence is a question of law. See United States v. Suarez, 588 F.2d at 354. This claim, therefore, should also be analyzed under § 2254(d)(1).

Appendix T.  Finally, Dr. Harold W. Carver, the state's chief medical examiner, testified that the autopsy report indicated that the medical examiner who performed the autopsy on the victim examined the body for the presence of semen in the pubic region and the anus. Transcript, 5/8/02 at 93, 101-102, Appendix T.  Dr. Carver stated, however, that there was no indication in the autopsy report that the medical examiner who conducted the autopsy examined the victim's buttocks, or any other part of her body, for the presence of semen. Id., at 103.

It is well established that a prosecutor may argue reasonable inferences based on the evidence. United States v. Suarez, 588 F.2d at 354.  "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d at 1253-54, quoting United States v. Baker, 10 F.3d at 1415.  In this case, the record fully supports the prosecutor's contention that the petitioner masturbated on the victim's body.

Gregory Coleman testified that the petitioner admitted to him that he masturbated on the victim's body after he had killed her.  The jury is, of course, entitled to credit that testimony and reject any conflicting testimony. State v. Mullins, 288 Conn. at 366; accord United States v. Khan, 53 F.3d at 514.  Moreover, the jury was entitled to credit part of Coleman's testimony and disbelief other parts. State v. Meehan, 260 Conn. 372, 381, 796 A.2d 1191 (2002).  Coleman's testimony alone, therefore, provided a sufficient basis for the prosecutor's argument.  Dr. Lee's testimony provided further support for the prosecutor's argument by suggesting that the victim's body had been manipulated after her death to expose her genitals to view.  Finally, Dr. Carver's testimony removed any conflict

in the evidence caused by the fact that no semen was detected on the body during the autopsy. It is, thus, clear that the record in this case provides ample support for the prosecutor's argument that the petitioner masturbated on the victim's body after he had beaten her to death with a golf club.

Accordingly, the petitioner has failed to show that the Connecticut Supreme Court's ruling rejecting his claim was either contrary to, or a unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399.

### 6. Prosecutor's use of an audiovisual display in his closing argument

On direct appeal, the petitioner claimed that the state's "manipulative use of the of prejudicially edited evidence during the summation was improper." Petitioner's Supreme Court brief at 61, Appendix A. The petitioner argued that the state had "literally produced an audio-visual confession by flashing huge six-foot high gruesome images of the victim's body at the murder scene while simultaneously playing an edited audiotape of [the petitioner's] admission of 'guilt' – *about a different event*. (Emphasis in original.) Id., at 59-60. The petitioner complained that "[t]he prosecutor turned [the petitioner] into a narrator of the murder by splicing together a deceptively edited version of his taped interview . . . in which the [petitioner] described his guilty feelings about masturbation, as a voice-over to horrific photographs of the murder scene." Id., at 60.

The Connecticut Supreme Court concluded that it was not improper for the prosecutor to play for the jury two minutes of the petitioner's tape-recorded interview with Richard Hoffman and to display photographs of the victim while the tape was being played. State v. Skakel, 276 Conn. at 767-68, Appendix D. The court noted that the presentation consisted of the written transcript of the interview, which the jury had already seen, the

corresponding audio and three unaltered pictures of the of the victim that had been admitted into evidence. Id., at 769. The court stated that by juxtaposing the photographs of the victim with the petitioner's statements, the prosecutor "sought to convey to the jury in graphic form what the state believed was the real reason for the [petitioner's] panic, that is, that he had killed the victim." Id. The court, therefore, was not persuaded that there was a reasonable likelihood that the state's presentation confused the jury or prejudiced the [petitioner] in any way. Id.

The court also rejected the petitioner's claim that "the state 'splic[ed] together a deceptively edited version of his [taped-recorded] interview with Hoffman' so as to omit critical portions of the [petitioner's] comments indicating that the reason he woke up in a panic was that he feared that someone may have seen him masturbating the night before." State v. Skakel, 276 Conn. at 769 n.106, Appendix D, quoting Petitioner's Supreme Court brief at 60, Appendix A. The court found that, contrary to the petitioner's claim, "the segment of the interview that the state played for the jury, in which the [petitioner] described his feelings of panic upon waking up the morning after the murder, was not altered or spliced in any way." Skakel, supra, 769 n.106, Appendix D. Accordingly, the court rejected the petitioner's claim that the prosecutor's use of audiovisual aides during closing argument violated his right to a fair trial. Id., at 769.

The petitioner now claims that the state supreme court's finding that the prosecutor's "use of a deceptive audio-visual display was proper is an unreasonable determination of the fact[s] given the evidence." Petitioner's Memorandum at 120. It is well established, however, that appellate tribunals do not assess credibility or find facts. State v. Lawrence, 282 Conn. at 156; Weil v. Miller, 185 Conn. at 502. Accordingly, the issue decided by the

state supreme court – whether the audio-visual presentation was proper – was a question of law and not of fact. See United States v. Suarez, 588 F.2d at 354. The petitioner's claim should, therefore, be assessed under § 2254(d)(1) rather than § 2254(d)(2).

In order to prevail on his claim, therefore, the petitioner must show that the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. at 399. Here, the petitioner is unable to point to any United States Supreme Court precedent, or indeed, any authority at all, in support of his claim. Instead, he merely complains that the Connecticut Supreme Court did not view the prosecutor's presentation as distorted or deceptive. In advancing his claim here, the petitioner does nothing more than ask this court to accept the interpretation of the audio-visual presentation that was rejected by the state supreme court. The petitioner, however, cannot obtain federal habeas corpus relief on the basis of such a claim. See id.

The petitioner has failed to show that the Connecticut Supreme Court's ruling on the audio-visual presentation was contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. at 399.

### 7.    The cumulative effect of the alleged misconduct

The petitioner claims that when his claims are "viewed collectively, it is even more apparent that the State's conduct was improper and that it amounted to a denial of due process." Petitioner's Memorandum at 122. The petitioner's claim fails for two reasons.

First, the petitioner made no claim in his habeas corpus petition that he was entitled to relief because of the cumulative effect of the alleged misconduct by the prosecutor during closing argument. See Habeas Corpus Petition, paragraph 19, Ground Four. Rule

2 of the Rules Governing Section 2254 Cases requires the petitioner to "specify all grounds for relief" that he is seeking. Rule 15(b)(2) of the Federal Rules of Civil Procedure provides that "an issue not raised in the pleadings" can be tried by the consent of the parties. See Rule 11 of the Rules Governing Section 2254 Cases (application of the Rules of Civil Procedure to habeas petitions). Consequently, in Winthrop v. Williams, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), the United States Supreme Court held that the district court erred in granting relief to a petitioner whose claim not properly raised in his habeas corpus petition. Id., 507 U.S. at 696. Here, the petitioner's claim regarding the cumulative effective of the alleged misconduct was not properly raised in his habeas corpus petition and should not, therefore, be considered.

Second, if this court reaches the merits of the petitioner's claim, the petitioner is not entitled to habeas corpus relief because, when the trial is considered as a whole, he has failed to meet the stringent standard for showing a due process violation on a claim of prosecutorial misconduct. The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is "'the narrow one of due process and not the broad exercise of supervisory power'" Darden v. Wainwright, 477 U.S. at 181, quoting Donnelly v. DeChristoforo, 416 U.S. at 642. Accordingly, "the Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between "ordinary trial error of a prosecutor and that sort of egregious . . . amount[ing] to a denial of due process." (Alterations in original.) Floyd v. Meachum, 907 F.2d 347, 353 (2nd Cir. 1990), quoting, Donnelly, supra, 647-48. "Under the standard of Donnelly, the question before a federal . . . court is whether 'the prosecutorial remarks were so prejudicial that they rendered the

trial in question fundamentally unfair.'" Floyd v. Meachum, 907 F.2d at 353, quoting Garofolo v. Coomb, 804 F.2d 201, 206 (2nd Cir. 1986).

When this standard is applied to the claims raised by the petitioner in this case, it is clear that he has fallen far short of showing that the alleged misconduct by the prosecutor in his closing argument "rendered [his trial] fundamentally unfair." Garofolo, supra, 206. Accordingly, the petitioner is not entitled to federal habeas corpus relief as a result of the cumulative effect of the alleged misconduct. Cf. Floyd v. Meachum, 907 F.2d at 353 (cumulative effect of prosecutor's persistent and clearly improper remarks amounted to such egregious misconduct as to render trial fundamentally unfair).

### E. The Petitioner Is Not Entitled to Habeas Corpus Relief Because the Trial Court Admitted Statements That He Made While a Student at the Elan School

In his petition for a writ of habeas corpus, the petitioner claims that admission of the testimony regarding the statements that he made while a student at the Elan School violated his right to due process of law because the statements were the product of coercion. Habeas Corpus Petition, paragraph 19, Ground Six. The petitioner's claim should be rejected because the Connecticut Supreme Court reasonably applied the governing principles of the United States Supreme Court's ruling in Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed. 473 (1986).

In his memorandum of law, the petitioner contends that "the Connecticut Supreme Court's reliance on Colorado v. Connelly was improper." Petitioner's Memorandum at 125. The petitioner claims that "the use of an involuntary confession in a criminal trial is a denial of due process of law." Id. He acknowledges that in Connelly, the Supreme Court held that "state action is required in order for the admission of an involuntary confession to constitute

a violation of a defendant's federal due process rights. . . ." Id., at 126. Nevertheless, the petitioner argues that Connelly "is distinguishable, is not controlling and should not have been relied on by the Connecticut Supreme Court." Id. He suggests that Connelly is not the controlling precedent because the confession in that case was the result of the defendant's mental illness while the statements at issue here were obtained through "torture or beating." Id. When the holding in Connelly is considered, however, it is clear that the petitioner's attempt to distinguish the case is completely unavailing.

In Connelly, the "the Supreme Court of Colorado held that the United States Constitution requires a court to suppress a confession when the mental state of the defendant, at the time he made the confession, interfered with his 'rational intellect' and his 'free will.'" Colorado v. Connelly, 479 U.S. at 159. In reversing the decision, the Supreme Court observed that "[t]he difficulty with the approach of the [Colorado court] is that it fails to recognize the *essential link* between coercive activity of the State, on the one hand, and a resulting confession by the defendant, on the other." (Emphasis added.) Id., at 165. The court further noted that "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." Id., at 166. Accordingly, the court held that "coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id., at 167.

When this language is considered, it is clear that the Connecticut Supreme Court correctly determined that Colorado v. Connelly was the controlling United States Supreme Court precedent for the petitioner's claim and reasonably applied that precedent. The petitioner's claim is, therefore, entirely without merit.

Alternatively, the petitioner claims that <u>Colorado v. Connelly</u> was wrongly decided and should not have been followed by the Connecticut Supreme Court. In making this claim, the petitioner overlooks the fact that both the Connecticut Supreme Court and this court are bound by United States Supreme Court's interpretation of the Constitution. Indeed, in <u>Jaffre v. Wallace</u>, 705 F.2d 1526 (11th Cir. 1983), the Eleventh Circuit observed that "[u]nder our form of government and long established law and custom, the Supreme Court is the ultimate authority on the interpretation of our Constitution. . . .; it's interpretations may not be disregarded. . . . If the Supreme Court errs, no other court may correct it." <u>Id</u>., at 1532-33; <u>see</u> <u>also</u> <u>Hutto v. Davis</u>, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1985) ("But unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.)

Accordingly, the petitioner has failed to show that he is entitled to federal habeas corpus relief and his claim should, therefore, be rejected. <u>See</u> 28 U.S.C. § 2254(d)(1); <u>Williams v. Taylor</u>, 529 U.S. at 399.

III.    **CONCLUSION**

For the reasons set forth above, in the respondent's motion for summary judgment and in the memorandum of law submitted in support of that motion, this court should deny the petitioner's motion for summary judgment, grant the respondent's motion for summary judgment and deny the relief requested by the petitioner in his habeas corpus petition.

Respectfully submitted,

PETER J. MURPHY, WARDEN
MacDOUGALL-WALKER CORRECTIONAL
        INSTITUTION
DEPARTMENT OF CORRECTION
STATE OF CONNECTICUT

RESPONDENT

By:    ____/s/   Michael E. O'Hare_____
MICHAEL E. O'HARE
Supervisory Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
Telephone: (860) 258-5887
Facsimile: (860) 258-5968
E-mail: michael.ohare@po.state.ct.us
Fed. Bar. No. ct 05318

SUSANN E. GILL
Senior Assistant State's Attorney
Office of the State's Attorney
Judicial District of Fairfield
1061 Main Street
Bridgeport, Connecticut 06604
Telephone: (860) 579-6506
Facsimile: (860) 382-8401
E-mail: susann.gill@po.state.ct.us
Fed. Bar No. ct 05415

**CERTIFICATION**

I hereby certify that a copy of the foregoing document was mailed, first class postage prepaid, to Attorney Hope C. Seeley, Attorney Hubert J. Santos, and Attorney Sandra L. Snaden, Santos & Seeley P.C., 51 Russ Street, Hartford, Connecticut 06106, Tel. No. (860) 249-6548, Fax No. (860) 724-5533, on January 15, 2009.

_____/s/   Michael E. O'Hare_____
MICHAEL E. O'HARE
Supervisory Assistant State's Attorney